FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2012 NOV -9  PM 3: 11

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANDREW COX, LUCINDA COX,                    )    Civil Action No.:
And STEPHANIE SNYDER                        )    CLASS ACTION
Individually and on behalf of               )
others similarly situated,                  )
                                            )
        Plaintiffs,                         )
                                            )
v.                                          )
                                            )
SHERMAN CAPITAL LLC;                        )    **JURY TRIAL DEMANDED**
                                            )
MEETING STREET PARTNERS II INC.;            )
                                            )
SHERMAN FINANCIAL GROUP LLC                 )
                                            )    **1: 12 -cv- 1 6 5 4 TWP -MJD**
SHERMAN CAPITAL MARKETS LLC;                )
                                            )
LVNV FUNDING LLC;                           )
                                            )
RESURGENT CAPITAL SERVICES LP;              )
                                            )
SHERMAN ORIGINATOR LLC;                     )
                                            )
SHERMAN ORIGINATOR III, LLC;                )
                                            )
SHERMAN ACQUISITION, LLC;                   )
                                            )
BENJAMIN W. NAVARRO;                        )
                                            )
LESLIE G. GUTIERREZ;                        )
                                            )
SCOTT E. SILVER;                            )
                                            )
KEVIN P. BRANIGAN;                          )
                                            )
ROBERT A. RODERICK;                         )
                                            )
KENNETT KENDALL;                            )
                                            )
and JOHN DOES 1-50.                         )
                                            )
Defendants.                                 )

<u>**CLASS ACTION COMPLAINT SEEKING DECLATORY AND EQUITABLE RELIEF AS WELL AS ACTUAL AND STATUTORY DAMAGES AND DISGOREMENT OF FUNDS**</u>
**JURY DEMAND**

1    On behalf of the putative class, Plaintiffs, ANDREW COX, LUCINDA COX and STEPHANIE SNYDER, by their attorneys, for its Complaint herein against Sherman Financial Group LLC ("SFG"), Sherman Capital LLC ("Sherman Capital"), Meeting Street Partners II Inc. ("MSPII"), Sherman Capital Markets LLC ("SCM"), LVNV Funding LLC ("LVNV"), Resurgent Capital Services LP ("Resurgent"), Sherman Originator LLC ("SOLLC"), Sherman Originator III LLC("SOLLCIII"), Sherman Acquisition LLC ("SALLC"); Benjamin W. Navarro; Leslie G. Guitierrez; Scott E. Silver; Kevin P. Branigan; Robert A. Roderick; and Kennett Kendall (collectively "Individual Defendants") (hereinafter all the Defendants are collectively referred to as "Sherman") allege violations of the Fair Debt Collection Practices Act, 15 USC 1692 *et seq.* ("FDCPA"); fraud; restitution; unjust enrichment; and violation of the United States Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(b), (c) & (d) and 1964(c).

## <u>INTRODUCTION</u>

2    This action arises out of Defendants' actionable conduct in connection with a collection scheme they created to fraudulently manipulate consumers into paying money on an alleged obligation owed Defendants when the consumers did not actually owe Defendants the money.  The Defendants have all engaged in a fraudulent scheme under the guise of "debt buying."  Actually, the Defendants are buying information about a credit card receivable not legal ownership.  The Defendants

purchase a pool of information, securitize the pool of information into a Collateralized Debt Obligation (CDO), and collect on the information for a fee.

3   Defendants and their agents have engaged in fraudulent collection activity by impermissibly pulling credit reports, performing manual and automated outbound dialer calling activity, sending dunning letters, and filing lawsuits against Indiana residents with no legal ownership of a debt.

4   Plaintiffs maintain that Defendants' actions are quite simply unconscionable.

5   As such Plaintiffs, on behalf of the putative subclass, seek statutory damages under the FDCPA.

6   Ultimately, Plaintiff seeks a judgment ordering Defendants to disgorge their ill-gotten monies under common law fraud; restitution; and unjust enrichment and enter an award for the total amount of dollars collected from the putative subclass members over the last six years and treble damages.

7   Pursuant to RICO, *18 U.S.C. §§ 1961,* 1962(b), (c) and (d) and 1964(c), Plaintiff on behalf of the putative subclass seeks treble damages that they sustained as a result of Defendants' schemes and artifices to defraud, acts of mail fraud (pursuant to *18 U.S.C. §§ 1341*), and wire fraud (pursuant to *18 U.S.C. Sec. 1343).*

8   Plaintiffs further seek a Judgment declaring that Plaintiffs are under no obligation to render payment to any Defendant arising from alleged money owed by Plaintiffs to Defendants.

9   While the aforementioned illegal activities are visibly performed by LVNV and Resurgent, the strings are ultimately pulled by Sherman including Sherman Capital, MSPII, SFG, SCM, SOLLC, SOLLCIII, SALLC, and the Individual

Defendants.  Under the Third Restatement of Agency and Respondeat Superior, all the Defendants are liable for the acts of LVNV and Resurgent.

## JURISDICTION & VENUE

10   This Court has jurisdiction for all counts under 15 USC 1692k(d) and 28 USC 1331, 1337, 1367 because Plaintiffs' claims constitute a federal question arising under the FDCPA.

11   Venue in this District is proper because Plaintiffs reside here and Defendants do business in this District under 28 U.S.C. 1391.

12   With respect to Counts 1-9; this Court has jurisdiction over Defendants under 28 USC 1332(a).

13   The total amount in controversy for Count 1-9 exceeds $75,000 dollars exclusive of interest and costs.

14   This Court has jurisdiction for all counts under The United States Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(c) & (d) and 1964(c).

## PARTIES

### Plaintiffs

15   Plaintiff, Andrew Cox, is a natural person and citizen of the State of Indiana, residing in Marion County.  Andrew has 28 years of experience in banking and finance which included securitization and collection compliance.  Further, Andrew spent 5 years with the Federal Bureau of Investigation (FBI) as a financial analyst for corporate white collar crime.  Starting in June 2010, Andrew received collection letters and

phone calls from Defendants and a cadre of their agents regarding an alleged debt purchased by Defendants from Chase Bank USA NA. Despite his numerous written and telephonic requests for validation of the Defendants' ownership of an alleged debt, Defendants were unable to produce any documentation showing Defendants' purchase of the alleged debt other than an old Chase billing statement received November 25, 2011 but continued to contact Andrew.[1]   Further, Andrew notified the Defendants that LVNV was neither licensed nor registered in the State of Indiana. The Defendants and their agents continued to harass Andrew without regard to the dispute of legal ownership of an alleged debt.

16      Plaintiff, Lucinda Cox, is a natural person and citizen of the State of Indiana, residing in Marion County.  Lucinda is Andrew Cox's wife and co-signor on the alleged Chase Bank USA NA debt.  Lucinda's facts are the same as Andrew's in regard to receiving collection letters and phone calls from Defendants and their agents.

17      Plaintiff, Stephanie Snyder, is a natural person and citizen of the State of Indiana, residing in Marion County.  Defendants filed a Complaint in Hamilton County based on Stephanie's former address.  Stephanie had no knowledge of the Defendants nor the Complaint until the Proceeding Supplemental was mailed to her employer.  Based on an alleged ownership of a Sears/Citibank credit card supported by no documentation other than by a non-notarized, robo-signed affidavit[2]; Defendants

---

[1] See **Plaintiffs' Exhibit A**.
[2] See **Plaintiffs' Exhibit B**. The affidavit was signed by Tobie Griffin(who has also signed as notary on other cases). Tobie Griffin is identified only as an employee of Resurgent Capital Services, LP despite the fact that the Plaintiff is LVNV Funding. There is no mention of Sears and no mention of the chain of title from Sears to Citibank to LVNV. Tobie Griffin testifies to knowledge of LVNV's record keeping practices only.

obtained a default judgment and subsequently garnished Stephanie's paycheck starting in September 2012.[3]

**Defendants**

18   Defendants Benjamin W. Navarro, Leslie G. Gutierrez, Scott E. Silver, Kevin P. Branigan, Robert A. Roderick, and Kennett Kendall (the "Individual Defendants") are individuals believed to reside in South Carolina.  The Individual Defendants own, manage, direct, operate, supervise, and oversee the business activities of all the Sherman business entities, which are all interrelated in a clandestine and complex business structure.  The business address for each of these Individual Defendants is: 200 Meeting Street, Suite 206 Charleston, South Carolina 29401.

19   At the top of the "Sherman structure" are Defendants Sherman Capital, a Delaware limited liability company, and MSPII, a Delaware corporation, which own and operate SFG.  All of the other business entities are ultimately owned, controlled, and operated by SFG.  The Individual Defendants serve as directors, managers, and officers of the subsidiary business entities in varying capacities.  The business address for Sherman Capital and MSPII is 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.  The Registered Agent for both Sherman Capital and MSPII is: The Corporation Trust Company, Corporation Trust Center,1209 Orange Street, Wilmington, Delaware 19801.

20   Defendant SFG is a Delaware corporation headquartered at 335 Madison Avenue, Floor 19, New York, New York 10017.  SFG is the LVNV CDO arranger.  SFG consists of numerous assets holding and operating entities throughout the U.S. and

---

[3] *See* **Plaintiffs' Exhibit C.**

Mexico City, Mexico.[4] SFG is owned by Sherman Capital and/or MSPII. The Registered Agent for SFG is: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

21   Defendant SCM is a Delaware limited liability company. SCM is the LVNV CDO manager. SCM has a business address of 200 Meeting Street, Suite 206, Charleston, South Carolina 29401. The Registered Agent for SCM is: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

22   Defendant, LVNV is a Delaware limited liability company. LVNV is the CDO SPV. Officers of LVNV include: Benjamin W. Navarro, General Manager; Kevin Branigan, President; Scott E. Silver, Secretary; Leslie G. Gutierrez, Chief Financial Officer; and Kennett Kendall, Treasurer. According to the Indiana Secretary of State, LVNV's business address is 625 Pilot Rd, Suite 3, Las Vegas, NV 89119 and the Registered Agent in Indiana is CT Corporation System, 251 E. Ohio Street, Suite 1100, Indianapolis, IN 46204. LVNV was engaged in collection activity absent a license in Indiana operate as a consumer collection agency in violation of Indiana Code 25-11-1-3 and absent a certificate of authority (I.C. 23-17-26-1 and 23-1-49-1) or certificate of admission (I.C. 23-1-49-1) until February 16, 2012.

23   Defendant Resurgent is a Delaware limited partnership. Resurgent is the master servicer of the LVNV CDO. Resurgent is a limited partnership that was formed

---

[4] Other "Sherman Companies" include but not limited to: Credit One Bank NA, Ascent Card Services LLC, Ascent Card Services II LLC, Wentworth Street LLC, PYOD LLC, Limestone Asset Management LLC, Granite Asset Management LLC, Anson Street LLC, Ashley Funding Services LLC, SFG REO LLC, Nassau Mortgage LLC, Bermuda Road Properties, Resurgent Real Estate Inc., Alegis Group LLC, Sherman Capital Markets Original LLC, Sherman Originator II LLC, Sherman Acquisition LP, Sherman Acquisition II LP, Resurgent Capital Services PR, Ventus Capital Services LP, Grupo Consupago S.A. de C.V., Chedraui, Banco Facil, B-Line LLC.

between Alegis Group LLC (the General Partner holding a 1% ownership interest) and SFG (the Limited Partner holding a 99% ownership interest). According to the Indiana Secretary of State, Resurgent's business address is 15 S. Main Street, Suite 600, Greenville, South Carolina 29601 and the Registered Agent in Indiana is CT Corporation System, 251 E. Ohio Street, Suite 1100, Indianapolis, IN 46204.

24    Defendants SOLLC and SOLLCIII are Delaware limited liability companies. SOLLC and SOLLCIII are the sponsors and/or originators of the LVNV CDO. Both SOLLC and SOLLCIII's business address is: c/o Sherman Capital Markets LLC, 200 Meeting Street, Suite 206, Charleston South Carolina 29401. The Registered Agent for both SOLLC and SOLLCIII is: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

25    Defendant SALLC is a Delaware limited liability company. SALLC repackages and sells the information on consumers that Sherman deems too costly to collect upon for the LVNV CDO to third party buyers via internet brokers. SALLC may also originate for LVNV CDO. The principal business address of SALLC is 15 S. Main Street, Suite 600, Greenville, South Carolina 29601. The Registered Agent for SALLC is: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

26    John Does 1- 50 are the unknown co-conspirator actors, business entities, and agents in Sherman's fraudulent scheme at the time of filing.

## FACTUAL ALLEGATIONS

### A.   Securitization- Asset Backed Securities

27     Consumer awareness and the legal system have not fully comprehended the two game

changing evolutions that have greatly altered the world's financial landscape: (1)

Securitization and (2) Credit Derivatives. [5]

28     After the Savings and Loan Crisis of the 1980s, federal regulators and bank

shareholders encouraged financial institutions that it was more economical to dispose

of liability through securitization rather than to raise new capital to comply with the

Basel Accords.

29     An asset-backed security (ABS) is a manufactured financial instrument whose value

and income payments are derived from and backed by a specific pool of credit card

receivables by an originating bank.  Pooling the originating bank's receivables into

financial instruments allows them to be sold to outside investors, a process called

"securitization".  The originating bank transfers the receivables to a special purpose

vehicle (SPV).  The SPV bundles the underlying receivables.  The SPV creates and

sells securities, which represent an ownership not in a specific receivable but instead

an undivided interest in the entire pool.   The proceeds of the sale are paid to the

originating bank with a premium.  The receivables are held by a trustee.  Upon the

sale, the originating bank removes the risky underlying receivables from its balance

sheet. The outside ABS investors hire a third party to service the consumer payment

of the receivables for a fee.

---

[5] "This stuff is so complicated how is anybody going to know" and "the growth of derivatives: by far the most significant event in finance during the past decade" are the findings of the National Commission on the Causes of the Financial Crisis in the United States as part of the Fraud Enforcement and Recovery Act (Public Law 111-21), *Authorized Edition The Financial Crisis Inquiry Report* pg. 45 and 68 published by PublicAffairs January 2011.

30    The ABS and prospectus are registered with the Securities and Exchange Commission ("SEC").[6]

31    The main results of securitization are: 1) the originating bank is paid in full; 2) the originating bank surrenders all control and ownership over the receivables; 3) the outside investors own the receivables as result of a true sale; and 4) the originating bank cannot get the receivables back without violating IRS, SEC, and accounting rules.[7]

## B.  Credit Enhancements – Credit Default Swaps

32    Credit enhancements are a key part of the securitization process since they are guarantees that the risk-averse investors will get paid in full if there is a default of the receivables.  One type of credit enhancement is a credit derivative.  It is difficult to imagine a word that conveys less information about these complex financial instruments than "derivative."  To those who live in the real world, the term denotes something that has been extracted from a specific source, while "derivatives" as used by financial engineers has only a hypothetical connection with an asset that they interact with yet no ownership of the asset is conveyed to the derivative buyer.  It is "let's make believe" using real money.  The word that better describes derivatives is "synthetics" as credit derivatives reflect imaginary events.  A credit derivative did not finance a single credit card purchase nor benefit the consumer in any way.  Further, the consumer is never notified of the derivative transaction.  A credit derivative is simply a bet. Today's synthetic derivatives market even allows for betting on other people's bets.

---

[6] Cox's credit card was securitized into Chase Credit Card Master Note Trust & Snyder's credit card was securitized into Citibank Omni-S Master Trust Asset-Backed Securities formerly Sears Credit Account Master Trust II.
[7] Financial Accounting Standards Board Statement NO. 166-167

33    The most common type of credit derivative is the credit default swap (CDS).  A CDS is a written gambler's contract where a protection seller agrees to compensate the protection buyer for face value of the underlying referenced receivable should a "credit event" such as a consumer bankruptcy or payment default take place.  In exchange for the promise, the protection buyer pays a periodic premium payment to the protection seller.

34    The protection seller does not have legal ownership of the receivable but is solely placing a bet on whether the receivable will be paid or not.  The protection seller will lower its risk to pay the protection by selling off pieces of the bet to other protection sellers or "laying off" the bet.

35    These bets, or CDS, are actively traded in an over-the-counter market without transparency or government regulation.

36    The CDS premium payment terminates upon maturity or a credit event.  Upon termination, all that remains is the consumer's information on an expired betting slip.  An attachment to the expired written contract reveals who the covered consumers were.

37    Upon a credit event, the ABS servicer typically has 180 days to collect upon the receivable.  If the ABS servicer is unsuccessful, the debt is considered "charged-off".  That means that the ABS servicer informs the ABS investor of the credit event; the credit enhancements are "tapped"; and, the ABS investor is paid in full.  Since the ABS investor is paid in full, there is no longer a debt obligation.

38    The financial engineers made a bulletproof system where the originating bank is paid in full and the investors are paid in full regardless of a default in the payment of the

receivables.  The protection seller, which wins more than it loses, willfully took a bet in exchange for a premium.

39      There is no mention of what happens to the "terminated CDSs" or "bad bets" in credit derivative literature.  If there are no longer premiums, it would appear that the terminated CDS has no value.   However, the terminated CDS's sole value is the information it contains regarding the consumer.  Due to the lack of transparency and government regulations of the CDS bets, a select secret market exists to sell the bad bets for pennies on the dollar without the consumer's knowledge.

### C. **Finally an answer to what has baffled the consumer and the legal system**

40      The baffling question is why the alleged debt buyer has no evidence of the alleged debt?  The answer is because the alleged debt buyer is actually buying a terminated CDS, or bad betting slip.

41      The U.S. Government has come to the conclusion that the electronic database the alleged debt buyer purchases "does not include account documents such as contracts signed by the consumer" and documents "that may substantiate the portfolio's data does not exist."[8]

42      On December 12, 2009, the Federal Trade Commission (FTC) sent an "Order to File a Special Report" titled "Resolution Directing the Use of Compulsory Process to Study the Practice of Debt Buying" to nine (9) alleged debt buyers including SFG.  The FTC concluded that "[t]he system for resolving disputes about consumer debts is broken." and SFG is "filing suits based on insufficient evidence."[9]

---

[8] United States v. Asset Acceptance, 8:12-cv-182-T-27Eat (US District Court Middle District Florida January 30, 2012) complaint #11, #13.
[9] Findings published in July 2010 FTC Report Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration, Pg. I and II.

43    "A cursory review of the literature demonstrates that the possibility of an alleged debt buyer attempting to collect a debt that it does not actually own, either through assignment or otherwise, is very real."[10]

44    On October 25, 2011, the Maryland State Collection Agency Licensing Board issued a Summary Order to Cease & Desist and Summary Suspension of Collection Agency Licenses against LVNV and Resurgent.  The conduct at issue included: (1) "knowingly filing false, deceptive, or deficient affidavits without personal knowledge"; (2) only having a computer database; and (3) no actual signed consumer contract.

45    LVNV has a history of possessing no proof of alleged debt ownership.[11]

46    The Minnesota Attorney General has stated that the alleged debt buyers "only acquire an electronic file *about* the debt and not actual copies of underlying charge slips, account statements, signed contracts, etc." This statement mirrors a CDS.  The CDS does not own the receivable.  The CDS only references the receivable.  The CDS is nothing more than a bet.  By simply replacing the term "debt buyer" with "terminated

---

[10] Webb v. Midland Credit Management Inc. (ND Ill ED, 11-cv-5111 May 31, 2012) involved Midland purchasing an alleged debt from Sherman.  Footnote 8,  further citing Peter A. Holland, The One Hundred Billion Dollar Problem in Small Claims Court: Robo-Signing and Lack of Proof in Debt Buyer Cases, 6 J. Bus. & Tech. L. 259 (2011); Rick Jurgens & Robert J. Hobbes, The Debt Machine: How the Collection Industry Hounds Consumers and Overwhelm Courts, The Nat'l Consumer Law Ctr. (July 2010), http://www.nclc.org/images/pdf/pr-reports/debt-machine.pdf; FED. TRADE COMM'N, REPAIRING A BROKEN SYSTEM: PROTECTING CONSUMERS IN DEBT COLLECTION LITIGATION AND ARBITRATION (2010), http://www.ftc.gov/ox/2010/07/debtcollectionreport.pdf.

[11] LVNV Funding, LLC v. Mastaw (10-C-2671, Tenn. Ct. App.  April 30,2012); Court reverse LVNV judgment since LVNV could not produce the debt ownership documentation and affidavit generated solely for litigation purposes not substitute for evidence of debt ownership.  LVNV Funding LLC v. Guest, 2012 NY Slip Op 50974 (5-29-2012); Court found a frivolous debt collection lawsuit since no proof of debt ownership other than a computer screen printout or Placement Print. The Court further noted the requisite proof of debt ownership could never be obtained.

derivative buyer", it answers the question why SFG does not have proof of the alleged debt.[12]

## D. Synthetic CDO

47    These "bad bets" can be repackaged into a synthetic collateralized debt obligation (CDO).

48    A synthetic CDO is an actively managed, complex paper transaction which requires no ownership of a consumer receivable. Therefore, a CDO can even be manufactured from a portfolio of terminated CDS, bad bets, or even "blue sky."[13] Through financial alchemy, a non-existent debt is repackaged and sold to investors. The CDO investor is simply making a bet on whether the CDO servicer can deceive a consumer to pay on a non-existent debt due to ignorance, embarrassment, and/or good intentions.

49    Securitization of the synthetic CDO is where the terminated derivative buyer purchases the bad bets, transfers the bad bets to a SPV; the SPV sells securities to investors for cash, the cash goes back to the originating derivative buyer; and the cash can be used to buy bad bets to sell to the CDO. The investors hire a servicer who hounds consumers for a fee. To get investors requires a credit rating. The credit rating is based on the servicer's capabilities and track record of collections.

## E. Creation of Sherman

50    In 1998, a joint venture between Mortgage Guaranty Insurance Corporation ("MGIC") and Enhance Services Group Inc. ("Enhance") (hereinafter referred to as "the Parents") created Sherman. Sherman was formed by the purchase and

---

[12] Minnesota Attorney General's March 28, 2011 press release.
[13] The first Blue Sky Law (or state securities law) was enacted in Kansas in 1911 at the urging of Kansas Banking Commissioner J.N. Dolley who railed against "blue sky merchants" who were selling fraudulent investments backed by nothing but the blue skies of Kansas. In Hall v. Geiger-Jones Co., 242 U.S. 539 (1917), Justice Joseph McKenna wrote about the evil of these "speculative schemes which have no more basis than so many feet of 'blue sky'" and "to stop the sale of stock in fly-by-night companies, visionary oil wells, distant gold mines and other such like fraudulent exploitations."

acquisition of Sherman Financial (the capital marketing and analytics management team) and Alegis Servicing (the collection agent).[14]

51    The Parents are credit enhancement companies.  The Parents admit that as a protection seller they have no recourse nor other rights and remedies against the protection buyer for the Parents' bad bet.  As defaults mounted, The Parents' SEC filings reveal they were losing money as a protection seller.[15]

52    The Parents created Sherman as a dumping ground to illegally collect on its bad bets and gave Sherman $40 million to buy bad bets from other CDS players in the credit card industry.[16] The Parents made a substantial economic profit off of their Sherman investment as well as the ancillary benefit of making a profit on its bad bets as these bad bets could be securitized into a Synthetic CDO.

53    Sherman's business is the purchasing, securitizing, and servicing of bad bets.[17] Despite the lack of actual debt ownership, the bad bet has enough information about the consumer to attempt to collect or file a lawsuit.  Lack of ownership does not prevent the bad bet from being securitized into a synthetic CDO. The cheap purchase price reflects the fact that there is no ownership of the debt; that the information is outdated; and there is no indication as to a consumer's willingness and ability to pay.[18]

---

[14] See Enhance 1999 10-K.  Radian Group Inc. ("Radian") purchased Enhance in 2001.
[15] Radian's 2007 10-K  admitted to losing $841 million on derivatives.
[16] Sherman had at least 3 synthetic CDOs:  Sherman Receivables SPE, LLC; Sherman Investments SPE, LLC and Sherman General Partner SPE, LLC which also do not appear to be registered with the SEC.
[17] see **Plaintiffs' Exhibit D.** Radian's Investor Day Presentation November 9, 2006.
[18] Encore Capital Group Inc., the publicly traded parent of Midland Funding LLC, 10-K admits the average cost is about 3 cents on the dollar.

## F.  **The Birth of LVNV**

54      Sherman was so successful in deceiving consumers that Sherman created its own

synthetic CDOs.  LVNV is actually an off-balance sheet SPV created April 13, 2005,

for at least two (2) LVNV Funding LLC Synthetic CDOs.[19]  A SPV is a passive robot

firm that has no employees,[20] makes no substantive economic decisions, and has no

physical location.[21]  LVNV has no other purpose other than to transfer "bad bets" into

its CDOs while simultaneously receiving money from investors.  The LVNV CDO is

used as a piggy bank to buy more bad bets via forward flow agreements and

auction.[22]  LVNV upon belief and information appears to be domiciled off shore in

the Bahamas or Puerto Rico.[23]

55      Each of the Defendant's role in the LVNV CDO is believed to be as follows:  (1) the

pipeline of "bad bets" begins with Sherman Capital Markets electronically selecting

the portfolios to purchase often using electronic warehouse lines of credit from the

very same banks who are selling the "bad bets" ; (2) Sherman Originator or Sherman

Originator III purchases the "bad bets"; (3) if Sherman Originator III purchases "bad

bets" it electronically transfers to Sherman Originator; (4) Sherman Originator

electronically transfers the "bad bets" to the  LVNV warehouse; (5) LVNV, to raise

funds to pay Sherman Originator, electronically issues marketable securities through

---

[19] *See* **Plaintiffs' Exhibit E.** Moody's org. no. 400039347 and no.720407008.  Moody's even defines LVNV as a "revolving issuance vehicle." Neither of the LVNV CDOs is registered with the SEC as well as non-registering of quarterly 10-Qs, yearly 10-Ks, and 8-Ks (which would have been triggered by the Moodys watch and credit rating lowering).

[20] A review of LVNV affidavits and bankruptcy proof of claims reveals that no employee of LVNV has ever come forward.  Only employees of Resurgent claiming to be authorized agent come forward on LVNV's behalf.

[21] LVNV's principal business address of 625 Pilot Road, Suite 3, Las Vegas, Nevada 89119 is a rented building 100% occupied by Credit One

[22] *See* Debtconnections.com and The Receivables Exchange.

[23] Favorable bankruptcy remote laws, limited taxation, Sherman's ownership of Nassau Mortgage and Resurgent Capital Services PR.

Harris Nesbitt (such as US Pass-Through Notes or Euro commercial paper) to investors; and (6) the Investors agree electronically to hire Resurgent as servicer of the LVNV CDO to attempt to collect on "bad bets".

56    Sherman extracts a profit through charging servicing fees to the LVNV CDO, usually 20-25% off the top, and the brokering fees from the investors as long as SFG is producing "collection" results under the guise of Alternative Investment Strategies.

57    Sherman bragged that the LVNV CDO is better than other CDOs since Sherman had acquired the ability to originate credit cards.[24]

58    According to Moody's, the majority of the LVNV CDOs are the terminated derivatives. However, the LVNV CDO also contains other debris.[25] In fact, one of the LVNV CDOs appears to be a CDO squared ("CDO2"). Sherman used the riskiest tranches of their first CDO to create a new original CDO2 backed by the first CDO.

### G. Sherman's Collection Methods

59    Sherman is only buying an electronic portfolio in the form of a spreadsheet of outdated information with no documentation of ownership nor right to commence litigation to produce the documentation from the seller. This portfolio is sold on an "as is" basis without any warranty as to the enforceability of the data. In fact, the

---

[24] *See* Radian Investors Day. In 2005, The US Government paid Sherman millions of dollars to take over First National Bank of Marin which was renamed Credit One. Sherman made an additional profit by selling all the parts of the FNBM except for the ability to originate subprime credit cards. If Sherman were to be found guilty of breaking federal financial laws, Sherman will be forced to forfeit FNBM and to repay the government the funds paid to take FNBM over.

[25] Other "debris" probably include but not limited to: (1) Radian Group Capital Trust I and Trust II (2) SFG Capital Trust II & III (3) performing and terminated CDS from Credit One and Ascent ABS (4) performing CDS (5) terminated medical CDS from Ventus (6) information obtained from Amerix Credit Counseling and CreditAssist Financial Services (7) Consupago's Mexican payroll loans (8) Chedraui (Mexican supermarket) originated through Bank Facil (Mexican bank that Mexican government paid Sherman to take over) credit card receivables as well as terminated CDS.

Purchase Agreement has a confidentiality clause not to respond to any inquiry from public, governmental, or administrative authorities.[26]

60    Sherman is merely buying a "grab bag" of outdated information.  After selling to the LVNV CDO, Sherman has to make a profit by collecting on the information.  The outdated information must be sorted to locate the consumer; determine if consumer has filed bankruptcy, is deceased, or is in prison; and the consumer's willingness and/or ability to pay.  This sorting process involves the use of the mail, wire, and electronic devices.

61    Since Sherman is buying outdated information electronically, before Sherman can coerce payments, it has to locate the consumer ("skip tracing"). [27]  The hunt begins by electronically loading the information into Sherman's collection system and electronically updating address information by impermissibly pulling of a consumer's credit report which is chock full of information.[28]  Electronically reporting to the credit bureaus is also a powerful, but low-cost option, as a consumer who is trying to improve a credit score is willing to pay on a reported item whether or not a debt is actually owed.  This information can be cross-referencing with a national change-of-address database as well as personal information database vendors.[29]  There are even skip tracers for hire.[30]

---

[26] *See* American Acceptance Co., LLC v. Goldberg et al, 2:08cv9 (ND Ind. January 8, 2008) Exhibit A, Purchase Agreement,which involved a Sherman portfolio being sold through a broker to American Acceptance.  This selling and buying or sharing of information is a violation of the Graham-Leach-Bliley Act.
[27] *See* US v. Asset Acceptance Complaint #15 and Collections 101: A Training Manual for Entry Level Debt Collectors, by RTMC Organization LLC.
[28] Information such as updated address; whether bankrupt, arrested, deceased, or already sued; identification information such as name, date of birth, social security number, spouse's name, and employment information as to name of employer, address, and phone number.
[29] Vendors include Accurint (Lexis-Nexis), Banko, PACER, Fair Issac Corp., Consumer Data Industry Association, Merlin Information Services and Insight America
[30] www.phonesearches.com and www.intelius.com

62      A zip code is used to determine demographics to determine a "probability of payment" (POP) score which is used to determine local affluency and predict bankruptcy activity, contacting the highest POP scores first.

63      Sherman engages in "active" (direct attempt to collect) and "passive" (outsource the collection activities to a separate agency or law firm) collection activities using the mail, telephone, wires, faxes, and internet.

64      To maximize profit, Sherman's business model is to (1) settle with a cooperative consumer, (2) sue recalcitrant consumer, and (3) sell to another third party bad bet buyer if uncollectable using the mail, wireless,, telephone, faxes, and internet.  If a consumer is willing, Sherman attempts a payment-in-full (PIF) or settlement-in-full (SIF) or payment plan agreement (PPA).  If consumer is unwilling but able to pay, Sherman uses one of its legal network attorneys to file a suit even though Sherman lacks proof of debt which eventually leads to garnishment, freeze of bank accounts, and placing of liens on real estate.  If uncollectable (consumer filed bankruptcy, consumer is deceased, or consumer is imprisoned)[31] or if the collection is too costly to pursue (consumer disputes validity, consumer cannot be found or consumer lives in State with unfavorable collection laws), Sherman often sells the information to a third party "debt buyer."[32]

---

[31] There are even markets for information that are not legally collectable, such as those discharged in chapter 7 bankruptcy.  Sherman can offer to refinance these not legally collectable on a sub-prime credit card (Ascent Card) to ensnare consumers into using a predatory product to repay non-existent debts pursuant to the former Sears bankruptcy model.

[32] See American Acceptance v. Goldberg; Webb v. Midland.

## CLASS ACTION ALLEGATIONS

65      This action is brought on behalf of the following three classes:

1.  The FDCPA Subclass consists of (i) all Indiana citizens (ii) whom were the subject of collection activity by the Defendants (iii) in an attempt to collect a debt incurred for personal, family, or household purposes (iv) which were served with process or contacted in any matter by Defendants (v) during the one year period prior to the filing of this original complaint in this action through trial of this cause which are in violation of the FDCPA.

2.  The Restitution Subclass consists of (i) all Indiana citizens (ii) who paid money to Defendants (iii) in regard to an alleged debt owed to Defendants (iv) during the six year period prior to the filing of the original complaint in this action through the trial of this cause.

3.  The Rico Subclass consists of (i) all Indiana citizens (ii) who paid money to Defendants (iii) under Defendants scheme to defraud (iv) using the mail or wires (v) during the four year period prior to the filing of the original complaint in this action through the trial of this cause.

66      Plaintiffs allege on information and belief that based upon Defendants' thousands of phone calls and dunning letters and hundreds of filings of virtually identical lawsuits that the class is so numerous that joinder of all members of the class is impractical.

67      There are questions of law or fact common to the classes, which common issues predominate over any issues involving only individual class members.

68      The common factual issue common to the FDCPA Subclass is whether members were subject to collection activity by or on behalf of Defendants.  The principal legal issue

for the FDCPA Subclass is whether Defendants engaged in debt collection with no legal standing and without requisite license/registration in violation of the FDCPA.

69    The common factual issue common to the Restitution Subclass is whether Defendants received a monetary benefit from members.  The principal legal issue for the Restitution Class is whether Defendants engaged in collection without legal standing and whether it would be inequitable for Defendants to retain the benefit without paying fair value for it, in violation of common law.

70    The common factual issue to the Rico Subclass is whether Defendants committed a scheme of fraud using the mail, wireless, telephone, faxes, and internet.

71    Plaintiffs' claims are typical of those of the class members.  All are based on the same facts and legal theories.

72    Plaintiffs will fairly and adequately protect the interests of the classes.  Plaintiffs have retained counsel experienced in handling actions involving unlawful practices under the FDCPA and class actions.  Neither Plaintiffs nor Counsel have any interest which might cause them not to vigorously pursue this action.

73    Certification of the classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

(1) The questions of law or fact common to the members of the class predominate over any questions affecting an individual member.

(2) A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

### COUNT I
### FAILURE TO OBTAIN A DEBT COLLECTION LICENSE AS MANDATED BY I.C. 25-11-1 -7 IN VIOLATION OF THE FDCPA

74     On behalf of FDCPA class members, Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph. Substance prevails over form.

75     The FDCPA has been construed by Federal Courts as a strict liability statute that is to be construed liberally as to effectuate its remedial purpose.[33]

76     Any potential *bona fide* error defense which relies upon Defendants' mistaken interpretation of the legal duties imposed upon them by the FDCPA would fail as a matter of law.[34]

77     LVNV's failure to obtain a collection agency license as mandated by Indiana Statutes 25-11-1 et seq., while actively engaging in debt collection in the State of Indiana, violated various provisions of the FDCPA including the following:  15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).[35]

78     LVNV was required to be licensed under the Indiana Code.

79     IC 25-11-1-7 makes it an unlawful act to conduct business in Indiana as a collection agency without first having obtained a license.

80     IC 25-11-1-1(a) defines "person" as "any individual, firm, partnership, limited liability company, or corporation."

[33] Russell v. Equifax A.R.S., 74 F 3d 30, 33 (2nd Cir. 1996); 15 U.S.C. 1692k(a).
[34] Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA, 130 S. Ct. 1605 (US Sup. Ct. April 21, 2010).
[35] In LeBlanc v. Unifund CCR Partners, 601 F3d 1185 (11th Cir. 2010) and Bradshaw v. Hilco Receivables, LLC, 2011 US Dist Lexis 17954 (D. Md. February 23, 2011) held that not registering as a collection agency constitutes a valid, if not *per se*, violation of the FDCPA.

81   IC 25-11-1-1 defines "collection agency" as "all persons" "engaging directly or indirectly and as a primary or secondary object, business, or pursuit, in soliciting claims for collections, or in the collection of claims owed or due or asserted to be owed or due to another."

82   LVNV is clearly a collection agency in the state of Indiana and was not licensed until February 16, 2012.

83   Sherman Capital, MSPII, SFG, SCM, and the Individual Defendants direct LVNV and SOLLC, SOLLCIII, and SALLC participate in LVNV.  None of these Sherman entities are licensed in Indiana.  Further, the LVNV CDOs, which hired Resurgent, are not licensed in Indiana.

84   Sherman's unlicensed collection activity constitutes false, deceptive or misleading representation or means in connection with the collection of the debt under 15 U.S.C. 1692e.

85   Sherman is a "debt collector" under 1692(a)(6).

86   "Debt" includes an "alleged obligation." 15 USC 1692a(5).

87   Further, 15 U.S.C. 1692e provides a non-exhaustive list of conduct that violates the FDCPA, including 15 U.S.C. 1692e(5) "threat" to take an action that cannot legally be taken.

88   Sherman's unlicensed activity constitutes a threat to take action that cannot legally be taken in violation of 15 U.S.C. 1692e (5).

89   Sherman's unlicensed activity constitutes a false and deceptive means of collecting or attempting to collect a debt in violation of 15 U.S.C. 1692 e(10).

90      Sherman's unlicensed activity constitutes an unfair means of collecting or attempting to collect a debt in violation of 15 U.S.C. 1692f.

91      Plaintiffs must only prove one violation of the FDCPA to trigger liability.[36]

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1.  Actual Damages;

2.  Statutory damages;

3.  Attorney's fees, litigation expenses and costs of the instant suit; and

4.  Such other relief as the Court deems proper.

## COUNT II
## FAILURE TO OBTAIN A REGISTRATION
## MANDATED BY INDIANA VIOLATION OF THE FDCPA

92      On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

93      Pursuant to I.C. 23-17-26 to have access to Indiana courts a business must be registered.

94      LVNV was not registered in the State of Indiana until February 16, 2012.  The other Sherman entities are still not registered with the State of Indiana.

95      Defendants made threats or actually filed legal action against Indiana residents when they had no right to.[37]

96      Defendant's actions violate 15 U.S.C. 1692 e of the FDCPA.

---

[36] Bradshaw.
[37] Berg v. Blatt, Hasenmiller, Leibsker and Moore LLC, 07c4887 (N.D. Ill. August 29, 2007) and Guevara v. Midland Funding NCC-2 Corp., 07c5858 (N.D. Ill. June 20, 2008) held that misrepresentation of an entity "authorized to do business" is sufficient to state a FDCPA claim.

97      Defendant's actions violate 15 U.S.C. 1692 e (5) of the FDCPA.

98      Defendant's actions violate 15 U.S.C. 1692 e (10) of the FDCPA.

99      Defendant's actions violate 15 U.S.C.1692 f of the FDCPA.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters

judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1. Actual Damages;

2. Statutory damages;

3. Attorney's fees, litigation expenses and costs of the instant suit; and

4. Such other relief as the Court deems proper.

## COUNT III
## FAILURE TO ACTUALLY OWN THE
## DEBT IN VIOLATION OF THE FDCPA

100     On behalf of FDCPA Subclass members Plaintiffs now re-allege each and every

allegation as set forth above, and hereby incorporates same by references as if all

were set forth fully herein.  Substance prevails over form.

101     Sherman does not legally own a debt but solely possesses information on a bad bet.

102     Defendants' actions violate 15 U.S.C. 1692 e of the FDCPA.

103     Defendants' actions violate 15 U.S.C. 1692 e (2) (A) of the FDCPA by false

representing the "character, amount, or legal status" of a non-existent debt.

104     Defendants' actions violate 15 U.S.C. 1692 e (5) of the FDCPA.

105     Defendants' actions violate 15 U.S.C. 1692 e (10) of the FDCPA.

106     Defendants' actions violate 15 U.S.C.1692 f of the FDCPA.

107     Defendants' actions violate 15 U.S.C. 1692 f (1) of the FDCPA since if no legal

ownership of a debt then no agreement expressly authorizing collection amounts.

*Wherefore*, Plaintiffs, on behalf of the FDCPA Subclass, request that the Court enters judgment in favor of Plaintiffs and the FDCPA Subclass and against Defendants for:

1. Actual Damages;

2. Statutory damages;

3. Attorney's fees, litigation expenses and costs of the instant suit; and

4. Such other relief as the Court deems proper.

## COUNT IV
## INDIANA COMMON LAW FRAUD

108   On behalf of Restitution Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

109   The elements of actual fraud are: (1) a material representation of past or existing facts which; (2) was false; (3) was made with knowledge or reckless ignorance of falsity; (4) was made with intent to deceive; (5) was rightfully relied upon by the complaining party and; (6) proximately caused injury to the complaining party.

110   Defendants made a material representation that Sherman legally owned an alleged debt by Plaintiffs (when Sherman did not and could not) and was entitled to monies when they were not.

111   Defendants had knowledge or reckless ignorance that Sherman did not and does not legally own an alleged debt and that Defendants purchased nothing more than information about the alleged debt.

112   Defendants had knowledge or reckless ignorance that neither LVNV nor the other Sherman entities was neither licensed nor registered in the State of Indiana to perform

collections against Indiana residents and avail itself of Indiana's courts to collect against Plaintiffs.

113     Based on Sherman's and Sherman's agents telephone calls; dunning letters; credit bureau reportings; and robo-signed affidavits as well as other inducing evidence such as old statements, Resurgent computer printouts, and blank card applications; and failure to notify Plaintiffs of securitization; the Plaintiffs legitimately relied upon the misrepresentation herein made by Defendants to Plaintiffs' detriment by paying monies to Sherman.

114     Defendants intended to deceive each Plaintiff into believing that Defendants were collecting on legitimate debts by designing and implementing a collection *enterprise* that gave Defendants the appearance of their ownership of the debt.

115     Defendants intended to deceive Plaintiffs, their counsel, and the Legal System that Sherman had standing to bring legal process to collect money from Plaintiffs using solely the information it purchased with no legal debt ownership.

116     Defendants' scheme, deceitful threats, legal process, and collection of money from Plaintiffs proximately caused damage to Plaintiffs' privacy, credit ratings, employment, loss of money, and consequential harm.

*Wherefore*, Plaintiffs, on behalf of the Restitution Subclass, request that the Court enters judgment in favor of Plaintiffs and the Restitution Subclass and against Defendants for:

1.   Treble damages;

2.   Consequential damages; and

3.   Punitive damages;

4.   Attorney's fees, litigation expenses, and costs of instant suit; and

5.   All other relief as necessary in the premises.

## COUNT V
## RESTITUTION

117     On behalf of Restitution Subclass members the Restitution Attempt class, Plaintiffs

now re-allege each and every allegation as set forth above, and hereby incorporates

same by references as if all were set forth fully herein.  Substance prevails over form.

118     A member of the Restitution class conferred a benefit on the Defendants; more

specifically a payment towards an alleged debt owned by LVNV.

119     Defendants have knowledge of the benefit (i.e. the money paid by each respective

consumer towards the alleged LVNV debt).

120     Defendants have accepted or retained the benefits conferred (i.e. the above-referenced

payment).

121     The circumstances are such that it would be inequitable for Defendants to retain the

benefit without paying fair value for it.

***Wherefore***, Plaintiffs, on behalf of the Restitution Subclass, request that the Court enter

judgment in favor of Plaintiffs and the Restitution Subclass and against Defendants for:

a.   Actual damages, for the total dollars unlawfully collected by Defendants from the

members of the Restitution Subclass over the last six years (plus interest);

b.   An order instructing Defendants to disgorge their ill-gotten monies from the

Restitution Subclass;

c.   Litigation expenses and costs of this instant suit; and

d.   Such other and further relief as the Court deems proper.

## COUNT VI
## UNJUST ENRICHMENT

122    On behalf of Restitution Subclass members Plaintiffs now re-alleges each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

123    Plaintiff alleges that the Defendants have unjustly retained a benefit to the Plaintiffs' detriment, and that Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

124    Plaintiffs have suffered a detriment - monies paid & damage to their credit report.

125    Plaintiffs's detriment has a connection between the detriment and the Defendants' retention of the benefit.

126    The Defendants' retention of Plaintiffs' monies is a detriment to plaintiffs.

127    Plaintiffs would have acted differently, had they known Defendants had no standing to file a lawsuit or engage in any other collection as a result of Defendants' failure to be licensed, registered, lack of a debt, and legal ownership of the alleged debt.

128    The transfer of money from plaintiff to defendant in exchange for paying off alleged debt violated the fundamental principles of justice, equity and good conscience so the Defendants' continued retention of money is a detriment.

129    The acts of Defendants complained of herein constitute unjust enrichment of Defendants at Plaintiff's expense in violation of the common law of Indiana.

130    Plaintiffs are entitled to disgorgement of ill-gotten gains in an amount to be proved at trial.

*Wherefore,* Plaintiffs, on behalf of the Restitution Subclass, request an Order from the Court requiring Defendants to disgorge all ill-gotten gains acquired from their deceptive illegal conduct and all other recovery necessary in the premises.

**COUNT VII**
**(Civil RICO as to all Defendants)**
Acquisition and Maintenance of an Interest in and Control of
An Enterprise Engaged in a Pattern of Racketeering Activity:
18 U.S.C. 1961 (5), 1962 (b)

131    On behalf of the Rico Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

132    At various times and places partially enumerated in Plaintiffs' *documentary material,* all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

133    During the ten (10) calendar years preceding October 4, 2012., all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

134    Plaintiffs further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities,* also in violation of the RICO law at 18 U.S.C. 1962(b) *supra.*

*Wherefore,* pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiff requests judgment against all named Defendants as follows:

1.  That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

3.  That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

4.  That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

5.  That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

6.  That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked (Plaintiff's standard professional rate at start of this action).

7.  That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiffs, their heirs, and assigns.

8.  That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

## COUNT VII
### (Civil RICO as to all Defendants)
Conduct and Participation in a RICO Enterprise
Through a Pattern of Racketeering Activity:
18 U.S.C. 1961 (5), 1962 (c)

135   On behalf of the Rico Subclass members Plaintiffs now re-alleges each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

### i) ALLEGATIONS IN SUPPORT OF CONDUCT AND PARTICIPATION

136   At various times and places partially enumerated in Plaintiffs' *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

137   Likewise, all Defendants did conduct and /or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity,* all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

138    As a result of Defendants' actions alleged Indiana Plaintiffs were defrauded in an amount estimated to exceed $ 25,000,000, the exact amount to be determined at trial, in payments which Defendants received for fraudulently collecting against Plaintiffs.

139    Defendants were not registered in Indiana and were not licensed to practice any collection activity in Indiana and have fraudulently committed collection demands upon Indiana consumers and illegally and systematically threatened collection through legal process on debts Defendants did not own and Plaintiffs were not obligated to pay.

140    Effectively, Defendants have engaged in multiple episodes of fraudulent activity ranging from schemes defrauding Indiana consumers in collection practices alleged herein. That their ongoing *pattern of racketeering* has continued despite repeated legal actions initiated in several states and their predicate offenses mail fraud and wire fraud.

141    On information and belief, the Defendants were able to collect millions of dollars on alleged debts consumers they did not own and Plaintiffs did not owe through their unregistered an unlicensed collection schemes.

142    On information and belief, Defendants swept money out of frozen checking and savings accounts of Plaintiffs, and made ACH wire transfers and check payments to Resurgent, LVNV and ultimately to all Defendants.

143    On information and belief, Defendants filed false proofs of claims in bankruptcy cases filed by Plaintiffs and bankruptcy trustees transferred by electronic funds transfer (EFT) money to Resurgent and LVNV and ultimately to all Defendants.

144    On information and belief Defendants swept money out of Plaintiffs' payroll accounts pursuant to garnishment orders by wire transfers from Plaintiffs' employers to Resurgent electronically by ACH transfers on behalf of Defendants.

145    The *pattern of racketeering* acts set forth herein were carried out over nearly a seven-year period, were related and similar, were committed as part of Defendants' ongoing scheme to defraud Plaintiffs, the courts and in furtherance of Defendants' RICO *Enterprise* and if not stopped will continue in the future.

146    During the period in which the individual Defendants operated the *enterprise*, they submitted multiple collection documents demanding payment of money and threatening legal action against Plaintiffs under the fraudulent pretense that the recipient of the letter was legally required to make the payment when it knew or should have known that the Plaintiff was not obligated to make payment.

147    The collection letters and supporting documents mailed by the Defendants, as well as the payments that plaintiffs made in response to those collections, were sent through the United States Postal Service. By virtue of those activities, Defendants engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the *Enterprise* through the date of the filing of this Complaint.

148    In addition to the specific misrepresentations identified for each of the mailings on that list, each and every document identified on the list contains the implicit material misrepresentation that the bill was generated by a legitimate professional corporation that was registered and licensed to operate under the mandates of the laws of the State of Indiana.

**ii) PREDICATE ACTS: MAIL AND WIRE FRAUD: *18 U.S.C. §§ 1341*, 1343**

149     Each of the thousands of submissions constitutes mail fraud pursuant to *18 U.S.C. §*
        *1341.*

150     Mail fraud constitutes racketeering activity as that term is defined in *18 U.S.C. §*
        *1961*(1)(b). By causing the mailing of hundreds of false reports, the Defendants have
        conducted the affairs of their fraudulent collection *enterprise* through a *pattern of*
        *racketeering* activity, in violation of *18 U.S.C. § 1962*(c).

151     Each of the thousands of wire and electronic transmissions constitutes wire fraud
        pursuant to 18 U.S.C. *§ 1343.*

152     Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C.
        *§1961(1)(b).*

### iii) PATTERN OF RACKETEERING ACTIVITY

153     At various times and places partially enumerated in Plaintiffs' *documentary material,*
        all Defendants did associate with a RICO *enterprise* of individuals who were
        associated in fact and who engaged in, and whose activities did affect, interstate and
        foreign commerce.

154     During the ten (10) calendar years preceding November 9, 2012, all Defendants did
        cooperate jointly and severally in the commission of two (2) or more of the RICO
        predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B), and did
        so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

155     By causing hundreds of wire transactions consisting of calls to Plaintiffs, electronic
        transfers of Plaintiffs' personal information, and electronic banking transactions
        with Plaintiffs' money, the Defendants have conducted the affairs of their fraudulent

collection enterprise through a *pattern of racketeering* activity, in violation of *18 U.S.C. § 1962*(c).

156   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective collection *racketeering activities*, also in violation of the RICO law at <u>18 U.S.C. 1962</u>(c) *supra*.

**Damages Sustained by the Plaintiffs**

157   Each of the Plaintiffs was injured in its business or property, by reason of Defendants' violation of *18 U.S.C. § 1962*(c). Plaintiffs suffered troublesome collection, unwanted phone calls, were threatened with legal action, sued, and defrauded into making payments to Defendants and paying for legal representation.

158   Pursuant to *18 U.S.C. § 1964*(c), Plaintiffs are entitled to recover from Defendants, jointly and severally, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**Wherefore,** pursuant to the statutes at <u>18 U.S.C. 1964</u>(a) and (c), Plaintiffs on behalf of the Rico Subclass, request judgment against all named Defendants as follows:

1.   That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at <u>18 U.S.C. 1962</u>(c) (Prohibited activities).

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) ("pattern" defined) and 1962(c) *supra*.

3.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s).

4.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

5.      That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

6.      That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

7.      That all Defendants pay to Plaintiffs their costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked (Plaintiff's standard professional rate at start of this action).

8.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s), be

deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiffs, their heirs and assigns.

9. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**COUNT XI**
**(CIVIL RICO as to all Defendants)**
Conspiracy to Engage in a
Pattern of Racketeering Activity
18 U.S.C. §§ 1961(5), 1962(d)

159    On behalf of the Rico Subclass members Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by references as if all were set forth fully herein.  Substance prevails over form.

**i) ALLEGATIONS IN SUPPORT OF CIVIL CONSPIRACY CLAIMS**

160    The elements for a civil conspiracy claim are (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) which agreement results in injury to the plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.

161     At various times and places alleged herein by Plaintiffs all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

162    As more fully described above, Defendants separately and in conjunction with each other conspired to defraud Plaintiffs into paying money to Defendant's *enterprise*.

163    A RICO *enterprise* includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961*(4)

164    The Plaintiffs allege that Defendants formed an *enterprise* that operated in furtherance of a common purpose beginning in or around 2005 and still active.

165    While each Defendant participated in and are members and part of this *enterprise*, they also have an existence separate and apart from the *enterprise*.

166    In order to intentionally, successfully and convincingly bluff Plaintiffs and the Courts into believing that Defendants had authority to collect, Defendants establish an aura of bona fide authority to perfect their collection scheme.

167    Defendants controlled and operated this enterprise through a variety of means, including, but not limited to, the following: (a) developing and utilizing a common scheme designed to mislead Plaintiffs and the Court into believing that Defendants held legal ownership of an alleged debt by manufacturing false affidavits; (b) falsely representing that Plaintiff's owed money to Defendants when Plaintiffs did not; (c) mailing dunning letters to Plaintiffs demanding money Plaintiffs did not owe; (d) making phone calls to demand payments which Plaintiffs did not owe (c) filing lawsuits against Plaintiffs who did not owe Defendants (d) and garnishing wages.

**ii) PREDICATE ACTS: MAIL AND WIRE FRAUD: *18 U.S.C. §§ 1341*, 1343**

168    During the ten (10) calendar years preceding November 9, 2012, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(B), and did so in violation of the RICO law at 18 U.S.C. 1962(d) (Prohibited activities).

169    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under *18 U.S.C. § 1341* (relating to mail fraud), and *18 U.S.C. § 1343* (relating to wire fraud).

170     For the purpose of executing and/or attempting to execute the above described

        scheme to defraud or obtain money by means of false or fraudulent pretenses,

        representations or promises, Defendants in violation of *18 U.S.C. § 1341,* caused

        matter and things to be delivered by the Postal Service or by private or commercial

        interstate carriers. These acts were done intentionally and knowingly with the specific

        intent to advance Defendants' scheme, or with knowledge that the use of the mails

        would follow in the ordinary course of business, or that such use could have been

        foreseen, even if not actually intended.

171     For the purpose of executing and/or attempting to execute the above described

        scheme to defraud or obtain money by means of false pretenses, misrepresentations or

        promises, Defendants, in violation of *18 U.S.C. 1343,* transmitted, caused to be

        transmitted and/or received by means of wire communication in interstate and foreign

        commerce, various writings, signs and signals. These acts were done intentionally and

        knowingly with the specific intent to advance Defendants' scheme, or with knowledge

        that the use of wire communications would follow in the ordinary course of business,

        or that such use could have been foreseen, even if not actually intended.

172     Upon good information and belief, Defendants utilized emails between Defendants

        and legal counsel hired by Defendant to coordinate collection of money from

        Plaintiffs.

173     Defendants carried out their scheme in different states and could not have done so

        unless they used the Postal Service or private or commercial interstate carriers.

174     The Defendants knew or should have foreseen that the use of the mails and wires

        would be required to carry out the scheme.

175     The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate media include, inter alia: Correspondence and e-mails among the Defendants regarding the scheme and conduct to be undertaken in furtherance of the scheme, calls to Plaintiffs electronic cellular phones and land line phones, making demands for money from Plaintiffs when Plaintiffs did not owe the money to Defendants.

### iii) PATTERN OF RACKETEERING ACTIVITY

176     At various times and places partially enumerated in Plaintiffs' *documentary material*, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).  See also 18 U.S.C. §§ 1961(4), (5) and (9).

177     Plaintiffs further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(d) *supra*. In fact, each of the Defendants has committed multiple acts of racketeering activity because thousands of reports were sent via US Mail or e-mails to the same credit bureaus with the false and deceptive information.

178     Defendants sent correspondence, made phone calls, monthly statements, and other communications to Plaintiffs via US Mail and forward financial documents and credit history correspondence to credit bureaus.

179     These predicate acts directly contributed to the losses and damages sustained by the Plaintiffs.

180     The multiple acts of racketeering activity, described above were committed directly by Defendants or were aided and abetted by one another in the commission of such predicate acts. Each act was related to each other and amounted to and posed a threat of continued racketeering activity constituting a "pattern of racketeering activity" as defined in *18 U.S.C. § 1961* (5).

**iv) DEFENDANTS' CONDUCT CAUSED DIRECT INJURY TO PLAINTIFFS**

181     Plaintiffs have suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment as more fully set forth above.  Specifically, damage to their credit rating, loss of money from garnishments, harassing phone calls and invasion of privacy, and payment of legal defense fees.

182     As a result of the Defendants' fraudulent scheme, Defendants have obtained money and property that belong to Plaintiffs and the Plaintiffs have been injured in their business and/or property by the Defendants' overt acts of collection which amount to mail and wire fraud.

*Wherefore,* pursuant to the statutes at <u>18 U.S.C. 1964</u>(a) and (c), Plaintiffs, on behalf of the Rico Subclass, requests judgment against all named Defendants as follows:

1.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO *enterprise* engaged in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(b) and (d) *supra.*

2.      That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra.*

3.      That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s).

4.      That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

5.      That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

6.      That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

7.      That all Defendants pay to Plaintiffs' costs of the lawsuit incurred herein including, but not limited to, all necessary research, and all reasonable counsel's fees, at a minimum of $350.00 per hour worked (Plaintiffs' standard professional rate at start of this action).

8.      That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s), be

deemed to be held in constructive trust, legally foreign with respect to the federal zone, for the benefit of Plaintiff, His heirs and assigns.

9.      That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

### JURY DEMAND

Plaintiffs hereby demands trial by jury on all issues which a jury may lawfully be convened.

Respectfully submitted,

Dated: November 9, 2012.

Matthew D. Boruta Bar No.  20803-49
CHEESEBOUROUGH & BORUTA
543 East Market Street
Indianapolis, Indiana 46204
317.637.7000 phone
317.638.2707 facsimile
boruta17@hotmail.com

Robert D. Cheesebourough Bar No. 18241-53
CHEESEBOUROUGH & BORUTA
543 East Market Street
Indianapolis, Indiana 46204
317.637.7000 phone
317.638-2707 facsimile
rdc@home-saver.org