UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREW COX, LUCINDA COX, and STEPHANIE SNYDER, Individually and on behalf of others similarly situated, | ) ) ) ) |
| | ) Cause No. |
| Plaintiffs, | ) 1:12-CV-1654-TWP-MJD |
| | ) Indianapolis, Indiana |
| vs. | ) CLASS ACTION |
| | ) **January 31, 2014** |
| | ) 9:04 a.m. |
| SHERMAN CAPITAL, LLC; MEETING STREET PARTNERS II, INC.; SHERMAN FINANCIAL GROUP, LLC; SHERMAN CAPITAL MARKETS, LLC; LVNV FUNDING, LLC; RESURGENT CAPITAL SERVICES LP; SHERMAN ORIGINATOR, LLC; SHERMAN ORIGINATOR III, LLC; SHERMAN ACQUISITION, LLC; BENJAMIN W. NAVARRO; LESLIE G. GUTIERREZ; SCHOTT E. SILVER; KEVIN P. BRANIGAN; ROBERT A. RODERICK; KENNETT KENDALL; AND JOHN DOES 1-50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**Before the Honorable**
**MARK J. DINSMORE**

OFFICIAL REPORTER'S TRANSCRIPT OF
HEARING ON MOTION TO COMPEL

Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                   United States District Court
                                   46 East Ohio Street, Room 340
                                   Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY AUDIO RECORDING
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

**APPEARANCES:**

**For Plaintiffs:**          Frederick D. Emhardt, Esq.
                             Alan S. Townsend, Esq.
                             Plews, Shadley, Racher
                              & Braun
                             1346 North Delaware Street
                             Indianapolis, IN  46202

                             Matthew D. Boruta, Esq.
                             Robert D. Cheesebourough, Esq.
                             Cheesebourough & Boruta
                             543 East Market Street
                             Indianapolis, IN  46204

**For Defendants:**          Gary S. Caplan, Esq.
                             Reed Smith, LLP
                             40th Floor
                             10 South Wacker Drive
                             Chicago, IL  60606-7507

                             James W. Riley, Jr., Esq.
                             Riley Bennett & Egloff, LLP
                             Fourth Floor
                             141 East Washington Street
                             Indianapolis, IN  46204

1              (In open court.)

2          THE COURT:  It is still 9:04 a.m., Friday,

3   January 31, 2014.  We're here in the matter of Cox, et al.,

4   vs. Sherman Capital, LLC, et al., 1:12-cv-1654.  For the

5   plaintiffs, Derrick Emhardt, Jeffrey Townsend, Matthew Boruta,

6   and Robert Cheesebourough; for the defendants, Gary Caplan and

7   James Riley.

8          We are here for hearing on docket 172, Plaintiff's

9   motion to compel regarding written discovery.  And I'm happy

10  to give each side time to make whatever argument you want, but

11  I thought I would start with a few questions, and we can go

12  from there.

13         So, looking at docket 173, which is Plaintiff's

14  memorandum at page 2, there's a couple of broad issues that

15  are addressed.  One is that the interrogatory responses aren't

16  verified.  What's the status of that?

17         MR. CAPLAN:  Your Honor, this is Gary Caplan.  It's

18  a pleasure.  Is it okay if I address you from --

19         THE COURT:  You may.

20         MR. CAPLAN:  Okay.  Thank you.  It's a pleasure to

21  meet you in person.  As we discussed in our memorandum, Your

22  Honor, I think the vast majority of issues raised in the

23  motion to compel have never been discussed amongst counsel.

24         As you will recall, we had met and conferred a bunch

25  of times over things that we thought were necessary for the

1  mediation that had been scheduled before Your Honor.  And then

2  I think, without warning, we were hit with a large motion to

3  compel that had many issues raised for the first time that we

4  had heard about.

5          Since then, we did have a meet-and-confer since we

6  filed our brief, and we've agreed on the vast majority of

7  those issues, including the verification of interrogatory

8  answers that you just asked about and a host of the other 16

9  issues that we had raised, that had never been met and

10 conferred about.  And then we talked to Mr. Townsend about it.

11 So, I think the vast majority of the issues that made up that

12 motion have been agreed to.

13         There are certain issues we think are ripe, that we

14 each have almost, I think we said to each other, agreed to

15 disagree on, that are ripe for today's discussion, but that's

16 the background specifically with regard to verification.  And

17 we have agreed to provide those as quickly as we can.

18         THE COURT:  Just -- it should have been with the

19 response, shouldn't it?  I mean, that's really not a matter of

20 agreement.  They're supposed to be verified.

21         MR. CAPLAN:  That's right.

22         THE COURT:  All right.

23         MR. CAPLAN:  We were unaware, and we said, yes, of

24 course, we will do that.

25         THE COURT:  Is that accurate?  Have you agreed to

1    resolve a number of the issues?

2              MR. TOWNSEND:  We have agreed to resolve some of the

3    issues, Your Honor, that being one of them, the verification.

4    The other issue raised in our II, on page 2, that you were

5    referring to, to the extent documents are produced in response

6    to a discovery request, that they be -- or produced in lieu of

7    an answer to an interrogatory, that they be fully identified

8    as being responsive to that interrogatory.

9              THE COURT:  Has that been resolved?

10             MR. TOWNSEND:  It has, Your Honor.

11             THE COURT:  Okay.  So, which ones haven't, then?

12   Let's start there.

13             MR. TOWNSEND:  Well --

14             THE COURT:  What's the first issue that is still

15   alive?

16             MR. TOWNSEND:  Okay.  Our III, they have agreed to

17   let us know which defendant is in possession of which

18   document.

19             THE COURT:  Okay.

20             MR. TOWNSEND:  So we look forward to that.  Item

21   number IV, on page 4, this is the first one, apparently, that

22   we have agreed to disagree on.  These are account purchase

23   agreements that the defendants have.  These are the agreements

24   that they use with the banks to obtain the data strings and

25   the account information.  They agreed in their original

1  response, filed November 11, to produce these agreements with

2  the attachment, which would include the data string.

3          Since then, we have tried to get those documents

4  that they agreed to produce on November 11th, and so far we

5  have received redacted copies of some agreements.  The

6  redactions make it difficult to tell if the agreements relate

7  to each other or if they're a separate agreement.  The data

8  strings that were -- that have been produced are limited to

9  two lines out of thousands, and without an identification of

10 which agreement they go with.

11         So, we've asked for the documents, they agreed to

12 produce them.  They haven't produced them, and we're still

13 waiting for them to produce them.  We would like to have the

14 purchase agreement and all of the data strings produced in

15 their entirety and in a portable and manipulatable manner so

16 that they are actually useful to us.

17         THE COURT:  Is this point specifically addressed in

18 your response brief?

19         MR. CAPLAN:  Your Honor, this --

20         THE COURT:  I assume it is, but --

21         MR. CAPLAN:  Yes.  I believe that this point kind of

22 encapsulates kind of the majority of the differences between

23 the parties on two fronts:  One, we have redacted price from

24 the purchase agreements at issue, and that's one of the issues

25 that in our numerous meet-and-confers we've agreed to disagree

1  on, because we don't believe that the price in which we

2  purchased these debts, not -- we didn't purchase the data

3  strings, we purchased the debts.  The price in which we

4  purchased the debts in the portfolio has no relevance

5  whatsoever to the claims at issue.

6          We've asked Plaintiffs repeatedly what the relevance

7  or why they need that information.  They've yet to tell us.

8  They've yet to put it in their brief.  I don't think there's

9  any reason they need to know what the total purchase price is.

10  It's the client's special sauce, and I'm not sure that

11  that's -- and our position is that that should not be

12  produced.

13          The second part --

14          THE COURT:  Let me stop you there.

15          MR. CAPLAN:  Sure.

16          THE COURT:  Why do you need the price?

17          MR. TOWNSEND:  The price goes to whether these

18  contracts are real contracts and real purchase agreements.  If

19  we can see the price that was paid, there's more than just the

20  price that's been redacted.  There's a lot of information

21  redacted about how these contracts --

22          THE COURT:  I stopped him there, so there's more.

23  He's got more.  So we're focusing on price now.

24          MR. TOWNSEND:  So the price goes to whether these

25  are actually contracts that would suggest the full -- any sort

1  of full value has been paid for these data streams.  It's our

2  position that they did not actually produce the accounts

3  receivables, that they don't own those.  And these, the

4  pricing information, are necessary for us to be able to

5  determine that and see what sort of value is being paid for

6  these, as well as --

7          THE COURT:  Who are these contracts between?

8          MR. TOWNSEND:  They're between the defendants on the

9  one hand and Chase Bank on the other.

10          THE COURT:  So some other entity?  It's not -- these

11  aren't internal inter-defendant contracts?

12          MR. TOWNSEND:  Well, there are those, as well, that

13  we requested.

14          THE COURT:  But the ones we're talking about in

15  particular are with Chase Bank?

16          MR. TOWNSEND:  Yes, and CitiBank.

17          THE COURT:  Okay.  So, what suggestion is there that

18  these aren't arm's-length transactions?

19          MR. TOWNSEND:  Well, it's our position that, for one

20  thing, the price would suggest whether -- it would go to that

21  question, which we're trying to determine.  Also, it's our

22  belief that when Chase acquires these accounts, that they

23  immediately sell them to a trust and do not retain the right

24  to then sell them again to the defendants.

25          The information in these contracts, including the

1   data string and the price, will go to -- to show that this

2   information has already been sold, the information in the

3   contracts.  And the data streams we can then use to go compare

4   with the information showing what accounts were sold to the

5   trusts to show that these accounts have already been sold.

6   The bank did not retain the right to sell them again to LVNV.

7               THE COURT:  Mr. Caplan?

8               MR. CAPLAN:  Your Honor, I disagree.  I don't think

9   price is indicative of any of the points that Counsel raises.

10  Whether or not -- if Chase or CitiBank actually sold these

11  before they sold them to us, A, that's news to us; and, B,

12  that would be pursuant to a different contract that would have

13  nothing to do with the price they sold it to us at.  The price

14  they sold it to us at has no bearing on ownership on any of

15  their issues.

16              Essentially, we redacted the price.  And the way we

17  get to that price -- and that, again, I believe is our secret

18  sauce and has no relevance whatsoever to their Fair Debt Act

19  claims, or their claims that we weren't licensed, or any of

20  the claims that are at issue in this lawsuit.

21              THE COURT:  Okay.  All right.  What's the issue

22  number two?

23              MR. CAPLAN:  The data string issue, Judge, that

24  Counsel referred to then kind of relates to kind of, I think,

25  what is the main issue that's been a dispute between the

1   parties since we started meeting and conferring.

2           THE COURT:  I don't doubt that.

3           MR. CAPLAN:  And that -- and that is whether or not

4   the defendants at this stage of the litigation, before the

5   motion to dismiss has been ruled on, before the class has been

6   certified, needs to provide class information.  That seems to

7   be the main issue that incorporates both the data string and

8   certain other issues.

9           Now, the data string itself, Your Honor, has an

10  additional issue in it, because the data string relates to

11  debtors that are across the country and not just in Indiana,

12  and the class is only Indiana.  So, the data string is, in

13  fact, well outside of the bounds of this case.

14          But, as to the Indiana debtors, it's been our

15  position, from the start of this discovery process, that

16  precertification identification of names, addresses of the

17  potential putative class members is improper.  And Plaintiffs

18  have suggested that they need it now.

19          We have suggested to them a couple of different

20  options.  One is, they do have the names that we've provided

21  of defendants that we have sued in lawsuits.  And the second

22  thing we've offered is perhaps some type of a sampling so that

23  we could provide them a certain number of names and addresses,

24  and perhaps even a certain amount of information about those

25  folks.  But, we do believe that it's improper to provide class

1  information at this stage of the litigation.

2          While we've been at it a while, Your Honor, we're

3  still in the early throes of discovery.  The case isn't at

4  issue yet, it hasn't been certified, and we think it's a

5  little premature for class information to be provided.

6          THE COURT:  The plaintiff's first response to that

7  is that those -- that that objection was never timely raised

8  in the response.  So, can you direct me to where in

9  Defendant's responses that objection was raised?

10         MR. CAPLAN:  Your Honor, in the responses, you are

11  correct.  He said they would produce the documents.  However,

12  at the start of our negotiations, our position with Defendant

13  has been clear.  If you look at tab R of their motion to

14  compel, which my letter is dated -- oh, I apologize.  I wasn't

15  on the record.

16         COURTROOM DEPUTY:  I was picking you up a little

17  bit.

18         MR. CAPLAN:  Okay.  If you look at tab R, Your

19  Honor, of their Plaintiff's motion to compel --

20         THE COURT:  Give me just a minute.

21         Your letter dated November 2, 2013?

22         MR. CAPLAN:  That's correct.

23         THE COURT:  Okay.

24         MR. CAPLAN:  That letter, Your Honor, sets forth in

25  writing the position that we discussed in person at

1  Mr. Riley's office, I believe, on October 29th, 2013, and

2  specifically says in number one, in response to number two, on

3  the first page, that, as well as I think throughout other

4  points, as well, that we thought that precertification --

5  providing precertification class information, such as names

6  and address, is premature.

7         The same thing with number two.  We did produce, for

8  example, the damage information they needed, but we didn't

9  specify it as to the names and addresses of people.  Again,

10  our position has been clear.  They've understood the

11  position --

12         THE COURT:  But this was after.  So, the specific

13  argument is that by failing to raise it as an objection to the

14  response, you've waived the objection.  This was after the

15  response.  So, how do you address their argument that you did

16  not raise this objection in responding to the request;

17  therefore, you waived it, and now you can't raise it

18  subsequent to the response in response either to a

19  meet-and-confer or a motion to compel?

20         MR. CAPLAN:  Your Honor, I believe the case law that

21  was cited requests timely objection.  I think that this letter

22  shows that from the get-go of discussing this with them, we

23  did raise a timely objection.  They've certainly understood

24  our position.  And our position has been uniform ever since we

25  started talking with them in October of 2013.

1        THE COURT:  Do you have any case law to support the

2  argument that an objection raised after the response is

3  timely?

4        MR. CAPLAN:  I do not have that with me, Your Honor,

5  right now.

6        THE COURT:  Okay.

7        MR. CAPLAN:  I could look for such case law.

8        THE COURT:  Okay.  Do you need the people who don't

9  live in Indiana?

10       MR. TOWNSEND:  We do, Your Honor.

11       THE COURT:  Why?  Why are they relevant?

12       MR. TOWNSEND:  To cross-reference with the list of

13  names that Chase Bank originally put into the trust.  The

14  wider data that we have to cross-compare, the better evidence

15  we will have that these accounts have already been sold and

16  not actually sold to LVNV.

17       THE COURT:  Let's say there's 10,000 accounts in the

18  data, 2,000 of them are from California, and all of them have

19  been previously sold.  They're irrelevant to this case, aren't

20  they?  Because none of these people are in this class.

21       MR. TOWNSEND:  It would go to show that the entire

22  accounts have been sold, including the Indiana account, but

23  the other names will be useful for us to prove that.  What we

24  were focusing on in this case, of course, is the Indiana

25  account.  It's what we've asked for, it's what they agreed to

1  produce.  It may be a lot of names, but it's just a computer

2  data string.  Our experts are going to need to use it and

3  review it and compare it for it to be useful.  The more names,

4  the more useful it is.

5          THE COURT:  But if there were, for example, 10,000

6  names on there, and 500 of them are from Indiana, if the other

7  9,500 have been sold, if you can't show that the Indiana ones

8  have been sold, how is that relevant?

9          MR. TOWNSEND:  Well, it would certainly go as a

10  piece of evidence that they have been sold to suggest that the

11  Indiana accounts were sold, as well.  The Indiana accounts,

12  undoubtedly, will show up, as well, but the wider base we

13  have, the more evidence we have to show that the sale actually

14  took place.  And that's what we intend to use it for, and not

15  for any other purpose, where they can produce it under the

16  protective order, and we will treat it accordingly.

17          THE COURT:  Do you have anything further on this

18  point, Mr. Caplan?

19          MR. CAPLAN:  No, Your Honor.

20          THE COURT:  Okay.  Just so I'm on the same page, the

21  purchase agreement is one or more of the defendants buying a

22  bunch of debt from one of the banks?

23          MR. CAPLAN:  Correct.

24          THE COURT:  And the data string is all of the data

25  that the bank has about each one of those debts?

1          MR. CAPLAN:  That's correct.

2          THE COURT:  Okay.  And you have produced solely the

3   pieces of that that relate to the named plaintiffs, is that

4   accurate?

5          MR. CAPLAN:  That's correct.  We redacted I think it

6   was ten before and after to show where they were in the data

7   string, and then we produced -- we also produced the damage

8   information that they had requested in a separate request, I

9   think, with regard to the class itself for the four years.

10   And I'm sure we'll get to the next part of it, be it for the

11   six years, but I believe that's correct.

12          THE COURT:  Okay.  Anything more from the plaintiff

13   on this point?

14          MR. TOWNSEND:  Just that there appear to be numerous

15   data strings.  There's a -- there appears to be -- although

16   with the redactions, it's hard to tell.  There appears to be

17   like a master purchase agreement and then a monthly purchase

18   agreement; each would have its own data string.  We just ask

19   that the production be complete.

20          MR. BORUTA:  If I may talk --

21          THE COURT:  No.  I get one person arguing from each

22   side.  So, if you want to confer for a minute.  I'll lose

23   control of this electronic record if I have six people talking

24   out there.

25              (Off the record.)

1          MR. TOWNSEND:  We would just ask that the Court

2    order production of all of the data strings.  At this point

3    we're not able to identify how many separate rolling data

4    strings there are, but we just ask for all of them within the

5    secure period leading up to the filing of the complaint.

6          THE COURT:  Okay.  Anything else?  Anything else on

7    this point?

8          MR. CAPLAN:  No, Your Honor.

9          THE COURT:  All right.  What's the next issue that

10   remains in dispute?

11         MR. TOWNSEND:  In our brief, at V, with respect to

12   request number 71, we've asked for the documents and data

13   counts that would show each credit card receivable account

14   purchased or handled by LVNV for Indiana consumers since the

15   filing of the complaint, which they agreed to produce.

16         In the previous request for production, number 70,

17   we asked for the six years leading up to the filing of the

18   complaint, to which they objected.  They have agreed to

19   produce the information since the filing of the complaint.

20   We've not received it yet.  This would -- this would likely

21   include the same data strings that we've been talking about,

22   but we're specifically asking for the data strings that worked

23   their way down to LVNV rather than a different -- any other

24   defendant that made the initial purchase and then assigned

25   down to LVNV.

1           THE COURT:  Okay.  And is this -- this was the --

2    Mr. Caplan mentioned earlier the six years versus four years.

3    This is as good a time as any to address that point.  Is it

4    different for this than just generally?

5           MR. TOWNSEND:  Again, the plaintiff's position is

6    that it's not different that the statute of limitations

7    relating to our fraud count is six years, and that's the time

8    period that we believe is relevant to the discovery requests.

9           THE COURT:  Okay.  Mr. Caplan?

10          MR. CAPLAN:  Your Honor, we have actually, in my law

11   firm's possession --

12          COURTROOM DEPUTY:  Your microphone.

13          MR. CAPLAN:  I apologize.  Thank you.

14          Your Honor, we do have, in my law firm's possession,

15   the six-year data, the extra two years' worth of data.  I got

16   it just yesterday.  Rather than produce once with the

17   information we had provided to them, we thought we would save

18   some time and expense, perhaps, and wait to discuss with you

19   what precertification information that you would order should

20   be provided.  But, we do have the full six years to provide as

21   soon as Your Honor makes that decision.

22          THE COURT:  So that's not an issue anymore?

23          MR. CAPLAN:  I don't believe so.

24          THE COURT:  All right.  All right.  So, with

25   regard -- this is as good a time as any to talk about this.

1   All right.  So, with regard to this response, LVNV's response

2   to number 70, let me ask this generally:  Have you produced a

3   privilege log?

4           MR. CAPLAN:  We have not, but we have discussed that

5   with counsel, and we believe there are a few privileged

6   documents.  But we may have that discussion as part of our

7   meet-and-confer, Your Honor, and we promised we would provide

8   a privilege log to them.

9           THE COURT:  Okay.  Because I'm just trying to

10  understand, how would any documents responsive to this request

11  be privileged?

12          MR. TOWNSEND:  Your Honor, if I may, you're

13  referring to --

14          THE COURT:  70.

15          MR. TOWNSEND:  70?

16          THE COURT:  Yeah.  It gets to the problem of, you

17  have incorporated in each of these responses this blunderbuss

18  of general objections, number two of which is it asks for

19  privileged information.  So, to every single request, you've

20  objected that it's overly broad, unduly burdensome, not

21  reasonably limited in time and scope, it asks for privileged

22  information, and all of these other things, about 90 percent

23  of which don't apply to each specific request, which makes it

24  frustrating for me to deal with.

25          It makes it frustrating for the plaintiff, because

1  they have no idea what you're objecting to, because most of

2  these objections clearly don't apply to most of these

3  requests, but you've made them, just like you've written them

4  in there, which is, of course, you know, the folly of these

5  general objections, generally.

6          So, I need to understand the specific objections

7  that you have made to this request.  Is it limited to overly

8  broad and unduly burdensome or is there something else?

9          MR. CAPLAN:  One of our objections here, Your Honor,

10 was that LVNV itself never actually purchased any of the

11 portfolios.  We have provided to them who was the purchaser

12 and how LVNV acquired it, and that's kind of what the last

13 sentence of our specific objection to request number 70

14 relates to.  So, it goes to -- from a different entity and

15 then LVNV acquires it from there.

16         THE COURT:  All right.  But that's within the scope

17 of the request, right?  Because it was purchased, acquired, or

18 otherwise handled?

19         MR. CAPLAN:  That's correct.  So as to, "acquired or

20 otherwise handled," that is correct.  And, you know, we

21 believe that providing all these documents and data counts,

22 and including addresses and names at this point,

23 precertification, I think this is the same issue as we've

24 raised before, is improper at this stage, before we're at

25 issue on the complaint or that the case has been certified.

1           THE COURT:  Okay.  Let me ask again.  Other than --

2    there's a specific objection in this response, that it's

3    overly broad and unduly burdensome.  Are there any of the

4    general objections, other than those two, that are being

5    incorporated into this specifically?

6           MR. CAPLAN:  I can say here, Your Honor, no.

7           THE COURT:  Okay.

8           MR. CAPLAN:  We have talked about the overbroad and

9    unduly burdensome previously with regard to the data strings

10   show --

11          THE COURT:  This is Indiana, this is only asking for

12   the Indiana.  And we've now resolved the six-year issue, which

13   may have been part of the overbreadth, so what -- are you

14   continuing to object that this request is overly broad?  And

15   if so, can you articulate for me the basis for that objection?

16          MR. CAPLAN:  No, Your Honor.  I see that it is only

17   an Indiana address, so the only objection that we have, Your

18   Honor, with regard to this is the one that I've articulated a

19   couple of times with regard to the stage of the litigation and

20   the precertification disclosure of putative class information.

21          THE COURT:  Again, that specific objection was not

22   raised in the response.

23          MR. CAPLAN:  Correct, Your Honor.  I think we

24   discussed that.

25          THE COURT:  All right.  Anything else on this point?

1          MR. TOWNSEND:  No, Your Honor.

2          THE COURT:  All right.  What's the next one?

3          MR. TOWNSEND:  The plaintiff's V on page 10 of their

4   opening brief.

5          THE COURT:  VI?  No, wait a minute.

6          MR. TOWNSEND:  VI.

7          THE COURT:  VI?

8          MR. TOWNSEND:  VI, which is the Moody's

9   information --

10          THE COURT:  Okay.

11          MR. TOWNSEND:  -- generally, a series of requests.

12   It's our position that the defendants engaged in

13   securitization, that they are not licensed to do so.  And

14   we've asked for very specific information from Moody's that

15   relates to two different securities that Moody's says that

16   they have reports for.  Defendants -- this is one that

17   Defendants have objected to generally, and we believe that it

18   will go to the issue of securitization, which we've raised in

19   our complaint, and will show that, in fact, they do securitize

20   these accounts.

21          THE COURT:  And how is that relevant to a claim or

22   defense you've made in the matter?

23          MR. TOWNSEND:  Well, it goes to show that they're

24   not licensed to do what they're doing; that is sell

25   securities.  They're not licensed.  We've alleged they're not

1   licensed as a debt collector in Indiana.  It goes to their

2   RICO counts to show a pattern of illegal activity, and it's

3   relevant to the claims that we've set forth in the complaint.

4        THE COURT:  As I read the complaint, it is focused

5   on allegedly fraudulent collection activity.  So, how is it --

6   can you point me to the allegations in the complaint that deal

7   with the improper sale of securities?  Paragraph 27 forward?

8        MR. TOWNSEND:  In the factual allegations, yes,

9   paragraph 27 of 47 through 49.  And what they do with their

10  accounts is similar to what Chase and Citi would do with the

11  original receivables.  And they're all subject to the same

12  kind of regulations.

13       THE COURT:  Which of the actual claims, which count

14  of the complaint, do these issues apply to?

15       MR. TOWNSEND:  Counts 4, 5, 6, and the RICO counts;

16  and also Count 3, failure to own the debt.

17       THE COURT:  All right.  What is it you believe the

18  Moody's information shows?

19       MR. TOWNSEND:  That the defendant takes this

20  information that they acquire from the banks, they bundle it

21  up, securitize it, and sell it off.  And we think that Moody's

22  ratings -- Moody's rates these securities that they put

23  together and sell off.  And we're asking for -- to see Moody's

24  information relating to these securities that they sell off,

25  to show, first of all, that they engage in this activity

1  without being licensed to do so; and, second, to show that

2  they no longer own those accounts because they've sold them

3  off to another party as a security.  And the Moody's --

4       THE COURT:  How is the Moody's information going to

5  tell you whether they sold the accounts or not?

6       MR. TOWNSEND:  Well, it will go to the issue of

7  whether they do, in fact, securitize in the first instance.

8  The defendants have told us they do not securitize and so we

9  don't need the Moody's information.  We believe the Moody's

10 information will show that they do securitize, and then that

11 will lead to the selling off of the account.

12       THE COURT:  Mr. Caplan?

13       MR. CAPLAN:  Your Honor, Plaintiff's counsel is

14 correct.  We have told Plaintiff's counsel that we do not

15 securitize and sell securities with regard to the credit card

16 debts at issue.  They deposed the individuals, as you know,

17 and each of the individuals told them they don't securitize or

18 sell securities with regard to these credit card accounts.

19       We've also told them what these Moody's are, because

20 we get loans from the banks to purchase the credit card

21 portfolios.  And they rate the portfolios, so they know what

22 to charge us with regard to these loans.  I'm not sure what

23 else we can tell them with regard to this, but there is no

24 claim for unauthorized or unlawful sale of securities without

25 being registered.

1   We have suggested that if they don't believe us,

2 that why don't they take Moody's depositions and hear it from

3 the horse's mouth, and perhaps that will get to the bottom of

4 this.  And we still think that's the proper evidence.

5   THE COURT:  Anything else on this?

6   MR. TOWNSEND:  Just that we're left in the dark to

7 some extent.  The defendants have responded to our motion by,

8 in their brief, by pointing out that we continue -- Plaintiffs

9 continue to ask for some documents that simply do not exist,

10 and then they refer to the Moody's documents as in that

11 category.  But then they clarify it to some extent by saying

12 because these documents don't show that we securitize.

13   So, on the one hand they say the Moody's documents

14 don't exist.  On the other, they say that they don't show that

15 they securitize.  We would ask that they tell us, do they

16 exist, and to produce them, because we believe it will go to

17 show that they securitize.

18   And if they -- if they are unable to produce them,

19 then at least identify them and let us know that Moody's has

20 them so that we can go to Moody's and subpoena the

21 information.  But, at this point we're left without a clear

22 answer as to whether they even exist.

23   THE COURT:  Mr. Caplan, the documents exist?

24   MR. CAPLAN:  I do not know, Your Honor, that my

25 clients -- I can't tell you that these documents that they've

1  specified exist, or if they do exist, that my client has them,

2  but I can tell you that to the extent that we do have such

3  documents which would evidence rating our loans, we could

4  produce those, but they don't have to do with selling

5  securities and they don't have anything to do with the claim

6  that's relevant to the lawsuit.

7          THE COURT:  Okay.  Anything else?

8          MR. TOWNSEND:  No, Your Honor.

9          THE COURT:  What's next?

10          MR. TOWNSEND:  Next is Plaintiff's VII, beginning on

11  page 14.  These requests generally relate to collection

12  activities in the state of Indiana.  Defendants had

13  initially -- well, I will say with respect to requests for

14  production number 25 and 26, Defendants agreed to produce the

15  documents showing their collection activities.

16          When we filed the motion to compel, they claimed

17  that they understood those requests to relate only to the

18  named plaintiffs and not to the plaintiffs in the class.  We

19  clarified for them, before we filed the motion to compel, that

20  we were seeking the information for the entire Indiana class

21  and not just the named plaintiffs.

22          Although the request only uses the word "plaintiff,"

23  which they say led to the confusion, in the other document

24  requests, when a request was limited to the named plaintiff,

25  it said, "Plaintiff, Andrew Cox," and not "plaintiff"

1   generally.  So, to the extent there could have been initial

2   confusion, we cleared it up.  We told them we want the entire

3   class.

4           They agreed to produce with respect to 25 and 26

5   initially.  Request number 28 relates to internal practices

6   that they have.  They have produced one document relating to

7   internal practices.  If that's all, that's fine.  If there are

8   more, we would ask that production be complete.

9           With respect to request number 57, we have agreed in

10  this round of discovery to waive that request and not pursue

11  it here with the Court.  That's request number 57 on page 15

12  of our opening brief.

13          Requests number 66 and 68, we have no doubt that

14  what is requested is the collection activity relating to the

15  Indiana class for the six years preceding filing of the

16  complaint.  And the defendants agreed in October to produce

17  that information, and that's requests 66 and 68.  And those,

18  as yet, have not been.  We would suggest that because they

19  agreed to produce them, have not raised any other timely

20  objection that might apply, that the Court order them to

21  produce the collection activities relating to the Indiana

22  consumers.

23          THE COURT:  Mr. Caplan?

24          MR. CAPLAN:  With regard to numbers 25 and 26, Your

25  Honor, we did, in fact, produce the documents with regard to

1  the named plaintiffs.  They were stacked about three or four

2  inches high.  I think Mr. Riley has them here at counsel table

3  so you can see it.

4        We spoke specifically with Plaintiff's counsel about

5  this at the meet-and-confer, and I believe they specifically

6  said, oh, they don't want this for everyone because this would

7  be reams and reams of paper that they would never get through.

8  We did not have a meet-and-confer about producing everyone

9  else since then.

10       We first heard in the motion to compel that they

11 wanted such documents, and then when we had our

12 meet-and-confer after we filed our response, they said, "Oh,

13 yeah, that applies to everyone in the class."  I think that

14 that's overbroad, unduly burdensome, and would relate to the

15 same objections that I made before, Your Honor, with regard to

16 precertification issues.  It's overbroad and unduly

17 burdensome, also, because it asks for things that aren't even

18 at issue in the complaint.

19       This is not an issue -- this complaint doesn't deal

20 with sections of the FDCPA except for licensing and

21 registration.  It's not that we didn't give Miranda warnings,

22 not that we didn't verify the debt, et cetera, et cetera.  I

23 think that numbers 25 and 26 specifically relate to the

24 plaintiffs, not to the class.  And that's the statement on

25 that.

1        I could address the others or we could go --

2        THE COURT:  Let's stop there for a minute.  You need

3   that level of data with regard to every person in Indiana?

4        MR. TOWNSEND:  Well, Your Honor, obviously, they

5   printed out many pages relating to the two named plaintiffs.

6   And I would agree, we do not necessarily --

7        THE COURT:  Right.  Number three?

8        MR. TOWNSEND:  Three.  They produced it with respect

9   to two, I believe.  Okay, joint credit card, all three were

10  included.

11       THE COURT:  We can agree that's about four inches of

12  data?

13       MR. TOWNSEND:  Yes, Your Honor.  What would be more

14  useful to the plaintiffs would be something similar to a

15  one-page summary that the defendants produce and provide to

16  bankruptcy courts in pursuing a collection matter.  And, Your

17  Honor, could we speak to this?  This -- is that okay?

18       THE COURT:  We'll see.  Go ahead.

19       MR. TOWNSEND:  Mr. Boruta, in his Chapter 7

20  practice, deals with proofs of claims from LVNV Funding and

21  Resurgent.  And a proof of claim was filed, and within 30 days

22  Resurgent was able to produce information in a computer

23  database form with the amount of the claim, the last time

24  there was a collection effort, what they say the current

25  balance is, the purchase date, who they say they purchased it

1   from, the last payment date, who the current owner is.

2          It's all in an easy computer format that these guys

3   could just press, press, press, instead of saying, you have to

4   have -- here's four-inches of papers from Andrew Cox.  They do

5   keep this information in an organized way, and it's not just a

6   bunch of papers in a warehouse that they go pull.

7          And these requests go to that kind of information.

8   There's no attempt on their part to allow the plaintiffs to

9   see those summaries.  And instead, for the settlement

10  conference, we're sent a letter that says that these are the

11  amounts that they've collected, and this and that.

12         And they obviously have got the data and they're

13  adding it up this way or that way, and we're not -- you know,

14  it's -- here's an example of it, and that's -- you can't file

15  33,000 lawsuits in the state of Indiana and not keep a pretty

16  good track on them, on a computer database, and come up with a

17  number.

18         And there's no way for us to look at the number,

19  test the number, know if the number is right in the letter

20  that they sent us, without having something like this.  And

21  this would be an easy production to do, much easier than the

22  four inches of the Andrew Cox file.  This could be done, and

23  it's there.  They must have that database.  And we have an

24  example of it from a recently filed proof of claim.

25         THE COURT:  Mr. Caplan?

1          MR. CAPLAN:  Your Honor, this is exactly why the

2    Federal Rules require a meet-and-confer.  We've never had a

3    meet-and-confer on this topic.  They filed their motion to

4    compel --

5          THE COURT:  Wait a minute now.  You said you had a

6    meet-and-confer after they filed this.

7          MR. CAPLAN:  They never told us --

8          THE COURT:  You never discussed this?

9          MR. CAPLAN:  They never told us they wanted this

10   bankruptcy form.  They said -- their request was all

11   documents, and then they never backed off of this.  And all

12   documents is all documents.  And they've never backed off of

13   that until today in front of Your Honor.

14         Now, the bankruptcy form itself is not just a press

15   a button.  And, you know, I don't believe that all of our --

16   of their potential class members have filed for bankruptcy and

17   have that form, so they are essentially asking us for work

18   product to compile stuff for them.

19         THE COURT:  Are you suggesting -- the information

20   would be in somebody's database.

21         MR. CAPLAN:  I believe that there's information on

22   these plaintiffs, absolutely.

23         THE COURT:  Are you suggesting they can't request

24   that compilation?

25         MR. CAPLAN:  I haven't done that research here, Your

 1  Honor.  And I --

 2        THE COURT:  That would not conform with my reading

 3  of Rule 34, particularly after the 2006 amendments to Rule 34.

 4  They amended what could be requested.  Rule 34(a), a party may

 5  serve on any other party a request within the scope of Rule

 6  26(b)(1) to produce and permit the requesting party or its

 7  representative to inspect, copy, test, or sample the following

 8  items in the responding party's possession, custody, or

 9  control.  And in 2006, the words "test" and "sample" were put

10  in there.

11        And I see some case law, but I've always read that

12  to suggest that that allows, if there's information in the

13  database, for it to be extracted.  And it's not just, well, we

14  never print that report, so we don't have to produce it.  If

15  the data is extractable, it can be extracted.

16        So, obviously, it's extractable, because it gets

17  extracted on certain occasions, so I would be unconvinced that

18  that information isn't producible in that format for anybody

19  you had the data for, whether it's been done or not.  Now,

20  that does not answer the question of how difficult or easy

21  that is to do.  And you don't have that information as we sit

22  here?

23        MR. CAPLAN:  I do not have that answer for Your

24  Honor.

25        THE COURT:  I guess my question is:  What's the

1   relevance to the case of that information on a class-member-

2   by-class-member basis?  Because, presumably, you've moved for

3   a class action because you say, well, this is all -- it's all

4   typical, you know, we can bring this all in one place, we

5   don't have to get into the weeds of what happened with regard

6   to each particular individual.

7           And the further -- the further we dig into those

8   weeds, the less the case starts to look like a proper class

9   action.  So that's -- whatever the burden, there's some burden

10  to providing the information in the form that you seek it.  So

11  how is that -- I understand there might be some relevance to

12  it, but, you know, if there's some burden, the benefit has to

13  exceed the burden to get it, and I'm trying to understand what

14  benefit you get from getting that information.  They've given

15  it to you on a gross basis; is that correct?

16          MR. TOWNSEND:  They have given us some gross numbers

17  that we are not able to verify, and the numbers have come in

18  the form of a letter from the lawyer.  We believe we need the

19  information to verify the gross numbers, to identify the

20  class, to see, you know, the numerosity, and also to

21  identify -- in the collection process, you know, we can see

22  how many plaintiffs have -- or defendants have complained that

23  the amounts were never verified.  And we may be able to follow

24  up on the information to find out how many people were

25  subjected to inappropriate collection activities.  Without the

1  information, we're hamstrung.  Based --

2          THE COURT:  I thought your claim was they're not

3  licensed to do business in Indiana, so anybody that they did

4  any collection activities to have a claim.  Regardless, it has

5  nothing to do with whether they sent the proper letters or

6  made the proper notices; it's anything you did in Indiana is

7  illegal because you're not licensed to do business in Indiana.

8  So, what does that have to do with anything if that's the

9  claim?  What's all that weeds got to do with the claims in the

10  case?

11          MR. TOWNSEND:  If I may?

12          THE COURT:  Sure.

13          (Off the record.)

14          MR. TOWNSEND:  Your Honor, this is information that

15  the defendants initially agreed to produce without objection.

16  And we have been provided an attorney letter, some general

17  information about the damages, about the numerosity.  We

18  believe that the data that's readily available to the

19  defendants should be produced to verify the information that

20  they have provided, and also for the plaintiff's class and

21  their attorneys to see the actual damages and types of damages

22  that are involved in the case, so that we can go forward,

23  pursue the case, and not have to come back and request

24  additional information at a later date when we've already

25  requested it and they've agreed to produce it.

34

1          THE COURT:  Well, I mean, what he said was they

2     agreed to produce it for the named plaintiffs, and they did.

3     And that can be a matter of interpretation.  I mean,

4     reading -- it is certainly not an unfair reading of the

5     request, the request as plaintiffs.  There are three

6     plaintiffs in the case.  Everybody else is a class member.

7          And so it is not an unfair reading to restrict this

8     request to the named plaintiffs.  And that's what they said

9     they did when they responded to it, and they produced the

10    information.  So, they've done exactly what they said they

11    were.  I'm not suggesting that it's an unfair reading to read

12    it to the class, but that's not the way it was read when it

13    was responded to.  So I think it would be unfair for me to

14    say, well, that's not what they meant and so you've waived any

15    objections by not -- by agreeing to produce this stuff.  So,

16    I'm not going to do that.

17         I agree that you need -- you certainly need the

18    information that you've received on a gross basis at a minimum

19    in an admissible form, but it would seem like you could take

20    the information that was in that attorney letter, put it in a

21    request for admission, coupled with an interrogatory if it's

22    denied, and send it to them and say, "Admit the numbers that

23    you gave us so we've got those in an admissible format."

24         I'm still lost why you need this data on an

25    individual-by-individual basis.  I mean, obviously, you've got

1   a better -- you're going to have a better argument if they

2   come in and say, "Oh, those numbers, yeah, we can't admit that

3   those are accurate numbers."  Then we have an issue.  But it's

4   a class case, so I understand why you need the gross

5   information.  I'm still a bit lost on why you need, individual

6   by individual, that data.

7          MR. TOWNSEND:  Well, Your Honor, to the first point,

8   if there could have been confusion in the word "plaintiffs" in

9   our request, apologies to the defendants and to the Court.  As

10  promptly as we could, we clarified that in a letter and said,

11  "No, we" --

12         THE COURT:  I understand that.  But when they

13  responded to it, they read it as the three named plaintiffs,

14  and so you were using as one of your arguments they agreed to

15  produce it.  Well, that's what they agreed to produce, and

16  they did.  I don't think there's any dispute about that.  So

17  I'm not going to read your definition, after they responded,

18  as their agreement to produce everything else.

19         MR. TOWNSEND:  All right.  But -- I'm sorry.

20         THE COURT:  Go ahead.

21         MR. TOWNSEND:  With respect to that, I was kind of

22  responding -- referring generally to the category of document

23  requests.  There are -- the ones following 25 and 26 are

24  undoubtedly corrected to the entire class.

25         THE COURT:  Right.

1          MR. TOWNSEND:  And so when I say they agreed to

2    produce it, I was including those responses, as well.

3          THE COURT:  All right.

4          MR. TOWNSEND:  So the allegations in the complaint

5    are more than just they weren't licensed.  The allegations

6    include that they made no effort to verify this debt, that

7    they buy data strings from these banks.  They have no access

8    to the underlying documents, or no immediate access.  They

9    have no proof that the debtor actually incurred that debt.

10          They take the data strings without any consideration

11    for the Indiana consumers and they go try and collect the

12    money based on the numbers in the data strings.  And they use

13    inappropriate collection activities, which we've alleged,

14    applied to the entire class, because they failed to verify

15    this information.

16          And if -- once we have access to the class members

17    and can see their data, we can identify more fully instances

18    where there have been -- has been a complete failure to

19    provide any proof that this debt is actually owned by the

20    defendants, and we'll be preparing for trial, as well as to

21    the extent there are further questions on class certification.

22    This is information that we need to prepare for trial and to

23    provide to our experts.

24          As an additional point, we internally have looked at

25    the numbers, the summary of numbers that have been provided,

1   and the defense counsel's letter, and they appear to us to be

2   strikingly low.  So, we can serve a request for admission,

3   asking, "Is this number correct?"  But, still, even if they

4   say -- admit, "Yes, this is correct," we're left unable to

5   challenge the number or to provide any evidence contrary.

6           THE COURT:  Mr. Caplan, you did not make an argument

7   with regards to requests 57, 66, and 68.  We just talked about

8   25 and 26.

9           MR. CAPLAN:  If I may respond to one point that

10  Counsel raised, if, in fact, they have other allegations under

11  the Fair Debt Act, other than not being licensed or

12  registered, I would invite them to amend their complaint and

13  bring such allegations.  If it's a -- they have no FDCPA

14  allegation claim for verification -- or lack of verification,

15  they have none for any kind of collections letters or calls in

16  the middle of the night, or anything like that.  But, if they

17  want to do so, they should do so, because I don't know that

18  their named plaintiffs have had these issues.

19          With regard to -- and so I just don't think it's

20  fair, since there's not a claim, to be asking that every

21  single person who might be in the class, that we have to dig

22  through and give them, you know, stacks of documents for

23  everybody.

24          I believe 28 we've provided to them.  As they said,

25  I think they withdrew 57.

1         THE COURT:  Yeah, 57, yeah.  66 and 68?

2         MR. CAPLAN:  And 66 and 68, again, Your Honor, in

3  their motion to compel, this was the first we had discussed

4  these.  I don't think we even discussed these in our

5  meet-and-confer.  We only discussed the 16 issues that we

6  raised in our brief.  I don't think we actually discussed

7  these two numbers ever.

8         I think they're premature at this point.  I don't

9  think we've ever had a discussion about what they need and why

10 they need this.  But I'm happy to address those.  If it's

11 just --

12        THE COURT:  I mean, you said -- 66, you said you

13 produced it, you said, for both of them.  I mean, the last

14 sentence says, "We'll produce them."

15        MR. CAPLAN:  If it's just a number of letters and a

16 number of calls, we can produce that to the extent we have

17 that information.

18        THE COURT:  All right.

19        MR. CAPLAN:  I'm not sure of the relevance of it,

20 but, yes, we said that and we will do so.

21        THE COURT:  The problem I have, Mr. Townsend, with

22 the more detailed information is, if that detailed information

23 is relevant to this case, how is it a class action?  I mean,

24 if particular communications with particular class members --

25 I mean, you know, it's a class action if -- I'm on board with

1  you, they're not licensed to do business in Indiana, anything

2  they do in Indiana is illegal.  And if that's a violation,

3  that would apply to everybody in the state of Indiana.  That's

4  got class written all over it if that's a valid claim.

5      If, well, they made a particular call to a

6  particular class member, they sent a particular letter to a

7  particular class member, that's starting to not look like a

8  class at that point.

9      And I'm just -- and with regard to -- with regard to

10  if you get a formal discovery response that answers the

11  question on a gross basis, you know, the question of, "We

12  don't know if they're telling the truth," you know, to the

13  extent that's the relevant information, further discovery on

14  it would be cumulative and you would have to show some basis

15  for a belief that they were not telling the truth to justify

16  additional discovery on the point.  I mean, sometimes an

17  answer is an answer whether you like it or not.  Maybe there's

18  just not that much activity in Indiana.  I don't know the

19  answer.

20      MR. TOWNSEND:  But to address that particular point,

21  I would never suggest that we don't believe defense counsel.

22      THE COURT:  Right.  But the last point you made was,

23  "We have no way of testing the response they give."  I mean, I

24  think you're entitled to a formal response that is admissible,

25  which is probably not a letter from Mr. Caplan, although it

1    might be.  But, you know, I would probably want to firm that

2    up into a formal discovery response.

3              But I expect that if Mr. Caplan has made the

4    representations, or another counsel, that this is the

5    information, that they will stick by that when you attempt to

6    formalize it.  If that becomes an issue, then it may be an

7    issue.

8              Okay, is there anything else on this point for the

9    plaintiff?

10             MR. TOWNSEND:  No, Your Honor.

11             THE COURT:  Anything else for the defendant?

12             MR. CAPLAN:  No, Your Honor.

13             THE COURT:  Okay.  What's the next one?

14             MR. CAPLAN:  The next is VIII, which appears on

15   page 20 of Plaintiff's opening brief.

16             THE COURT:  Okay.

17             MR. CAPLAN:  And this is one that we discussed after

18   the filing of the motion to compel, and I believe we have an

19   agreement that the defendants will produce a list of all

20   Indiana FDCPA suits for the last four years, and complaints,

21   if they are in defendant's possession, custody, or control.

22   And the plaintiffs are agreeable to that production.

23             THE COURT:  Agree?

24             MR. CAPLAN:  That's correct, Your Honor.  We still

25   don't believe they are relevant, but we will produce them.

1              THE COURT:  All right.  What's next?

2              MR. TOWNSEND:  Item IX on page 21, insurance

3  policies.  This is another discovery request that we have

4  discussed since the filing of the motion, and the defendants

5  have yesterday produced an insurance policy, which we

6  appreciate.  I don't know, they didn't represent whether it

7  was all of the insurance policies, but I don't believe they

8  have an objection to producing whatever policies they have.  I

9  just don't know if the one we received is all of them.

10             MR. CAPLAN:  I believe it's the relevant policy for

11  them, but we can certainly talk some more if there's anything

12  else you think you need.

13             THE COURT:  I mean, Rule 26(a)(1) requires any

14  defendant that has an insurance policy that's covering any

15  part of this is supposed to be produced for inspection.  So,

16  since they formally requested it, it ought to be produced.

17  That would be my position.

18             MR. CAPLAN:  Agreed.

19             THE COURT:  All right.  What else?

20             MR. TOWNSEND:  Next is item X, which is requests 51

21  and 52.

22             THE COURT:  Okay.

23             MR. TOWNSEND:  And that is financial reports to

24  investors and the tax returns of the defendants.  We believe

25  that the information is relevant to go to the issues of the

1   ownership of Defendants, which we have repeatedly attempted to

2   learn who are the true owners of these defendants.  They've

3   repeatedly failed to disclose the true ownership.

4          We believe that the financial information contained

5   in the reports and the tax returns will also shed light on

6   the -- whether and to what extent they engage in

7   securitization of securities.  It will help to identify the

8   current and former officers of the corporations or entities so

9   that we can follow up with depositions of the most

10  knowledgeable people.  And it will go to punitive damages, as

11  well.

12         We have agreed -- we've discussed with Defendants

13  the financial reports they claimed that they produced.  They

14  prepare many financial reports.  We don't know which ones

15  they've produced -- or prepared, which ones go to their

16  investors, their owners.  We have agreed in our reply to limit

17  our initial request to only audited financial reports that the

18  company has prepared in the last two years, take a look and

19  see what information is contained in those that may be

20  sufficient.

21         We asked what type of reports that they have in

22  addition to their employee reports and things, and didn't get

23  a clear answer.  So, audited financial statements that would

24  disclose the ownership and the structure of the corporations,

25  reveal the securitization, and the same with respect to the

1  tax returns.

2          THE COURT:  Mr. Caplan?

3          MR. CAPLAN:  Your Honor, just because Plaintiffs

4  file a lawsuit against Defendants doesn't give them the right

5  to just say, "Let me have all of your financial information."

6  There has to be a reason why it's relevant.  They, for the

7  first time after they filed a motion to dismiss, in their

8  conference, they suggested that it would relate to ownership,

9  securitization, as they just said.  I don't think that our

10  financial data has anything to do with that.

11          The only thing that they've offered, that is

12  potentially even relevant, is punitive damages, which they've

13  now offered, said in their reply brief for the first time.

14  When we talked about it, they offered no reason why they

15  thought any of this was relevant.

16          And the punitive damage claim here, there's no

17  punitive damages for RICO, there's no punitive damages under

18  the Fair Debt Collection Practices Act.  The only claim I can

19  see is their fraud claim, I believe.

20          And our position is that to disclose financial

21  information, tax returns, and whatever amorphous financial

22  information they've requested and wouldn't limit is extremely

23  premature at this stage, or not even at issue.  We don't even

24  know what claims are surviving.  And, clearly, there's been --

25  we haven't gotten past the motion to dismiss stage, let alone

1  summary judgment, in order to be discussing punitive damages.

2       I believe Your Honor had a recent decision which

3  addressed that --

4       THE COURT:  Now you're going to start citing my

5  cases?

6       MR. CAPLAN:  I think it's the *Ripberger* case.

7       THE COURT:  Okay.  Plaintiff's brief cited a lot of

8  familiar cases.  Anything else on this?

9       MR. TOWNSEND:  Just to the point of the ownership of

10  the defendants.  We've sought mightily to learn that.  The

11  issue was raised by the defendants in their motion to dismiss,

12  but in the initial corporate disclosure statement the

13  defendants identified their ownership.  And then eight days

14  later they changed the ownership of their structure by

15  creating new entities.

16       In a deposition that we took of one of their

17  chairmen, the guy that names the corporation, he says that

18  even after that, they had set up a sub S corporation that now

19  was the new owner.

20       In the meet-and-confer, the defendants have agreed

21  to provide ownership information, and did; and, indeed, two

22  days ago, on January 29, sent a letter outlining the ownership

23  of the entities, which we appreciate.  But the information in

24  the letter contradicts the sworn testimony of their chairman,

25  who testifies about these matters.

1        And it also appears that the entities that they've

2    identified now are the -- are entities that were created eight

3    days after their corporate disclosure statement, which has not

4    been amended as Federal Rule 7.1 might suggest it should have

5    been.

6        And so we're at a loss to actually identify who the

7    actual owners of this company are, and we continue to search

8    for that.  We believe that these two document requests will

9    shed more light on that issue.

10        MR. CAPLAN:  I guess there's two responses, Your

11    Honor.  One is, financial information will not provide them

12    the ownership information.  I think they're separate

13    categories.  And so I stand on what I said about the financial

14    information.

15        With regard to the ownership information, which is

16    new, we did provide them with the ownership of the two

17    entities that they had asked for, and I don't agree that it

18    contradicts what the person said.  I think the fact that there

19    was an S corp from one individual that changed is a bit of a

20    red herring here, because what that S corp has anything to do

21    with the licensing of other entities, LVNV and Resurgent, down

22    the road, they're -- I know they're focused on an S corp of

23    one individual, but I don't see the actual relevance here with

24    regard to any of the claims.  But there's nothing nefarious

25    about it.  It was done -- you know, I guess that's all I would

1   say about it.

2         With regard to the ownership, I think they have the

3   ownership.  We've suggested to them and to the Court long ago

4   that if they're going to ask individuals about who owns what

5   entities, they can tell you what they know, but perhaps the

6   30(b)(6) deposition would be the best way for them to explore

7   the org chart we've given them.

8         They haven't done that yet.  All they've done is

9   taken individual depositions, Your Honor.  So for them to

10  claim all this confusion when we've provided them the

11  information, I think it rings a little hollow.  We've provided

12  them what they have asked for.  And regardless of what their

13  theories are, I believe we've complied with their discovery

14  requests.

15        THE COURT:  Anything else?

16        MR. TOWNSEND:  No, Your Honor.

17        THE COURT:  Okay.  What's next?  XI?  Let's resolve

18  that one.

19        MR. TOWNSEND:  XI is -- Your Honor, I don't think

20  we -- we don't believe we've resolved -- although I might as

21  well say that we received a letter from Defendant's counsel

22  stating on January 2nd (inaudible).

23        THE COURT:  Well, if any of these did exist, they

24  would be on Edgar, wouldn't they?

25        MR. TOWNSEND:  No.  We haven't been able to find

1  (inaudible).

2          Your Honor, if I -- one more point.  When we search

3  for these files, it would be helpful to know who the filings

4  are being submitted by, who the owners are, what entity is at

5  the top of the food chain.  You know, we can search for the

6  names that we were initially able to identify ourselves, our

7  named defendants, but they change from time to time.  And so

8  if there are any SEC filings by any of the defendants, whether

9  owners, new or otherwise, then that's what we're seeking.

10          THE COURT:  Is it possible to simply make that

11  unequivocal statement that for each one of these, that LVNV

12  has made no SEC filings, and for the others?

13          MR. CAPLAN:  I can unequivocally say that for all

14  the defendants, no SEC filings have been made with regard to

15  any of the issues here, the sale, the purchase of these

16  portfolios of credit card debt.  I can --

17          THE COURT:  I'm not sure what that means.  A 10-K --

18  I mean, you know, a 10-K wouldn't talk about a particular

19  transaction.  So have any of the defendants filed a 10-K?

20          MR. CAPLAN:  Your Honor, these are -- I've discussed

21  this internally with lots of folks.  These are large companies

22  that do more than just the purchase of portfolio companies at

23  issue here.  I don't have the ability to tell you that none of

24  the entities do anything that may require it.  All I can tell

25  you is, for any of the issues that we're here for today in

1   this case, there's no securitization, there's no SEC filings.

2   I don't know why anything else would be relevant.

3           THE COURT:  Anything else, Mr. Townsend?

4           MR. TOWNSEND:  No, Your Honor.

5           THE COURT:  What's next?

6           MR. TOWNSEND:  Item -- or XII on page 24.

7           THE COURT:  Okay.

8           MR. TOWNSEND:  Requests for production number 54.

9   We've agreed, in our reply brief, not to pursue 55, because we

10  believe it would be included in the production for 54.  Again,

11  this -- we've asked for internal correspondence between the

12  defendants relating to the plaintiff's debt.  They agreed to

13  produce the information, and we simply haven't received it

14  yet.

15          MR. CAPLAN:  To date, Your Honor, we don't -- we

16  haven't discovered any of this information that they're asking

17  for.  So, as I sit here today, there's nothing to produce.

18          THE COURT:  Anything more on this?

19          MR. TOWNSEND:  No, Your Honor.

20          THE COURT:  Okay.  What's next?

21          MR. TOWNSEND:  The next item in our motion is item

22  XIII, which is one that we're willing to waive for the time

23  being and not pursue.

24          THE COURT:  Okay.

25          MR. TOWNSEND:  Next is item XIV, verification of the

1    alleged debt.  Again, we've requested internal procedures that

2    the defendants may or may not have to verify that the debt

3    that they're trying to collect is actually a valid debt or is

4    actually owed or that there's supporting information for it.

5            We simply ask for whatever internal documents they

6    have that define the procedures that their employees are

7    supposed to follow to verify the debt.  And if, as we suspect,

8    they made no effort, and so there would be no documents, but

9    if there are, we think it would be relevant to prove the

10   claims as we proceed toward trial.

11           THE COURT:  Mr. Caplan?

12           MR. CAPLAN:  Your Honor, we objected to this

13   because -- as to what they mean by "verification."

14   Verification of a debt is a specific section of the FDCPA and

15   a specific potential violation.  And it's a term of art as to

16   what a debt collector needs to do to verify a debt.  That is

17   not one of the allegations in the complaint.

18           And so if that's what they mean -- and this is,

19   again, something that we didn't discuss until -- I don't know

20   that we ever actually discussed what they meant by

21   "verification," but if it has to do with an FDCPA verification

22   complaint, that's not a relevant -- that's not a relevant

23   issue.  If they mean, "Hey, tell us that you own Plaintiff's

24   debt," we've provided that documentation, as well.

25           THE COURT:  Mr. Townsend?

1          MR. TOWNSEND:  We didn't ask for verification that

2    they owned the named plaintiff's debt --

3          THE COURT:  Well, is this FDCPA level verification

4    activity?

5          MR. TOWNSEND:  Well --

6          THE COURT:  What do you mean by "verification"?

7          MR. TOWNSEND:  Well --

8          THE COURT:  That's part of the objection.  That's a

9    term of art.  Is the term of art the term that you intend this

10   request to mean?

11         MR. TOWNSEND:  Well, that term of art would be a

12   good starting point.  In my reading of the request, I would

13   use the Webster's Dictionary definition, which I didn't bring

14   with me, but the documents, the procedures that they use to

15   make sure that the debt is valid and accurate.

16         THE COURT:  Okay.  Is there a claim in this case

17   that they failed to verify?

18         MR. TOWNSEND:  Yes.  Well, it is part of our claim,

19   that they failed to verify, and that they pursued the Indiana

20   debtors, and that the statements that they make, that a debt

21   is owed, is a fraudulent statement, because they --

22         THE COURT:  And point me to the --

23         MR. TOWNSEND:  We would go to Count 3, Your Honor,

24   the failure to actually own the debt, in violation of the

25   FDCPA, that debts are -- count -- and this goes to -- we're

1  asking them for (inaudible).

2         THE COURT:  Well, verifying the debt means, does

3  this individual owe this money, right?  That's verification of

4  a debt, right?  That's different than, does the person who is

5  trying to collect it own it?  Am I missing something?

6         MR. CAPLAN:  In fact, it's a specific procedure

7  where the consumer has to say, "Can you verify this debt," in

8  which the defendant then has a statutory obligation, under the

9  FDCPA, in which to do so.

10        MR. TOWNSEND:  Your Honor, also, it goes to show

11 that, as Mr. Emhardt pointed out, our claim that the

12 defendants did not own the debt, because they have no way to

13 verify the debt under any sense of the term, because all they

14 buy is data information.  It does not give them the ownership

15 of these accounts and the information that any debt collector

16 would need to verify.

17        It's been redacted from these contracts, the -- what

18 they go through if they want to have any information besides

19 the number and a name for any particular person that they are

20 going to collect from.  And they go back to the bank and they

21 pay different amounts, which have all been redacted.

22        To even get basic information about the person and

23 what's owed, and things like that, they have to pay for it.

24 And there's a contractual provision that says, if you ever

25 come back to us, you need to start paying us money to get this

1   or this or this, and we may not ever get it for you.

2           And we don't -- I mean, that's all been redacted.

3   We have some idea of what goes on and doesn't go on, but

4   that's what this request was going to.  What do you do to go

5   figure out the amount actually owed?

6           THE COURT:  But is there a claim in this case that

7   they failed to do that?

8           MR. TOWNSEND:  Well, to look at Count 3 and say

9   they -- what they have -- what they purchase is a little bit

10  of information about different Indiana consumers, and a number

11  that a bank says that person owes.  And that's not -- they

12  don't own the debt.  This whole procedure of having to go back

13  to ask for this or that to even have any information aside

14  from a single number goes to the point that they haven't --

15  they haven't obtained this in -- they never did actually own

16  it.  They never bought it.  They just bought a name and an

17  amount of money that someone said they owed.

18          THE COURT:  Anything else, Mr. Caplan?

19          MR. CAPLAN:  No, Your Honor.  I don't think it's

20  part of the case.  I've seen other cases in which this

21  allegation has been alleged, but it hasn't been alleged in

22  this case.

23          THE COURT:  All right.  I have to go take a call, so

24  we'll take a short break, and I'll be right back.

25          (Recess at 10:38, until 10:58.)

1             THE COURT:  All right, it is 10:58 a.m.  We are back

2    on the record in Cox v. Sherman Capital.  We left with --

3    finished with issue XIV.  So what's next, Mr. Townsend?

4             MR. TOWNSEND:  Your Honor, issue XV, the plaintiffs

5    agree to, for the moment, waive that request.

6             THE COURT:  Okay.

7             MR. TOWNSEND:  Item XVI, this is an interrogatory,

8    although in the subheading it's called a "Document Request,"

9    but it's actually an interrogatory, which is Exhibit A rather

10   than Exhibit B.

11            THE COURT:  Right.

12            MR. TOWNSEND:  And, generally, we ask for them to

13   state, not only the number of lawsuits that they've initiated

14   in Indiana in the preceding six years, but names and cause

15   numbers and addresses of the consumers.

16            This is one that the defendants agreed to produce

17   documents in response to the interrogatory.  If they have

18   responsive documents, we would ask that they be produced and

19   that they be identified clearly so that we can know which ones

20   they are.

21            We have received to date some information, names of

22   Indiana consumers, and it's hundreds of pages of random names

23   that are not alphabetized.  And it's -- we are aware of some

24   consumers who should fall into the category of people who have

25   been sued by these defendants, but we don't -- manually going

1  through that list of names, we can't see that the names that

2  we previously identified show up there.

3         So, we would just ask that in responding to this

4  interrogatory, they've agreed to produce documents that --

5  that they produce, you know, usable data that identifies these

6  Indiana consumers with their cause number, name, and address,

7  so that we can actually use the information.

8         THE COURT:  Mr. Caplan?

9         MR. CAPLAN:  We have agreed, Your Honor, to produce

10  the list of names that we produced to plaintiffs in a

11  searchable format, I believe it's searchable, but in a way

12  that they can manipulate the names.  And I know we were

13  working on that this week.

14         With regard to the addresses and causes in the list,

15  I think that relates, again, to the same argument we've had on

16  precertification issues.

17         With regard to the complaints themselves, the

18  defendants, on that issue, do not have access to many of these

19  complaints.  As we've explained, there are law firms and other

20  collection agencies that actually do the litigation work for

21  the defendant entity, for LVNV and Resurgent, and so the issue

22  there is the custody and control.  We have requested and tried

23  to get the actual complaints for all these.

24         I think -- I think it's -- I don't think -- I

25  apologize.  It's been -- it's been -- we haven't gotten a lot

1  of movement.  I'm getting all these.  I would suggest perhaps

2  if they want to see a subset of complaints.  I don't know why

3  they need them for each of the class members, for each of

4  these complaints.  I'm not sure what they would do for them in

5  terms of this case, but a subset of the complaints might be

6  relevant to them.

7          What we have given them is damage information and

8  the names of the folks.  And so I think that the same

9  arguments that we've talked about throughout the day apply

10  here, as well.

11          THE COURT:  So, giving them the names -- will you

12  give them the cause number?

13          MR. CAPLAN:  I don't believe that that's something

14  that is readily available to us.

15          THE COURT:  But their addresses are?

16          MR. CAPLAN:  Yes, they are.

17          THE COURT:  And you don't want to give them the

18  addresses because of the class certification issue?

19          MR. CAPLAN:  That's correct.

20          THE COURT:  Okay.  We've already talked about that.

21          MR. CAPLAN:  And just so the Court is clear, I think

22  we're talking somewhere in the 33,000 range is what we've

23  identified to the plaintiffs.

24          THE COURT:  How many different law firms are

25  involved?

1          MR. CAPLAN:  I thought that the number I have off

2     the top of my head, Your Honor, is more than 100.

3          MR. BORUTA:  183.

4          THE COURT:  183?

5          MR. CAPLAN:  That's the universe throughout the

6     country, and I think they all touch Indiana, that we've seen.

7          MR. TOWNSEND:  Your Honor, it seems more likely that

8     there are only a handful that do the bulk of the Indiana

9     collection work, but we can't know that.

10         THE COURT:  Okay.  Anything else on this one,

11    Mr. Townsend?

12         MR. TOWNSEND:  No, Your Honor.

13         THE COURT:  Mr. Caplan?

14         MR. CAPLAN:  No, Your Honor.

15         THE COURT:  All right.

16         MR. TOWNSEND:  Next is item XVII.  This is an

17    interrogatory where we asked the defendants to explain their

18    affiliations with each other, including common ownership.

19    Defendants objected, claimed it was vague, and asserted some

20    privileges.

21         We believe it's a fairly straightforward request for

22    them to explain their relationship, whether they're shell

23    companies, whether they're pass-through companies, whether

24    they have common ownership, so that we can identify the

25    correct defendants in the case, and we ask that they be

1   required to answer the interrogatory fully and completely.

2          THE COURT:  Mr. Caplan?

3          MR. CAPLAN:  Your Honor, we have provided ownership

4   information up and down the line now.  We believe that for us

5   to identify in an interrogatory answer all the various things

6   they've requested, as well as what counsel has just

7   required -- you know, is it a shell company?  Is it a

8   pass-through company?  Obviously, we don't believe these are

9   shell companies.  We don't -- they have raised this as an

10  issue in the case.  I think that those issues are issues that

11  are subject to depositions and discovery, and not a response

12  in an interrogatory answer -- not properly responded to that

13  way.  And that's why we made our objections.

14         THE COURT:  So on this vagueness question, my

15  assumption is that we've clarified if you inserted the word

16  "defendant" after the word "other"?

17         MR. TOWNSEND:  I believe that's a suggestion that

18  the defendants made.

19         THE COURT:  Is that -- were you looking for

20  something else?

21         MR. TOWNSEND:  No.

22         THE COURT:  That's what you're looking for, the

23  relationship of this defendant with any of the other

24  defendants?

25         MR. TOWNSEND:  Yes.  I think the way the clause is

1    worded, it can only refer to other defendants.  And that was

2    our intent.

3            THE COURT:  Is that still an issue?

4            MR. CAPLAN:  Well, I believe it is.  Right?

5            THE COURT:  I'm not sure it is once they explain it.

6    You still do not understand it?

7            MR. CAPLAN:  I'm sorry.  Is it still an issue now?

8    I mean, we've never had that actual discussion.  But, if we --

9    are we affiliated with any other defendant in the lawsuit?

10            THE COURT:  I'm not sure that the interrogatory is

11    really susceptible to any other reading, but I don't think we

12    need to argue about that.

13            Okay, what else is vague, in Defendant's opinion?

14            MR. CAPLAN:  I'm not sure what "overlapping company"

15    means.  I know that we've produced both the ownership

16    information for them, as well as an org chart, and so it's

17    still -- I'm still a little unclear of exactly what they want

18    us to put in an interrogatory answer about the companies.

19            THE COURT:  Okay.  Mr. Townsend?

20            MR. TOWNSEND:  I think the interrogatory is pretty

21    clear on the type of information it seeks.  At a minimum, the

22    defendant certainly can tell us who owns who, and if they have

23    overlapping officers and managers.  If they all work out of

24    the same building, it seems like that would be pretty easy to

25    say, as well.  And we asked them to describe the affiliation,

1  if it's a parent, subsidiary.  If it's some other affiliate,

2  just tell us, is what we're asking for.  When we --

3  THE COURT:  So -- yeah.  I mean, as I read it, is

4  the defendant affiliated with any other defendant?  Examples

5  would be common ownership, overlapping officers or managers,

6  or common facilities or employees.  And if the answer is yes,

7  that would define what is meant by "overlapping company,"

8  those two companies that are affiliated in one of those ways.

9  And so describe the affiliation, participants in the

10  affiliation, and the roles, duties, activities, and

11  responsibilities of each of the officers that relates to each

12  of those two companies.  That does seem -- is that what it's

13  asking?

14  MR. TOWNSEND:  Yes, Your Honor.

15  THE COURT:  Is there still confusion?

16  MR. CAPLAN:  No.  If that's -- if they want -- if

17  that's what they want, Your Honor, then that is not confusing.

18  THE COURT:  Okay.  Is any of that privileged?

19  MR. CAPLAN:  Perhaps some activities that certain of

20  the participants engage in may be privileged, Your Honor.

21  That's all I can say.

22  THE COURT:  None of those entities are law firms,

23  they're not practicing law?

24  MR. CAPLAN:  I believe that's correct.

25  THE COURT:  So, if you --

1              MR. CAPLAN:  There are --

2              THE COURT:  -- shared a general counsel, I don't

3     know that --

4              MR. CAPLAN:  There are --

5              THE COURT:  -- saying, "We share general counsel,"

6     would be disclosing privileged information.  That's just --

7     that's a fact.  Facts aren't privileged, so --

8              MR. CAPLAN:  Correct.  There are attorneys that work

9     at the various entities.  And what roles and activities that

10    they do may, in fact, be privileged; not the companies

11    themselves.  But they're asking for individual activities of

12    the participants, each officer.

13             THE COURT:  Keep in mind that what you do isn't

14    typically privileged.  The doing of it may be, but that's --

15    that's a fairly precise question.  And then, to the extent

16    it's confidential, proprietary, or trade secret, you can

17    always subject the interrogatory response to the protective

18    order --

19             MR. CAPLAN:  Very well.

20             THE COURT:  -- when you produce it.  There's nothing

21    wrong with that.  All right --

22             MR. CAPLAN:  We will do so.

23             THE COURT:  All right.  What's next, Mr. Townsend?

24             MR. TOWNSEND:  Next, and I believe last, Your Honor,

25    is --

1          THE COURT:  Yay.

2          MR. TOWNSEND:  -- two interrogatories, number --

3 this is item --

4          THE COURT:  XVIII?

5          MR. TOWNSEND:  XVIII.

6          THE COURT:  All right.

7          MR. TOWNSEND:  Two interrogatories, numbers 15 and

8 16.  They request the same information.  One requests it with

9 respect to Chase Bank and the other with respect to CitiBank.

10 And, essentially, we've asked them to tell us:  How does the

11 data from Chase Bank/CitiBank get to you?  And what -- by what

12 process?  Who -- what information is physically transferred?

13 Who gets the information?  What do they do with it?  How does

14 it get to the law firms?  How does -- you know, how does it

15 ultimately end up being part of a complaint?

16          And so we asked that basic information about their

17 operations.  They agreed to produce documents that would

18 respond to their request, but as yet, I don't believe --

19 either we have not received the documents that would be

20 responsive to the interrogatories or, if we have received

21 them, they haven't been identified as such.

22          THE COURT:  And so we're all on the same page, and

23 you said you were, that if you're referencing a document

24 pursuant to Rule 33(d), you have to reference it by Bates

25 number.  You've got to go to a specific page.

 1              MR. CAPLAN:  I think we've agreed to (inaudible).

 2              THE COURT:  Okay.  All right.

 3              MR. CAPLAN:  With regard to these, Your Honor, we

 4  did agree to produce such stuff (inaudible) we haven't

 5  discussed it but for this limited scope, and we will provide

 6  (inaudible).

 7              THE COURT:  Is there still an issue what is meant by

 8  the term "transmission letters"?  I'm just reading the

 9  objection.

10              MR. CAPLAN:  Yes, I still don't understand exactly

11  what that means.  We will try --

12              THE COURT:  Your mic is off --

13              MR. CAPLAN:  (Inaudible.)

14              THE COURT:  Your mic.

15              MR. TOWNSEND:  Gary, your mic.

16              MR. CAPLAN:  Oh, I apologize.

17              While I still don't understand what is meant by

18  "transmission of information," exactly, or "transmission

19  letters," we agreed to and will provide responses to the

20  process in which once we get the information and we buy the

21  debt from whomever we are purchasing it from, how it gets from

22  there to the process of collection.

23              THE COURT:  Okay.  We seem to have exhausted your

24  memorandum.  Is there anything else to address with regard to

25  the motion?

1          MR. TOWNSEND:  Your Honor, with respect to the items

2     set forth in the motion, we've covered them.  Thank you.  And

3     then the only thing left, I guess, is we would ask for fairly

4     prompt responses.

5          THE COURT:  That's my next question.  So you're

6     going to produce this stuff by when?

7          MR. CAPLAN:  Your Honor, in our meet-and-confer, we

8     gave a fairly detailed response as to how and when we could

9     produce a bunch of this, and we've talked to them about a lot

10    of that.

11         As to some of the new stuff we've talked about

12    today, I guess this is as good a time as ever to inform the

13    Court that today is my last day at Reed Smith.  You will

14    probably note that another attorney in my office moved to

15    appear pro hac vice.

16         THE COURT:  I did.

17         MR. CAPLAN:  His name is Jim Rolfes.  He will be

18    taking over for me at my firm.  I am leaving to go to the

19    Illinois Attorney General's office.  She is a friend, an old

20    colleague of mine, as is her chief of staff.  Both were my

21    associates way back when.  And so today is my last day.  So

22    the reason -- first of all, I thought you deserved it, I would

23    tell you in person.

24         And when you say, when can we do this, there will be

25    a slight, if not a large -- but not a large transition period.

1    I've transitioned this in the last month, because I've known.

2    And so Mr. Rolfes is up to speed and he's ready to go.

3          But I guess the reason I'm trying to say is, I can't

4    tell you, okay, we're going to get you this stuff in three

5    days right now.  But I guess what I would suggest is that we

6    talk to counsel immediately about anything else that we

7    haven't actually agreed on in our prior conversations as to

8    timing.

9          THE COURT:  Would 30 days seem unreasonable?

10          MR. CAPLAN:  That would not seem unreasonable, Your

11   Honor.

12          MR. TOWNSEND:  From our side, I hear what he's

13   saying about transition and a new person coming in, and we do

14   have CMO deadlines.  And we also, when we came up with the

15   CMO, we were thinking of a December settlement conference or a

16   quick settlement conference that would have gotten discovery

17   going, and so we feel like everything is progressing a little

18   slowly anyway.

19          So I can't suggest a specific deadline in the CMO

20   that we think may need to be moved a little bit to accommodate

21   that change, but -- and what's happened already, but if it is

22   30 days, we're probably going to need to look at some of the

23   CMO deadlines and move them a little bit.

24          THE COURT:  I don't doubt that.  The only thing I

25   would disagree with, that you said, would be the qualifier

1  "little slowly."  We're moving more slowly than a little

2  slowly.  You've got an expert disclosure deadline in March,

3  and that's unlikely to be doable if you don't get these

4  documents until the beginning of March, in 30 days.  So I will

5  set another conference and ask you to get together and discuss

6  modification of the deadlines.

7           Do you have to move to Springfield?

8           MR. CAPLAN:  Thankfully not, Your Honor.  It's just

9  a few blocks from my office in Chicago.

10           THE COURT:  That's good.

11           MR. TOWNSEND:  I love that Lincoln Museum.  That's a

12  fun place to visit.

13           MR. CAPLAN:  That seems to be about the only good

14  thing about Springfield.

15           THE COURT:  Slightly smaller than Chicago.

16           MR. CAPLAN:  The Lincoln Museum is, indeed, a nice

17  thing.

18           MR. TOWNSEND:  Congratulations.

19           MR. CAPLAN:  Thank you.

20           THE COURT:  What's your position going to be?

21           MR. CAPLAN:  I -- my official title is going to be

22  assistant chief deputy.  As people have said, exactly what I'm

23  doing, I'm not quite sure.

24           THE COURT:  Chief cook and bottle washer?

25           MR. CAPLAN:  Whatever Lisa Madigan asks me to do.

1          THE COURT:  Very good.  Anything else?

2          MR. TOWNSEND:  No, Your Honor.

3          THE COURT:  Anything else?

4          MR. CAPLAN:  There's one other housekeeping matter,

5     Your Honor.  We filed a motion to seal.  I think there was an

6     exhibit we filed in our response brief, that inadvertently had

7     not been sealed, and it was sealed in a prior, I think,

8     pleading; and we would just ask that that be sealed, as well.

9          MR. TOWNSEND:  No objection here, Your Honor.

10         THE COURT:  There's actually a couple of motions to

11    seal in here.

12         MR. TOWNSEND:  Correct, Your Honor, there were.  The

13    plaintiff submitted some recently in connection with our reply

14    brief.

15         THE COURT:  All right.  Good.  Anything else?

16         MR. RILEY:  Your Honor, I apologize to the Court for

17    the inconvenience of having to resubmit the motion for

18    Mr. Rolfes' pro hac vice admission.  I'll have that on file

19    today.

20         THE COURT:  You saw what the issue was?

21         MR. RILEY:  I do.

22         THE COURT:  It was that language issue.  All right,

23    very good.  I actually -- I was issuing a lot of orders

24    yesterday and I signed it early, and I said, well, because I

25    expected he was appearing so he could come to the hearing

67

1  today.  And then I said, well, that will get out and they will

2  fix it, and it won't be a problem.  And then we were

3  discussing it with -- I'm not sure when that got done.  It's

4  like, oh, dear.

5          But, we would have dealt with it had he been the

6  person who showed up, because it was just a technical issue.

7  So, I'm sure that will get -- he sent the check.  That's the

8  most important thing.

9          All right.  Thank you all very much.  It was --

10  everybody was well prepared and I appreciate it.

11          MR. TOWNSEND:  Thank you, Your Honor.

12          THE COURT:  I'll talk to you soon.

13          THE COURTROOM DEPUTY:  All rise.

14

15          (Proceedings adjourned at 11:23 a.m.)

16

17

18

19

20

21

22

23

24

25

68

1                    CERTIFICATE OF COURT REPORTER

2

3        I, David W. Moxley, hereby certify that the

4   foregoing is a true and correct transcript from

5   reported proceedings in the above-entitled matter.

6

7

8

9   /S/ David W. Moxley                February 10, 2014
    DAVID W. MOXLEY, RMR/CRR/CMRS
10  Official Court Reporter
    Southern District of Indiana
11  Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25