# EXHIBIT P

# In The Matter Of:

*Andrew Cox, Lucinda Cox and Stephanie Snyder  v.*
*Sherman Capital, LLC, et al.*

---

*Kevin P. Branigan*
*May 17, 2013*

---

Min-U-Script® with Word Index

Page 37

1 And, you know, we could get the
2 magistrate on the phone, because the magistrate
3 limited this, you know, because he understood that.
4 This is going to turn on specific jurisdiction.
5 There's not going to probably be general
6 jurisdiction. It's specific jurisdiction over
7 these individual defendants. You guys had an
8 opportunity.
9     MR. CHEESEBOUROUGH: Okay.
10     MR. DeMARINO: You probably will have
11 another opportunity to serve discovery, get a
12 30(b)(6) and which all that information you could
13 have had, right, but it's not. It's not relevant
14 to whether or not this court has jurisdiction
15 over -- over the deponent, so...
16     MR. CHEESEBOUROUGH: And given that,
17 okay, and given that, you did hear what I said,
18 though. I just -- I just gave you about -- like an
19 inch, less than inch, whatever that distance
20 between my fingers is, away from removing the
21 individual defendants in this case.
22     Now, what I'm saying to you is: If you
23 want to have a minute to talk to your client and
24 find out what that answer would be, that's fine.
25 I'll leave out of the room. And then you can come

Page 38

1 back on the record. And if he wants to answer that
2 question, I think we're about this close to letting
3 them all go.
4     But if your answer is just in the
5 opposite, then, you know, that we are not going to
6 get an answer, then we just continue. So do you
7 want some time with your client?
8     MR. DeMARINO: You know, we'll go off
9 the record and we'll take a couple minutes anyway
10 because I want to talk to him anyhow, if that's
11 okay, but I think we're going to have to get the
12 magistrate on the phone because my answer is not
13 going to change from that.
14     MR. CHEESEBOUROUGH: Okay. I just
15 wanted to make sure you understood what I was
16 saying.
17     MR. DeMARINO: I understand. Let me
18 talk to him anyhow.
19     MR. CHEESEBOUROUGH: Okay.
20     (A recess transpired from 10:23 until
21     11:04.)
22     (Whereupon, a telephone call was placed
23 via speaker phone to The Honorable Mark J.
24 Dinsmore.)
25     THE COURT: This is Mark J. Dinsmore,

Page 39

1 United States Magistrate Judge. I've been
2 contacted by the parties regarding a discovery
3 dispute during the conduct of this deposition.
4 Could somebody read back the question that the
5 objection relates to?
6     (The Court Reporter read the question
7 commencing on Page 31, Line 17.)
8     MR. DeMARINO: Your Honor, if I may
9 comment.
10     THE COURT: Please.
11     MR. DeMARINO: Your Honor, the problem,
12 and it's been kind of consistent problem, you know,
13 has been defining the scope of these depositions,
14 which we understood were limited to personal
15 jurisdiction with respect to the individual
16 defendants in this case. And that was personal
17 jurisdiction outside of the RICO jurisdiction.
18     And it seems very clear from
19 plaintiffs' questions that they just want more than
20 that; that their questions are designed to uncover
21 money flow between the entities, who owns what and
22 where, securitization of these assets.
23     And it's our position that all that
24 discovery, which they could have had, you know, if
25 they'd designated a corporate representative, is

Page 40

1 outside of the scope of whether or not these
2 individuals have contacts with Indiana.
3     The two core allegations in this
4 complaint, Your Honor, are that LVNV operated
5 without licensing in Indiana and that they
6 collected debt that they didn't own.
7     We've established that LVNV has
8 contacts with Indiana. We've established that
9 Resurgent, the other defendant that has contacts
10 with Indiana, is an attorney-in-fact for LVNV.
11     And the question then is what these
12 individuals had to do with the underlying alleged
13 misrepresentations that plaintiffs claim that LVNV
14 and Resurgent made and really how that confers
15 specific jurisdiction over the personal -- or the
16 individual defendants.
17     THE COURT: Okay. Just a minute.
18 Okay. Mr. Cheesebourough?
19     MR. CHEESEBOUROUGH: Judge, you know,
20 we've been given the task -- I mean, with our
21 deposition, the purpose behind this was to
22 basically focus on four areas: Namely, in the
23 questioning what we wanted to understand was
24 whether or not each of these individuals had
25 substantial control over the company, whether they

Page 41

1   were majority shareholders or shareholders of the
2   company, and whether they carried out the business
3   decisions for the company, and then finally,
4   whether the corporation was, you know, just merely
5   a shell created to conduct the business.
6       And I think we have sufficiently
7   established the elements needed for me to take the
8   jurisdiction over the corporations and impute that
9   to the individuals with the exception of the first
10  issue -- of the issue which is at hand right now,
11  which is whether or not the individuals had some
12  share holdings in this -- in this entity.
13      And so I'm just going down the line to
14  prove my argument that the jurisdiction over the
15  corporation should be imputed to the individuals,
16  and I've been met at every turn with a response
17  that was to not have the question answered.
18      And we've delayed in communicating with
19  you because we've gone now -- this is our third
20  day, and we've gone through one, two, three other
21  depositions because personally I felt that, you
22  know, we could get to this question at the end of
23  this point and that if -- and that Mr. Branigan
24  would know the answer to these questions and call
25  you at this juncture rather than trying to deal

Page 42

1   with this earlier in all the other things that
2   we've fought through.
3       So we've come a good distance here
4   and -- without your assistance, but at this point I
5   need to know the information for the purpose of
6   establishing that I do have personal jurisdiction
7   over these defendants or not, potentially.
8       If the answer to the question which I
9   was going to ask and which was the follow -- I
10  actually told counsel what -- the questions I would
11  follow up with. I told him the one which was read
12  to you, Judge, and then the next question, which
13  was do any of the individual defendants have an
14  ownership interest in the entity which owns LVNV
15  Funding. And that would be the next question in
16  order. Once those two questions are answered,
17  Judge, I'm done, and that's what my position is.
18      MR. DeMARINO: Your Honor, may I speak
19  to that?
20      THE COURT: Go ahead.
21      MR. DeMARINO: Your Honor, we just see
22  this as nothing but a way to back door in his RICO
23  discovery, which is just outside the scope of this
24  deposition.
25      Now, plaintiff wants to ask those two

Page 43

1   questions, but inevitably he wants more and he's
2   going to go to other places than just those
3   entities, and he's going to want to back door in
4   the entire corporate structure by saying, well, who
5   owns that? Well, then who owns that and how?
6       And he does not need that information
7   to assert personal jurisdiction over these guys,
8   over the individual defendants as far as FDCPA
9   claims go and as far as the fraud claims go.
10  That's pure, in our minds, RICO discovery.
11      And counsel has said as much, Your
12  Honor. He's gone on the record -- once Mr. Boruta
13  and once Mr. Cheesebourough were on the record. I
14  said, you know, it's clear from your questions that
15  you want to bolster your RICO claims, and they said
16  of course.
17      And, you know, it's just clear to me
18  that this sort of information is not going to help
19  out, it's not relevant to whether there's specific
20  jurisdiction, whether these individuals have
21  contacts with the state of Indiana and, more
22  specifically, the allegations in the complaint that
23  are connected to Indiana.
24      And, you know, that's been our position
25  on it all along, and we've just -- we've butted

Page 44

1   heads as far as, you know, where we see the scope
2   of these depositions being.
3       I will say that at every corner I've
4   offered, you know, to have you on the phone to
5   discuss this early on. I did not want to wait
6   until now to do it. And, you know, I feel like now
7   we're a day late and a dollar short. But that's --
8   that's really our position here.
9       They have to go -- there's been no
10  alter ego theory put forward. I mean, there's --
11  it's just absurd to me that -- you know, we haven't
12  touched on any sort of elements that would
13  establish a basis for the sort of veil piercing
14  from entities that are, you know -- they named 15
15  different entities.
16      So that's been our position all along,
17  Your Honor, and, you know, it's our contention that
18  this sort of -- these sort of questions are just
19  really a back door to find out about their RICO
20  claims.
21      THE COURT: All right. Hang on a
22  minute. All right. Let me ask you a couple of
23  questions, Mr. Cheesebourough, and see if I can
24  clarify this.
25      Let's use a hypothetical. Let's say

Page 45

1 we're dealing with General Motors Corporation. Can
2 we -- for purposes of this discussion, can we agree
3 that General Motors is probably subject to
4 jurisdiction in any state in the union?
5    MR. CHEESEBOUROUGH: Yes.
6    THE COURT: I've got the president of
7 General Motors who has lived -- and let's say he's
8 the president and majority shareholder. He owns 60
9 percent of the stock in General Motors Corporation.
10    He has lived in the state of New York
11 his entire life, never left the state of New York,
12 never personally conducted any business, you know,
13 anyplace but the state of New York.
14    Do you believe there is some theory
15 that would allow you to obtain personal
16 jurisdiction over that individual in Indiana in a
17 case against General Motors?
18    MR. CHEESEBOUROUGH: Yes, sir, I do.
19    THE COURT: And what is it?
20    MR. CHEESEBOUROUGH: Whether or not he
21 had substantial control over the company, whether
22 he held ownership interest in that company, and
23 whether or not he was responsible for the --
24 carried out the business decisions for the company.
25    THE COURT: So yes, he's the majority

Page 46

1 shareholder, he's the president. So he submits all
2 three of those. So you're saying that the
3 president of General -- and majority shareholder of
4 a corporation is subject to personal jurisdiction
5 in every single jurisdiction that corporation is
6 subject to jurisdiction?
7    MR. CHEESEBOUROUGH: No. No, sir. I
8 wasn't finished. I apologize.
9    THE COURT: All right.
10    MR. CHEESEBOUROUGH: Also that the
11 corporation itself was merely a shell created to
12 conduct the business. I'm only going through the
13 case -- I'm going through the progeny established
14 by Sarah Evans Barker's opinion.
15    She had a case out there, and that case
16 was First Albany -- it was Wesleyan Pension Fund
17 versus First Albany. And in that case Judge Barker
18 basically dealt with 16 companies that were sued by
19 the defendant, and three individuals were sued.
20    It was a main corporate defendant named
21 Clover who wholly owned -- was wholly owned by the
22 three individuals, and Clover owned the other 15
23 companies.
24    And in her decision she said that the
25 defendants solicited, offered to -- and offered to

Page 47

1 sell and did sell some securities to the -- to the
2 plaintiff.
3    One of the individuals talked with the
4 plaintiff on the phone and did some other things,
5 whatever, but none of the defendants were Indiana
6 residents. They all moved to dismiss the case for
7 a lack of jurisdiction.
8    However, she acknowledged that
9 jurisdiction over the corporation is imputed to the
10 individuals because it's clear that the individuals
11 exerted substantial control over Clover. They were
12 the majority shareholders and carried out all the
13 business decisions.
14    Further, the 15 corporations were
15 merely shells created to cover -- or created by
16 Clover to conduct business. All their address and
17 telephone numbers were at the same location.
18    We kind of have some similarities in
19 this case where we've got a number of companies,
20 but I'm just focusing on LVNV.
21    In her decision she cited --
22    THE COURT: Do you have a cite?
23    MR. CHEESEBOUROUGH: Yes, I do. I
24 think so. Let me see. Sorry, Judge. I've got to
25 open that up to find that.

Page 48

1    THE COURT: Take your time. Take your
2 time.
3    MR. CHEESEBOUROUGH: See if I can open
4 it up.
5    MR. DeMARINO: Your Honor, may I speak
6 really quickly? This is Mike DeMarino.
7    THE COURT: Sure.
8    MR. DeMARINO: You know, I'm not
9 familiar with that case, Your Honor, and I'm
10 certainly going to read it.
11    But just listening to what
12 Mr. Cheesebourough had read, what I just heard was
13 that, you know, at least to some extent what went
14 into the Court's analysis was that the individuals
15 had talked to the residents of Indiana, which, of
16 course, you know, could establish specific
17 jurisdiction over them. So, you know, again, I
18 think that they have to focus on that sort of
19 inquiry here.
20    And really, there's nothing, Your
21 Honor, to suggest that, you know, there's been any
22 sort of disregard for these corporate structures,
23 you know, which is what -- you know, the road
24 opposing counsel is going down.
25    And I think Your Honor was 100 percent

(12) Pages 45 - 48

Page 49

1  correct when, you know, you started to ask
2  Mr. Cheesebourough about -- you know, based on his
3  theory, nearly every CEO in the world would be
4  subject to Indiana if, you know, the company that
5  they were an officer of or directed, you know, had
6  connection -- had sufficient contacts in that
7  state.
8      The fact is that corporations can't act
9  without an agent. Someone has to do the acting,
10 and those are the officers. But the mere fact that
11 an officer directs or controls a corporation, you
12 know, does not necessarily subject, you know, that
13 person to a forum jurisdiction.
14     MR. CHEESEBOUROUGH: Judge, I am having
15 a little bit of -- this is Robert Cheesebourough
16 now. I am having a little bit of difficulty
17 opening up the attachment of the case to get that
18 cite, but --
19     THE COURT: Can you give me the name
20 again?
21     MR. CHEESEBOUROUGH: Yes, sir.
22     MR. BORUTA: Do you have the Internet?
23 If you give him the case he could probably pull it
24 up on the Internet.
25     THE COURT: I can probably find it if

Page 50

1  you tell me --
2      MR. CHEESEBOUROUGH: It's Wesleyan
3  Pension Fund versus First Albany Corp.
4      THE COURT: Wesleyan. How do you spell
5  Wesleyan?
6      MR. CHEESEBOUROUGH: W-E-S-L-E-Y-A-N
7  Pension Fund versus First Albany Corp.
8      THE COURT: Okay. And do you know time
9  frame? Last decade, 30 years ago? How old,
10 generally?
11     MR. CHEESEBOUROUGH: It's a Sarah Evans
12 Barker case, so in her tenure.
13     THE COURT: That gets us down to about
14 30 years, so...
15     MR. CHEESEBOUROUGH: Judge, I would
16 just add one thing while you're looking that up.
17 Active solicitation, even if for just a single
18 contract, amounts to purposeful establishment of
19 contacts with the forum. That satisfies due
20 process.
21     And here, Judge, in this case in our
22 complaint we've all -- we've mentioned the fact
23 that these individuals have what is a -- called a
24 CDO.
25     MR. DeMARINO: Your Honor, that's --

Page 51

1  I'm sorry to interrupt. That fact is in dispute.
2      MR. CHEESEBOUROUGH: They have --
3  excuse me, Your Honor.
4      THE COURT: Wasn't that in the reply
5  that I struck?
6      MR. CHEESEBOUROUGH: I'm not sure what
7  you're referring to, but --
8      THE COURT: I don't think that that was
9  put in. But hang on just a second. Let me search
10 for that.
11     MR. DeMARINO: Can you give me the case
12 again?
13     MR. CHEESEBOUROUGH: It's Wesleyan
14 Pension Fund versus First Albany Corp.
15 W-E-S-L-E-Y-A-N.
16     MR. DeMARINO: I'm sorry. Versus who?
17     MR. CHEESEBOUROUGH: Right there.
18     MR. DeMARINO: First Albany. Your
19 Honor, I have the case cite here. I was able to
20 pull it up. My days of clerking have paid off.
21     THE WITNESS: '97.
22     MR. CHEESEBOUROUGH: Judge, in this
23 particular case we -- I'm sorry. I may have used
24 the term that people don't use, but we've
25 acknowledged that ████████████████████████

Page 52

1  ████████████████████████████████████
2  ████████████████████████████████████
3  ████████████████████████████████ And
4  so the company is, in essence, a -- are you there,
5  Judge?
6      THE COURT: I am.
7      MR. CHEESEBOUROUGH: Oh, okay. The
8  company is, therefore, a shell company, and that
9  fits right along the lines of what Judge Barker
10 mentioned as one of the components. GM in your
11 example is not a shell company. And in this case
12 we're dealing with a company that is a shell
13 company.
14     One other thing is that with the
15 concept of this -- and we apply this to the concept
16 of the veil piercing to get the personal
17 jurisdiction. These individuals -- we have alleged
18 fraud in this case. And fraud has to be part of
19 this, and also, the overall element of injustice
20 and unfairness has to be present.
21     And so we have that in place with
22 regard to our allegations. And we have alleged
23 injustice and we have alleged fraud in this case.
24 And we have, in this case, active solicitation;
25 i.e., the offering to sell of investments in this

Page 53

1  case.
2      MR. DeMARINO: Your Honor, I'm sorry.
3  I have to stop him there. I don't mean to
4  interject, and normally I would let him speak
5  except that that's -- there's been no establishment
6  of that.
7      Your Honor, there is no offering of
8  securities in this case. And that's what they're
9  focused on, and that's why they think they need all
10  this RICO discovery. There hasn't even been an SEC
11  allegation. I mean, this turns on two FDCPA
12  violations that they've bootstrapped into -- I
13  don't even know what you describe it, Your Honor.
14      THE COURT: All right. Stand by. Let
15  me read this order here quickly.
16      Okay. Well, here's where we're at. I
17  believe the case to which Mr. Cheesebourough cited
18  is Wesleyan -- that's W-E-S-L-E-Y-A-N -- Pension
19  Fund, Incorporated versus First Albany Corporation.
20  It is cited at 964 F. Supp. 1255. It is a 1997
21  decision, April 28, 1997, by Judge Barker here in
22  the Southern District of Indiana.
23      I've done some very quick and dirty
24  research. I found another case: Northern Laminate
25  L-A-M-I-N-A-T-E, Sales, Incorporated versus

Page 54

1  Matthews, 249 F. Supp. 2d. 130 from the District of
2  New Hampshire, an order dated March 7, 2003.
3      Both of these cases appear to suggest
4  that personal jurisdiction over an individual
5  owner, shareholder, principal, director can be
6  established through jurisdiction over a corporate
7  entity with the piercing theory.
8      So the problem we have is that
9  Mr. DeMarino has not seen any of these things. And
10  so by virtue of that, I can't give you a definitive
11  ruling. It puts Mr. DeMarino, however, in the
12  unenviable position of having to make a decision.
13      And I would certainly suggest that
14  perhaps you take a few minutes, maybe call back to
15  the office and have somebody do some research for
16  you. Because you're going to have to make a
17  decision as to whether you're going to allow those
18  questions to be answered or not.
19      If you elect for them not to,
20  Mr. Cheesebourough is likely going to file a motion
21  to compel, which then will be briefed, and then it
22  can be decided once it's briefed. And if he's
23  right, you may well be paying for him to go back to
24  South Carolina to complete this deposition.
25      That's all I can tell you. Because I

Page 55

1  am not going to rule in favor of one of you. Well,
2  most particularly I'm not going to rule against the
3  defendants when you haven't even seen the case law
4  so you can't even give me a contrary argument.
5      So I'm not going to definitively rule
6  that the plaintiff has the right to ask these
7  questions, because that wouldn't be fair to you,
8  Mr. DeMarino. It's only marginally less unfair
9  that I'm putting you in a position where you have
10  to make a decision without the benefit of the
11  decision.
12      But I can tell you that looking at
13  these two cases, I came in thinking that that
14  wasn't the law, and I appear to have been wrong.
15      These cases certainly suggest that you
16  can assert personal jurisdiction over an individual
17  through a veil piercing theory, and that appears to
18  be what Judge Barker did and this other Court did
19  in those cases. So it's kind of like kissing your
20  sister. That's not very helpful.
21      MR. DeMARINO: No. And I understand
22  that, Your Honor. And, you know, it's -- certainly
23  there is a veil piercing theory that can confer
24  personal jurisdiction over a defendant through a
25  subsidiary.

Page 56

1      But what's going on here is that -- and
2  the cases that they're looking at -- and I haven't
3  read the two and I just was -- the few sentences
4  that I saw from the Wesleyan case is that that
5  deals with securities offering to Indiana
6  residents, and that just stands in stark comparison
7  to what is going on in this case. This is not --
8      THE COURT: Yeah, but the -- and again,
9  you haven't read the case, but the -- Judge
10  Barker's discussion in that case is a pure personal
11  jurisdiction discussion. It has absolutely nothing
12  to do with the theories at issue.
13      So the fact -- it could have been a
14  patent case, it could have been a personal injury
15  case. It was not specific to the -- the decision,
16  as I read it, was not specific to the type of legal
17  theories that were being asserted as the basis for
18  liability.
19      And I'm just -- and the New Hampshire
20  case is -- I'm taking a look. Hold on. That's a
21  Uniform Fraudulent Transfer Act case. So that's
22  not a security case. Let's see if Judge Barker
23  says what kind of case this is. Yeah, Judge
24  Barker's case was a securities case, so...
25      MR. DeMARINO: And I understand that,

Page 57

1   Your Honor. I was only going down that path
2   because I just wanted to demonstrate that I don't
3   think that even -- I just think that that goes to
4   RICO, the structure of these -- you know, any sort
5   of veil piercing helps his RICO claim as far as
6   personal jurisdiction.
7      THE COURT: But it's not --
8   essentially, it's not limited to his RICO claim.
9   You don't have to have a RICO claim to pierce the
10  corporate veil. You can have any number of types
11  of claims. It certainly doesn't need to be a RICO
12  claim to have a veil piercing theory.
13     And if his theory of personal
14  jurisdiction as to these individuals lies through a
15  veil piercing theory, one of the elements of that
16  is establishment of the control these individuals
17  have over the companies.
18     And so I think that those -- if I'm
19  reading these cases right, and I'm not definitively
20  saying that. I'm saying I've read these two cases,
21  and that appears to be what they suggest, but you
22  haven't been able to properly respond because you
23  haven't even seen the darn things. So that's why
24  I'm not ruling one way or another.
25     But just kind of following it down its

Page 58

1   path, if my quick reading of these is correct and
2   that's the law and that's the theory, then it would
3   seem that questions about the control of these
4   companies would fall within the ambit of my order
5   because it would relate to questions of personal
6   jurisdiction of these individuals.
7      That's all I can say, and it's as far
8   as I'm willing to go. I'm not willing to say it is
9   or it isn't because you have simply not had an
10  opportunity to properly respond.
11     MR. DeMARINO: Okay, Your Honor. I
12  understand completely what you're saying. I'm
13  going to call the office, you know, if we could
14  take a short break. It puts me in kind of a
15  difficult decision.
16     THE COURT: It does indeed.
17     MR. DeMARINO: And so, you know, I --
18  just to be clear -- and I agree, you know.
19  However, if we were to move forward and if he were
20  to be able to establish control, you know -- I'm
21  sorry -- do discovery on, you know, some of these
22  entities and who owns what, in my mind that still
23  would be limited to the -- to the claims outside of
24  his RICO claims.
25     In other words, you know, that doesn't

Page 59

1   give him carte blanche discovery into securities
2   offerings, securities filings and things of that
3   nature, which have nothing to do with the core
4   allegations in this complaint, which were that we
5   weren't licensed in Indiana as a debt collector and
6   that the collection -- and that there was a
7   collection of debt that we didn't own.
8      Those are the allegations that make up
9   the fraud, and the licensing in Indiana, no matter
10  what plaintiffs think as far as there being some
11  sort of debt offering to the public in trying to
12  bootstrap this into an SEC case, which is just
13  nowhere in the complaint, really.
14     So, you know, I just wanted to put that
15  out there on the record; that even so, I think --
16  you know, going forward with discovery on -- you
17  know, in order to determine, you know, requisite
18  control for purposes of establishing personal
19  jurisdiction still should be limited to, you know,
20  outside of the RICO claims.
21     THE COURT: All right. I don't
22  disagree with that. What Mr. Cheesebourough
23  represented was that the questions he wanted to ask
24  relate to control of these corporations and the
25  personal involvement in that control and the

Page 60

1   ownership of these individuals. Did I -- am I
2   reading something into your words,
3   Mr. Cheesebourough, that wasn't there?
4      MR. CHEESEBOUROUGH: No, sir. You're
5   absolutely correct, and --
6      THE COURT: So going beyond that would
7   be beyond that, and then that would be a different
8   question, certainly.
9      MR. DeMARINO: Okay, Your Honor. And
10  that makes sense, and I just wanted to clarify
11  that. I'm going to -- I'm going to call my office,
12  if we could take a quick break. Would you like us
13  to get back on the --
14     MR. CHEESEBOUROUGH: Just call you
15  back?
16     MR. DeMARINO: Yeah, get back on the
17  phone with you or just --
18     THE COURT: If you need to. I mean,
19  the problem is, if you find a case that says the
20  opposite, then Mr. Cheesebourough is going to be --
21  he's not going to have read it. I mean, this --
22     MR. DeMARINO: Right.
23     THE COURT: Sometimes I get these calls
24  and they're pretty easy. You know, these are good
25  for the easy questions. They're not good for the

Page 61

1  questions that require research.
2     MR. DeMARINO: Right.
3     THE COURT: And so -- but I'm here, so
4  if you need to talk to me again.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 63

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25