EXHIBIT A

## SHERMAN ORIGINATOR, LLC
## PURCHASE AND SALE AGREEMENT

### April 2007 Sears MasterCard/Sears Private Label Retail Accounts (EO #2)

This Purchase and Sale Agreement (the "Agreement") is made as of April 4, 2007, between Citibank (South Dakota), National Association (the "Bank"), a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, South Dakota 57117 and Sherman Originator LLC ("Buyer"), organized under the laws of the State of Delaware, with its headquarters/principal place of business c/o Sherman Capital Markets LLC at 200 Meeting Street, Suite 206, Charleston, SC 29401.

WHEREAS, the Bank desires to sell and Buyer desires to purchase certain of the Bank's credit card accounts on the terms and conditions hereinafter provided;

NOW, THEREFORE, in consideration of the mutual promises herein, Buyer and Bank agree as follows:

## 1.   DEFINITIONS

1.1   "Account Document" means, with respect to any account, any application, agreement, billing statement, notice, correspondence or other information in the Bank's possession that relates to an Account. An Account Document may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. Excluded from the definition of Account Document is any correspondence, report, information, internal analyses, sensitive attorney-client privileged documents, internal memoranda, documents, credit information, regulatory reports, and/or internal assessments of valuation of such Account, or any other documents relating to an Account that may be, but are not necessarily, missing or excluded (whether intentionally or unintentionally).

1.2   "Accounts" means the Bank's Sears MasterCard and private label retail accounts and receivables listed on the Asset Schedule (attached hereto as Exhibit 1) the balances of which the Bank has written off for accounting purposes, subject to adjustment of the Cut-Off Date (as defined below) in accordance with Section 2.2.

1.3   "Cardholder" means the person in whose name an Account was established.

1.4   "Closing Date" means April 4, 2007, or such other date mutually agreed to by Buyer and the Bank.

1.5   "Cut-Off Date" means March 20, 2007.

1.6    "Purchase Price"  means  ███████████████████████
██████████████ subject to Pre-Closing Adjustment pursuant to Section 2.2.  Thereafter, Bank
shall be entitled to receive additional amounts as calculated in accordance with the formula set
forth in Exhibit 4, attached.  The Purchase Price shall be paid in accordance with Section 2.3 of
this Agreement.

1.7    "Adjustment Amount" means the portion of the Purchase Price allocated to the balance of
any Account that is: (a) increased or decreased as described in Section 2.2(a); (b) retained by
Bank and not transferred to Buyer pursuant to Section 2.2(b); or (c) repurchased by Bank
pursuant to Sections 3.7 or 8.1. The Adjustment Amount shall be equal to the portion of the
Purchase Price (prior to adjustment) attributable to the balance of the Account.  This amount
shall be determined by multiplying the balance by the percentage of the Purchase Price relative to
the aggregate balance of Accounts associated with the unadjusted Purchase Price.

## 2.    PURCHASE AND SALE OF ACCOUNTS

2.1    Purchase and Sale.  On the basis of, and subject to, the representations, warranties and
covenants in this Agreement, the Bank agrees to sell, assign and transfer to Buyer, and Buyer
agrees to purchase from the Bank on the Closing Date all right, title and interest of Bank in the
Accounts.  Buyer has made an independent investigation as it deems necessary as to the nature,
validity, collectibility, enforceability and value of the Accounts, and as to all other facts that
Buyer deems material to Buyer's purchase.  Buyer enters into this Agreement solely on the basis
of that investigation and Buyer's own judgment.  Buyer has made an independent determination
that the Purchase Price represents the Accounts' fair and reasonable value. The sale and
assignment are without recourse to the Bank, and without warranty of any kind (including,
without limitation, warranties pertaining to validity, collectibility, accuracy or sufficiency of
information), except as stated in Article 3 below. Buyer also understands that the account
balances purchased include finance charges assessed up to the date the account was charged off
by Bank.  Buyer is not acting in reliance on any representation by the Bank, except as set forth in
Article 3 below.

2.2    Pre-Closing Adjustment.  The Purchase Price amount stated in Section 1.6 shall be
adjusted to reflect any changes in the status of the Accounts as of the Cut-Off Date, as follows:

        (a)     a change in the balance of any Account from the balance shown on the due
diligence tape  provided to Buyer; and

        (b)     retention by the Bank of any Account that on the Cut-Off Date (i) to the Bank's
knowledge, fail to meet the representations set forth in Section 3.6; or (ii) the Bank determines
that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal
proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or
otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the
Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that

CONFIDENTIAL

SO-0002

the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

The Purchase Price will be adjusted by the Adjustment Amount associated with any balance or Account described above. The Bank will notify the Buyer of the adjusted Purchase Price prior to the Closing Date.

2.3    Payment.  Buyer shall pay the Purchase Price on or before 3:00 p.m.  Eastern Time on the Closing Date. The Bank will transfer the Accounts to Buyer in accordance with Section 2.4 below.

2.4    Transfer. On the Closing Date, subject to satisfaction or waiver of the conditions precedent set forth in Article 5 of this Agreement by Bank or Buyer, as applicable, the Bank and Buyer will execute and deliver to each other a Bill of Sale, Assignment and Assumption Agreement substantially in the form of Exhibit 2, and other mutually agreed upon closing documents. The Bank will provide to Buyer, at least one (1) business day prior to the Closing Date or at such other time as is mutually agreed to by the Buyer and Bank, a computer printout or magnetic tape listing the Accounts as of the Cut-Off Date (the "Cut-Off Date Tape" ) that were purchased by the Buyer; provided, however, that Buyer shall not load or input into its computer system or database any information contained in the Cut-Off Date Tape or undertake any collection action or any other activity that would indicate account ownership, including pledging the accounts as collateral, prior to the Closing Date. On the  Closing Date, Bank will transfer all Bank's right, title and interest in the Accounts and Buyer will assume, with respect to each Account, all of Bank's rights, responsibilities, and obligations that arise as a result of Buyer's purchase of the Accounts.  If the Bank receives any payments of principal and/or interest by or on behalf of any Cardholder with respect to an Account between the Cut-off Date and the Closing Date, Bank shall hold such amounts in trust for Buyer and pay over such amounts to Buyer (without interest thereon) within sixty (60) days after the Closing Date.  If payments are received by the Bank from a cardholder on or after Closing Date, the Bank shall forward such payments (without interest thereon) to Buyer within 30 days from date of receipt.  Bank shall charge Buyer a fee of $5.00 per payment to process any Account payment received by Bank more than one (1) year after the Closing Date. Bank may, at its discretion, deduct the processing fee when remitting the payments to Buyer.

2.5    Sales, Use or Transfer Taxes.  If any sales, use, or transfer tax is assessed or otherwise payable as a result of the transactions contemplated hereby, Buyer shall assume the obligation to pay such tax.  Neither Buyer nor Bank is aware of any such taxes that will become due as a result of this transaction.

**CONFIDENTIAL**                                            **SO-0003**

3.     **REPRESENTATIONS AND WARRANTIES OF THE BANK**

The Bank makes the following representations and warranties:

3.1     <u>Due Organization; Authorization</u>.   The Bank is duly organized, existing and in good standing as a national banking association, and the Bank's execution, delivery, and performance of this Agreement are within the Bank's corporate powers and have been duly authorized by all necessary corporate action.

3.2     <u>Servicing</u>.   After the Cut-Off Date, the Bank shall not compromise, settle (for less than full value) or otherwise release a Cardholder on any Account without Buyer's consent.  The Bank will undertake only those servicing activities necessary to preserve and maintain the integrity and enforceability of the Accounts.

3.3     <u>No Conflict</u>.  The execution and delivery of this Agreement by Bank and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Bank, or (B) any provision of any law or regulation to which Bank is subject, or (ii) conflict with or result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Bank is a party or by which it is bound or any order or decree applicable to Bank or result in the creation or imposition of any lien on any of its assets or property.  Bank has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

3.4     <u>No Finders</u>.  Bank has not utilized any investment banker or broker in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement.

3.5     <u>Proceedings</u>.    There is no proceeding, action, investigation or litigation pending or threatened against Bank which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with the Bank's obligation contemplated herein, or which would be likely to materially impair its ability to perform under the terms of this Agreement.

3.6     <u>Representations Concerning Accounts</u>. With respect to each Account, the Bank represents that to the best of its knowledge as of the Closing Date:

(a)     the debt represented by such Account has not been satisfied and/or the stated balance on such Account has not been paid;

(b)     each Account is a legal, valid and binding obligation of the Cardholder;

(c)     no judgment has been entered by a court of competent jurisdiction with respect to the debt represented by the Account;

**CONFIDENTIAL**                        **SO-0004**

(d)    the Cardholder has not been released from liability on the Account;

(e)    the Account is not involved in an open bankruptcy case and has not been discharged in bankruptcy;

(f)    the Cardholder is not deceased;

(g)    the Bank has good and marketable title to the Account, is the sole owner thereof and has full right to transfer and sell the Account free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys previously retained by the Bank or Sears;

(h)    there is no dispute, claim, action, suit or proceeding pending or threatened with respect to any Account;

(i)    the current balance on the Account is $100 or more;

(j)    each Account is closed and there is no requirement for future advances of credit or other performance by Bank; and

(k)    each Account has been originated, maintained and serviced in full compliance with applicable state and federal laws including where applicable, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act.

(l)    Tapes.  Information provided by Bank on the due diligence tape, and on the Cut-Off Date Tape and Post – Closing Tape, is materially true and correct.

(m)  Work Effort.  The Accounts have been sent for collection effort to no more than one third party agency, which was done on a pre-charge-off (early out) basis.

The Bank makes no other representations or warranties, express or implied, with respect to any of the Accounts other than as specifically set forth in this Section 3.6.

3.7    Remedies for Breach of Representations Concerning Accounts.

(a)  Time Period. Buyer's sole remedy against Bank, other than indemnification per Article 10.2, for a breach of any of the representations listed in this Article 3 shall be as set forth in this Section 3.7.  Upon notice of breach from Buyer,  Bank shall then have, at its option, the right to (A) cure such breach referred to in the notice of Claim, in all material respects, or (B) repurchase the affected Accounts by paying Buyer the Purchase Price Percentage multiplied by the stated Account balance.  A Notice of Claim under this Section 3.7 must be delivered by the Buyer to the Bank in writing and accompanied by the documentation required under Section 3.7(b). Notwithstanding Section 12.10, the Buyer's failure to provide a Notice of

**CONFIDENTIAL**                                               **SO-0005**

Claim with respect to any claimed breach of Bank as provided in this Section 3.7 shall terminate and waive any rights Buyer may have to any remedy for such breach under Article 3 of this Agreement, provided, however that this limitation of remedies shall not limit Bank's indemnification obligations to Buyer under Section 10.2. Bank may not use the "best of knowledge" qualification contained in Section 3.6 as a defense to a claim made by Buyer under this Section 3.7 or the indemnification. Buyer shall notify the Bank of the breach of any representation contained in Article 3 no later than 180 days from the applicable Closing Date; provided, however, that a claim of a breach of representation under Sections 3.6(g), (h), (j), (k) and l) shall not be subject to the 180 day limitation. A notice of breach under this Section 3.7 must be delivered by the Buyer to the Bank in electronic format. Except for Bank's indemnification obligations to Buyer under Section 10.2 herein Buyer represents that it intends that this Section 3.7 sets forth its sole and exclusive remedy relating to, arising out of, or for any breach of representation under Article 3 by Bank under this Agreement, and that Buyer intends by this paragraph to limit its remedies against Bank, regardless of the nature of the claim, cause of action, or legal theory asserted by the Buyer, to a maximum recovery of the Repurchase Price for such Account

(b)  Form of Notice Required.  Buyer shall notify Bank in writing of each Account of which Buyer seeks to have Bank repurchase.  All notices shall contain the customer's name and Bank's account number and will be accompanied with the following applicable documentary evidence satisfactory to the Bank:

| | |
|---|---|
| Bankruptcies: | Credit Bureau with non-dismissed bankruptcies, or<br>Attorney name, case number, and date of filing, or<br>Copy of actual court papers, or approved third party service<br>(Banko, Inc.; Experian; Trans Union; or Equifax) |
| Deceased: | Copy of death certificate, or<br>Credit bureau indicating date of death, or<br>Executor or attorney letter with date of death, or<br>approved third party service (Banko, Inc.; Experian; Trans<br>Union; or Equifax) |
| Settled or<br>Paid in Full: | Copy of Bank, Sears or their agent's letter verifying action<br>Copy of the canceled, final check (front and back) |
| Fraud: | Letter from or to Citibank, Sears or their agent's<br>Complaint in writing explaining event |

Bank shall make a determination within forty five (45) business days after receipt of Buyer's Request, unless Bank's delay in responding is caused by or related to Buyer's failure to provide Bank with necessary information and documentation required under this Section 3.4.

(c)  Repurchase/Adjustment Payment.  If the Bank is required to either repurchase the Accounts or reimburse the Buyer an Adjustment Amount, the Bank shall not be obligated to make payment

**CONFIDENTIAL**                                    **SO-0006**

on an Account by Account basis, but may elect to provide such adjustment in a single payment within 30 days of notification, at Bank's option. The Bank makes no representation as to the number of Accounts that may be subject to repurchase pursuant to this section.

## 4.      REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties:

4.1      <u>Due Organization; Authorization</u>.  Buyer is duly organized, existing and in good standing as a limited liability company under the laws of the State of Delaware.  Buyer has full authority to execute, deliver and perform this Agreement according to its terms, and Buyer's execution, delivery and performance of this Agreement have been duly authorized, and are not in conflict with any law or regulation applicable to Buyer or the terms of Buyer's partnership documents or articles of incorporation, charter or bylaws, as applicable, or of any indenture, agreement or undertaking to which Buyer is a party or by which it or any of its assets is bound.

4.2      <u>No Conflict</u>.  Buyer's review of Account and Cardholder information will not represent a conflict of interest on the part of Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to any litigation, or involved in any litigation, with any Cardholder or with the Bank.

The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Buyer, or (B) any provision of any law or regulation to which Buyer is subject, or (ii) conflict with or result in a breach of or constitute a default (or any event which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer or result in the creation or imposition of any lien on any of its assets or property.  Buyer has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

4.3      <u>Investigation of Accounts</u>.  Buyer is a sophisticated investor and its bid and decision to purchase the Accounts are based upon its own independent expert evaluations of the nature, validity, collectibility, enforceability and value of the Accounts.  The Buyer has had sufficient opportunity to complete the independent investigation and examination into the Accounts that Buyer deems necessary. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment.  Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value.  Buyer is not acting in reliance on any representation by the Bank, except those listed in Article 3.

4.4      <u>Accounts Sold As Is</u>.  Buyer acknowledges and agrees that except for warranties and representations set forth in Article 3 of this Agreement, Bank has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the

**CONFIDENTIAL**                                **SO-0007**

Accounts and supporting documentation provided by Bank to Buyer, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Buyer with respect to any and all Accounts is sold, transferred, assigned and conveyed to Buyer on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

4.5     No Finders.  Buyer has not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement.

4.6     Proceedings.   There is no proceeding, action, investigation or litigation pending or threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with the Buyer's obligation contemplated herein, or which would be likely to materially impair its ability to perform under the terms of this Agreement.

## 5.     CONDITIONS PRECEDENT TO PURCHASE AND SALE OF ACCOUNTS

5.1     Representations and Warranties.   The representations and warranties of the Bank and Buyer in this Agreement will be true and correct as of the Closing Date.

5.2     Compliance with Covenants and Agreements.  Buyer and the Bank will have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before the Closing Date.

5.3     No Violation of Law.   Consummation by Buyer and the Bank of the transactions contemplated by this Agreement and performance of this Agreement will not violate any order of any court or governmental body having competent jurisdiction or any law or regulation that applies to Buyer or the Bank.

5.4     Reassignment and Removal from Trusts.   As of the Closing Date (i) any outstanding Account receivables owned as of the Closing Date by Bank are not securitized or will have been reassigned to the Bank, and (ii) all conditions precedent for removal of such receivables from Standard Credit Card Master Trust will have been satisfied.   In the event that this condition cannot be satisfied prior to the Closing Date, this Agreement shall terminate.

5.5     Approvals and Notices.   All required approvals, consents and other actions by, and notices to and filings with, any governmental authority or any other person or entity will have been obtained or made.

5.6     UCC Financing Statements.   Buyer will prepare on or after the Closing Date, as the parties hereto shall agree, such UCC Financing Statements for filing in such jurisdictions as the Buyer may deem necessary or appropriate.  The UCC Financing Statements shall be for notice

**CONFIDENTIAL**                                      **SO-0008**

purposes only and shall expressly indicate that UCC Financing Statements are for notice purposes only and creates no security interest in the assets, property or interests of the Bank.

## 6.   RIGHTS AND OBLIGATIONS OF THE BANK AND BUYER AFTER THE CLOSING DATE

6.1   Notice to Cardholders.  After the Closing Date, the Bank may, but will not be obligated to, give any Cardholder written or oral notice of the transfer of the Cardholder's Account to Buyer at the Cardholder's last known address.  The Buyer shall not discredit or impugn the reputation of the Bank in any correspondence sent to the Cardholder in connection with the Accounts purchased by the Buyer.

6.2   Retrieval of Account Documents.  After the Closing Date, the Bank will furnish Buyer at ▌▌▌▌▌with Account Documents that Buyer reasonably requests within 180 days of the Closing Date, up to a maximum number of Account Documents equal to ▌▌▌ of the Accounts purchased.  The Bank will charge ▌▌▌ for each Account Document furnished on Accounts in excess of the ▌▌▌threshold, or requested after 180 days of the Closing Date, but prior to three years after the Closing Date.  Except in instances of litigation unrelated to collection activity or accounts that are within the statute of limitation at the time requested, the Bank will have no obligation to provide Buyer with Account Documents more than three years after the Closing Date.  Documents will be furnished within 60 days of the date of the request.  Buyer's request for an Account Document must be presented to Bank on a form provided by Bank and must be made with sufficient specificity to enable the Bank to locate the Account Document.  The Bank will use reasonable diligence to provide the Account Document. The failure of the Bank to provide an Account Document requested by Buyer will not be a breach of this Agreement. If the Bank cannot reasonably provide an Account Document that the Buyer requests, the Bank will inform Buyer accordingly, and at Buyer's request, provide an Affidavit in the form shown in Exhibit 3, as a substitute Account Document in accordance with the terms of this paragraph, provided that the parties will mutually agree to a timeframe within which affidavits given in lieu of Documents will be produced.

Buyer may, in addition to its request for Account Documents, request an Affidavit from Bank, in the form shown in Exhibit 3, indicating the date the Account was opened, the Account number, the Annual Percentage Rate (APR), and the balance existing as of a specified date.  The Bank will provide a total number of affidavits equal to ▌▌▌▌▌▌▌▌ of the total accounts purchased.  The Buyer shall be limited to one request for affidavits per week with a maximum of ▌▌▌▌▌▌per request.  Bank shall have three (3) weeks to complete the affidavits requested. Requests shall contain sufficient information about the relevant accounts to allow Citibank representatives to locate the Account information to complete the affidavits.  The Buyer shall pay Bank ▌▌▌ per affidavit requested and provided.  Payment shall be due at the time the affidavit is provided.

6.3   Credit Bureau Reporting.  The Bank shall promptly request that the major credit reporting agencies (including, without limitation, Experian, CBI and Trans Union) update the accounts as

**CONFIDENTIAL**                         SO-0009

sold or transferred. The Bank reserves the right to request the credit reporting agencies delete the Accounts from their records. The Bank will notify the Buyer if the Bank requests that the major credit reporting agencies delete the accounts from the debtors' consumer credit reports (credit bureaus). The Buyer may report its ownership of the Accounts to credit reporting agencies provided that the Buyer agrees to comply with the Fair Credit Reporting Act (FCRA) and any other laws or regulations governing credit agency reporting.

6.4     <u>Compliance with Law</u>.  With respect to any Account, Buyer or Buyer's agent will at all times: (a) comply with all state and federal laws applicable to debt collection, including, without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, and (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Cardholder does not pay.

6.5     <u>Post Closing Account Review</u>.  Prior to initiating any contact, whether verbal, written or electronic, with the Cardholder, Buyer shall review the portfolio through a competent third party vendor (e.g., Banko, Inc.) or other process to discover whether any Accounts included are involved in an open bankruptcy case or have not been discharged in bankruptcy (the "Post Sale Scrub"). Buyer shall immediately cease any collection efforts upon receiving written notice (whether from the Cardholder, the Bank, or a third party on behalf of the Cardholder) that a Cardholder has discharged the debt in bankruptcy, or that the Cardholder alleges the balance on the Account as the result of unauthorized use or identity theft.  Buyer shall not re-commence collection activity on an Account Balance alleged to be the result of unauthorized use or identity theft until (i) Buyer has notified Bank, as soon as commercially practical that the Debtor has alleged that the Account Balance is the result of unauthorized use or identity theft; and (ii) Bank has had an opportunity to investigate the Debtor's allegations.  Bank shall, at completion of its investigation, notify Buyer of Bank's review and conclusion.  If Bank concludes that Buyer's allegations are supported by the evidence available, Buyer shall not recommence collection action against the Cardholder, and Buyer shall have whatever rights against Bank that Buyer has under Section 3.7 of this Agreement. Furthermore, Buyer shall not recommence collection activity until Buyer has conducted a reasonable investigation into the Cardholder's claim and determined, based upon reasonable evidence, that the Cardholder's claim of bankruptcy is unfounded.

6.6     <u>Notice of Claims</u>.  Buyer will notify the Bank promptly of any claim or threatened claim against the Bank, or any claim or threatened claim that may affect the Bank, that is discovered by Buyer.  The Bank will not provide notice to Buyer of any notice of bankruptcy filing it may receive after the Closing Date. Bank will notify Buyer promptly of any claim or threatened claim against Buyer, or any claim or threatened claim that may affect Buyer, that is discovered by Bank.

6.7     <u>Bank As Witness</u>.  If Buyer, upon reasonable written notice to Bank, requests or subpoenas an officer or employee of Bank to appear at a trial, hearing or deposition concerning an Account to testify about the Account, Bank shall ensure the requested employee appears at such hearing or deposition and will be available for consultation with Buyer.  Buyer will pay Bank for the officer's or employee's time in traveling to, attending and testifying at the trial,

**CONFIDENTIAL**                                    **SO-0010**

hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate equivalent of such officer or employee. Buyer will also reimburse Bank for the officer's or employee's reasonable out-of-pocket, travel-related expenses.

6.8     Bank's Obligation to Forward Payments and Mail to Buyer.   Each month after the Closing Date, Bank will forward to Buyer an Account level report detailing all payments Bank has received after the applicable Cut-Off Date on the Accounts. Simultaneously, Bank shall wire payment to Buyer or enclose a check for such payments. In the event that any such payments are reversed for insufficient funds, Buyer shall promptly refund any such payment previously received to Bank. Additionally, on a monthly basis, Bank will forward all mail received relating to the Accounts to Buyer, subject to Bank's right to retain copies thereof to the extent the Bank's interests are affected. Notwithstanding anything to the contrary in this Section 6.8, Bank shall notify Buyer of Bank's receipt of any payment received on any Account as soon as commercially practical.

6.9     Additional Compensation.   Buyer shall compensate Bank as described in Exhibit 4, at such times as designated therein.

6.10     Reporting by Buyer.   On a quarterly basis commencing July 2007, Buyer shall report all cash flow collections on the Accounts for the preceding period to Bank.

6.11     Post Closing Tape.   Bank shall deliver to Buyer within two weeks of the Closing Date a computer print out or magnetic tape ("Post Closing Tape") showing the Annual Percentage Rate ("APR") that was most recently assessed against the Account Balances for the purpose of calculating finance charges.

## 7.     USE OF BANK'S NAME

7.1     Use of Names.   The Buyer will not use or refer to the name "Citibank," "Citibank Classic," "Sears", "Sears National Bank", "Sears Roebuck", "Citicorp," "Citigroup", "Associates Capital Bank, Inc.", "Associates Credit Card Services, Inc.", "Associates Commerce Solutions", "Associates National Bank", "Universal Card Services Corp." or any similar name or successor corporation, except to reference "Citibank" or "Sears" for purposes of identifying an Account in communications with the Account's Cardholder, in collecting amounts outstanding on the Account, and in conducting litigation or participating in a bankruptcy proceeding with respect to the Account. Buyer shall not represent that there is an affiliation or agency relationship between Buyer and the Bank, nor shall Buyer state or represent in any way that it is acting for or on behalf of the Bank. Buyer shall not misrepresent, mislead or otherwise fail adequately to disclose its ownership of the Accounts.

7.2     Breach.   Buyer and the Bank acknowledge that Buyer's breach of this Article 7 will result in actual and substantial damages to the Bank. Therefore, if the Buyer breaches any part of this Article 7, then Bank shall have the right to seek and obtain in any court of competent jurisdiction an injunction to restrain a violation, alleged violation, or continuing violation by the Buyer. In

CONFIDENTIAL

SO-0011

addition to all equitable claims, Bank shall be entitled to bring any and all separate clams to recover damages against Buyer that Bank may suffer as a result of Buyer's breach.  Bank may recover its costs incurred in bringing any successful action under this Article 7, including but not limited to reasonable attorney fees and court costs.  Further, Buyer shall immediately cease and desist from continuing any act that is alleged by Bank to be a violation of this Article 7, and Buyer shall take whatever action that is necessary to correct any violation of this Article 7 upon receiving written notice from Bank.  In addition, if Buyer breaches this Article 7, Buyer will pay the Bank the sum of $10,000.00 for each breach (each breach being the single use of the above names, communicated to a third party as described above) as liquidated damages  to a maximum of $1 million ($1,000,000.00); provided, however, that nothing herein shall limit, restrict or prohibit Bank's right to bring any and all claims to recover damages in excess of the $1 million ($1,000,000.00) dollar maximum against Buyer that Bank may suffer as a result of Buyer's breach.

## 8.     THE BANK'S RIGHT TO REPURCHASE ACCOUNTS

8.1     Accounts Affected.  The Bank shall have the right to repurchase any Account that has not been paid in full, released or compromised by Buyer, if the Bank determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

8.2     Right to Repurchase.

(a)     Upon notice to Buyer, the Bank may repurchase any Account described in Section 8.1 by repaying to Buyer the Adjustment Amount associated with the repurchased Account.

(b)     Upon delivering to the Bank a full accounting of the Account, Buyer may retain any money or value that Buyer collected or received on the Account before Buyer's receipt of the Bank's notice electing to repurchase the Account. Buyer shall remit to Bank any payment received after notice.  After Buyer has received the Bank's notice, Buyer will immediately cease releasing or compromising any Account. Notwithstanding the foregoing, in the event that Bank needs to repurchase an Account within the first month of the Closing Date, Buyer shall remit to Bank any payments received on the Account, net of any collection fees due third parties.

## 9.     RIGHT OF RESALE

9.1     Sale or Transfer to a Third Party.  Buyer may resell or transfer the ownership of any Account to a third party, including the transfer of Cardholder information (such as names and addresses) to any third party (each referred to as "Third Party Buyer"); provided, however, that Buyer must conduct commercially reasonable and prudent due diligence of the Third Party

**CONFIDENTIAL**                                    **SO-0012**

Buyer. Buyer shall defend, indemnify and hold harmless Bank from any and all causes of action, claims, expenses or judgments incurred by Bank for which Buyer's Third Party Buyer or any buyer of Third Party Buyer (collectively referred to herein as "Downstream Buyer") is solely or partially responsible. Buyer shall require all Downstream Buyers to agree to be bound to all of the Buyer's obligations and limitations or remedies, and to acknowledge all of Bank's rights set forth in this Agreement including, without limitation, the Sections in Articles 6, 7, 8, and 9. All Downstream Buyers' requests for documentation pursuant to Section 6.2 must be made to Bank through Buyer, unless Bank otherwise agrees in writing. Nothing in this Section 9.1 shall modify the indemnification provisions between Bank and Buyer as set forth in Article 10 of this Agreement.

Furthermore, Buyer shall not resell, transfer, convey or assign the ownership of any Account to Providian Financial Corporation, First Select Corporation (a Providian Financial Company) or Capital One Financial Corporation, for a period of one (1) year from the Closing Date.

9.2   Exceptions. Notwithstanding Section 9.1, Buyer may sell, pledge or transfer Accounts to one or more of its wholly owned subsidiaries or affiliates or to a trust or other special purpose vehicle which is wholly owned by such subsidiary or affiliate or a third party (except Providian Financial Corporation, First Select Corporation, [a Providian Financial Company] or Capital One Financial Corporation) for the sole purpose of obtaining financing and/or issuing asset-backed securities secured by such Accounts, provided that Buyer shall give Bank  notice of the sale, pledge, or transfer under this Section 9.2.


## 10.    INDEMNIFICATION

10.1   Indemnification by Buyer. Buyer hereby agrees to indemnify, defend, and hold harmless the Bank, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses, costs or expenses (including any and all reasonable attorneys' and experts' fees), asserted by a third party that Bank might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement, or any other act or omission by Buyer, its officers, directors, agents, employees, representatives or any Downstream Buyers  with respect to any Account or any party obligated on an Account after the Closing Date; provided, however, that, (i) the Bank notifies Buyer within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Bank, its parent, affiliates, subsidiaries or any of their employees or agents and (iii) the Bank provides Buyer with information that is available to the Bank and is reasonably necessary for Buyer to prosecute its defense of the action.

Buyer shall bear all reasonable expenses in connection with the defense and/or settlement of any such claim or suit. The Bank shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and which has been assumed by the obligation or indemnity hereunder; Buyer, in the defense of any such claim, except with the written consent of

**CONFIDENTIAL**
**SO-0013**

the Bank, shall not consent to entry of any judgment or enter into any settlement that either: (a) does not include, as an unconditional term, the grant by the claimant to the Bank of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Bank.

10.2    Indemnification by Bank.  Bank hereby agrees to indemnify, defend, and hold harmless the Buyer, its permitted assigns, parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses costs or expenses (including any and all reasonable attorneys' and experts' fees) asserted by a third party that Buyer might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement (provided that Bank may not use the "best of knowledge" qualification contained in Section 3.6 as a defense to an indemnification claim), or any other act or omission by Bank, its predecessors in interest, its officers, directors, agents, employees, or representatives with respect to any Account or any party obligated on an Account prior to the Closing Date, provided, however, that (i) the Buyer notifies Bank within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Buyer, its parent, affiliates, subsidiaries, transferees, contractors, agents or any of their employees or agent and (iii) the Buyer provides Bank with information that is available to the Buyer and is reasonably necessary for Bank to prosecute its defense of the action.

Bank shall bear all reasonable expenses in connection with the defense and/or settlement of any such claim or suit.  The Buyer shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and the defense of which has been assumed by the Bank's obligation or indemnity hereunder.  Bank, in the defense of any such claim, except with the written consent of the Buyer, shall not consent to entry of any judgment or enter into any settlement that either, (a) does not include, as an unconditional term, the grant by the claimant to the Buyer of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Buyer.

10.3    Survival.  The provisions of this Article 10 shall survive the termination or expiration of this Agreement.

## 11.    CONFIDENTIALITY

11.1    Confidential Information.  From and after the execution of this Agreement, Buyer hereto shall keep confidential, and shall use reasonable efforts to cause their respective officers, directors, employees and agents to keep confidential, any and all information obtained from the Bank concerning the assets, properties and business of the Bank, and shall not use such confidential information for any purpose other than those contemplated by this Agreement; *provided, however*, that Buyer shall not be subject to the obligations set forth in the preceding sentence with respect to any such information provided to it by the Bank which either (i) was in Buyer's possession at the time of the Bank's disclosure, (ii) was in the public domain at the time of the Bank's disclosure, or subsequently enters the public domain through no act or failure to act

CONFIDENTIAL

SO-0014

on the part of the Bank, or (iii) is lawfully obtained by Buyer from a third party. Nothing in this Agreement shall be construed to limit Buyer's obligations under the confidentiality agreement entered into between Buyer and the Bank with regard to Accounts other than those sold hereunder. If Buyer or any of its employees become legally compelled (by deposition, interrogatory, request of documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, Buyer shall provide Bank (to the extent permitted by law) with prompt written notice of such requirement so that Bank may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement. In the event that such protective order or other remedy is not obtained, Bank waives compliance with the provisions hereof, and Buyer may provide such information as is legally required to be furnished.

11.2   Public Announcement. Neither Buyer nor the Bank shall make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any representative of the news media without the prior written approval of the other party. The parties will not respond to any inquiry from public, governmental, or administrative authorities concerning this Agreement without prior consultation and coordination with each other.

11.3   Survival.   The provisions of this Article 11 shall survive the termination of this Agreement.

## 12.   GENERAL PROVISIONS

12.1   Applicable Law. The laws of the State of South Dakota shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto.

12.2   WAIVER OF JURY TRIAL. NOTWITHSTANDING ANYTHING STATED HEREIN, IF EITHER PARTY BRINGS ANY ACTION AGAINST THE OTHER PARTY, WHETHER AT LAW OR EQUITY, REGARDING THE OTHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT OR BRINGS ANY ACTION CONNECTED IN ANY WAY WITH THIS AGREEMENT, THE PARTIES AGREE TO WAIVE TRIAL BY JURY.

12.3   Notices. All notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Bank: | Citibank (South Dakota), National Association |
|  | Attn: General Counsel |
|  | 701 East 60th Street North |
|  | Sioux Falls, SD  57117 |

**CONFIDENTIAL**                          **SO-0015**

And Copies to:   Citicorp Credit Services, Inc. (USA)
                 Attn: Mike Tucci
                 7920 NW 110th Street
                 Kansas City, MO 64153

If to Buyer:     Sherman Originator LLC
                 c/o Sherman Capital Markets LLC
                 200 Meeting Street, Suite 206
                 Charleston, SC 29401

The parties hereto may at any time change the name and addresses of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving written notice to the other party.

12.4   Binding Nature of Agreement.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto, and their respective legal representatives, successors and permitted assigns.

12.5   Assignment.   Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Article 9 above. Notwithstanding the foregoing sentence, Bank may assign its rights and obligations under this Agreement to any of its affiliates, subsidiaries, or parent corporations without obtaining Buyer's permission or consent.

12.6   Expenses.   Except as otherwise expressly provided in this Agreement, Buyer and the Bank will each bear its own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.7   Entire Agreement.  This Agreement and the Exhibits hereto embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.   The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying Exhibit or the certificates or other closing documents delivered in accordance with this Agreement. All prior representations and statements made by any party or its representatives, whether orally or in writing, are deemed to have been merged into this Agreement, except as otherwise stated in this Agreement.

12.8   Amendment.  Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally.  Any change, waiver, discharge or termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

12.9   Severability.  If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceability, the invalidity, illegality or unenforceability will not

**CONFIDENTIAL**                              **SO-0016**

affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10   Waiver.   Except as required under Section 3.7, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11   Headings.   Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

12.12   Counterparts.   This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

12.13   Further Assurances. From and after the applicable Closing Date, each party will take such action as the other party may reasonably request to carry out the purpose of the Agreement, including, without limitation, providing any individual Account assignments as requested.


IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above.


**Citibank (South Dakota), N.A.**                    **Sherman Originator LLC**


By:_____                    By:_____
       (Signature)                                           (Signature)

Name:_____                    Name: _Les Gutierrez_____

Title:_____                    Title: _Authorized Signatory_

**CONFIDENTIAL**                                  **SO-0017**

affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10  Waiver.  Except as required under Section 3.7, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11  Headings.  Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

12.12  Counterparts.  This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

12.13  Further Assurances. From and after the applicable Closing Date, each party will take such action as the other party may reasonably request to carry out the purpose of the Agreement, including, without limitation, providing any individual Account assignments as requested.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above.

Citibank (South Dakota), N.A.

By:_____
        (Signature)

Name:_____

Title:_____

Sherman Originator LLC

By:_____
        (Signature)

Name:_____

Title:_____

CONFIDENTIAL                    SO-0018

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of April 4, 2007, between Citibank (South Dakota), National Association, a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD  57117 (the "Bank") and Sherman Originator, LLC, a Delaware corporation, located c/o Sherman Capital Markets LLC at 200 Meeting Street, Suite 206, Charleston, SC 29401 ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated April 4, 2007, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Section 1.2 of the Agreement.

This Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility except as provided in the Agreement.

Citibank (South Dakota), N.A.

By: _____
(Signature)

Name: _____

Title: _____

Sherman Originator, LLC

By: _____
(Signature)

Name: _____

Title: _____

**CONFIDENTIAL**          **SO-0019**