IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREW COX, *et al.*, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SHERMAN CAPITAL LLC, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.: 1:12-cv-1654-TWP-MJD

CLASS ACTION

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     BACKGROUND ........................................................................................... 1

III.    FACTS ........................................................................................................... 4

      A.      Claims of the Proposed Class Representatives ................................... 4

            1.      Andrew Cox ................................................................................ 4

            2.      Andrew Cox and Lucinda Cox ................................................... 5

            3.      Stephanie Snyder ........................................................................ 6

            4.      Robert Goodall ........................................................................... 7

            5.      Plaintiffs' Purported Causes of Action ...................................... 8

      B.      Plaintiffs' Discovery Responses Regarding Alleged Securitization of Their Credit Card Accounts ..................................................................... 10

      C.      Information Produced by Defendants Regarding Indiana Accounts ................... 11

IV.     RULE 23 REQUIREMENTS FOR CLASS CERTIFICATION ..................................... 12

V.      ARGUMENT ................................................................................................ 13

      A.      Plaintiffs' Proposed Class Definitions Are Flawed ............................ 13

      B.      Because Resolution of Plaintiffs' Claims Will Require Individualized Proof on a Number of Issues, Many of the Rule 23 Requirements Cannot Be Satisfied. ........................................................................ 18

            1.      Plaintiffs' Securitization Theory Will Require Individualized Proof. .......................................................................... 18

            2.      Other Issues Requiring Individualized Proof ............................ 22

                  a.      Defendants' Defense Based on Defendants' Good Faith Belief that the Sellers Had Authority to Sell the Accounts of Plaintiffs and the Absent Class Members. ................................ 22

                  b.      Claims of Named Plaintiffs and Absent Class Members Who Have Filed for Bankruptcy. ............................................ 23

                  c.      Reliance Or Directness Of Injury For the Fraud and RICO Claims. ................................................................ 25

            3.      Plaintiffs Have Not Satisfied The Rule 23 (a)(2) Commonality Requirement ........................................................................... 27

            4.      Plaintiffs Have Not Satisfied The Rule 23(a)(3) Typicality Requirement or the Rule 23 (a)(4) Requirement of Adequacy of Representation. ...................................................................... 28

            5.      Plaintiffs Have Not Satisfied The Requirements of Rule 23 (b)(3). ......... 30

C.     Plaintiffs' Counsel Have Not Shown Their Adequacy Under FRCP 23(g).......... 32

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alliance to End Repression v. Rochford*,
565 F.2d 975 (7th Cir. 1977) ................................................................16

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................................30, 31

*Anderson v. Acme Mkts., Inc.*,
287 B.R. 624 (E.D. Pa. 2002) .........................................................24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................25

*Blair v. Supportkids, Inc.*,
No. 02-CV-0632, 2003 WL 1908031 (N.D. Ill. 2003) ..........................31

*Citibank (South Dakota), N.A. v. Carroll*,
148 Idaho 254, 220 P.3d 1073 (2009)..........................................3, 4, 20

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) ......................................................17

*Covert v. LVNV Funding, et al.*,
No. 14-1016 (4th Cir. March 3, 2015)..............................................24

*Cox v. CA Holding, Inc., et al.*,
2015 WL 631393 (S.D. Ind. Feb. 13, 2015) ..................2, 3, 20, 21, 22

*Cunningham Charter Corp. v. Learjet, Inc.*,
258 F.R.D. 320 (S.D. Ill. 2009) .................................................14, 17

*Dafforn v. Rousseau Assocs., Inc.*,
No. F 75-74, 1976 WL 1358 (N.D. Ind. July 27, 1976) ..................14, 15

*In re Dairy Farmers of Am., Inc.*,
No. 2031, 2013 WL 6050431 (N.D. Ill. Nov. 15, 2013)........................33

*Davidson v. Citizens Gas & Coke Util.*,
238 F.R.D. 225 (S.D. Ind. 2006)......................................................34

*Eager v. Credit Bureau Collection Servs., Inc.*,
Nos. 1:13-CV-30, 1:13-CV84, 1:13-CV-173, 1:13-CV-261, 2014 WL
3534949 (W.D. Mich. July 16, 2014) ............................................16, 17

*Eisen v. Carlisle and Jacquelin*,
   417 U.S. 156 (1974)................................................................................31, 33

*Evans v. City of Chicago*,
   434 F.3d 916 (7th Cir. 2006) ...................................................................25

*Fisher v. United States*,
   69 Fed. Cl. 193 (Fed. Cl. 2006) ...............................................................33

*Gammon v. GC Servs. Ltd. P'ship*,
   162 F.R.D. 313 (N.D. Ill. 1995)................................................................34

*Golon v. Ohio Sav. Bank*,
   No. 98-CV-7430, 1999 WL 965593 (N.D. Ill. 1999) ................................31

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992)...................................................................................25

*Hurt v. Shelby Cnty. Bd. of Educ.*,
   No. 2:13-CV-230-VEH, 2014 WL 4269113 (N.D. Ala. Aug. 21, 2014) ................16

*Indiana State Emp. Ass'n, Inc. v. Indiana State Highway Comm'n*,
   78 F.R.D. 724 (S.D. Ind. 1978).................................................................15

*Jamie S. v. Milwaukee Public Schools*,
   668 F.3d 481 (7th Cir. 2012) ....................................................................16

*John Roe I v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) .......................................................15

*Johnston v. HBO Film Mgmt. Inc.*,
   265 F.3d 178 (3d Cir. 2001).......................................................................31

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   571 F.3d 672 (7th Cir. 2009) ....................................................................18

*Lambert v. Fuller Co., Inc.*,
   122 B.R. 243 (E.D. Pa. 1990) ...................................................................23

*Lucas v. Vee Pak, Inc.*,
   --- F. Supp. 3d ---, 2014 WL 4637193 (N.D. Ill. Sept. 17, 2014)............15

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) .............................................................14, 16

*Oshana v. Coca Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) .............................................................14, 28

*In re Ozark Rest. Equip. Co.*,
816 F.2d 1222 (8th Cir. 1987) ...........................................................................24

*Panwar v. Access Therapies, Inc.*,
No. 1:12-cv-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015)(Pratt, J.)............12, 13, 14, 18

*Peters v. Nat'l R.R. Passenger Corp.*,
966 F.2d 1483 (D.C. Cir. 1992) .........................................................................34

*Rahman v. Chertoff*,
530 F.3d 622 (7th Cir. 2008) .............................................................................16

*Robert James Goodall v. Fidelity Nat'l Title Ins. Co.*,
646 F.3d 347 (6th Cir. 2011) ........................................................................14, 15

*Retired Chi. Police Ass'n v. City of Chi.*,
7 F.3d 584 (7th Cir. 1993) .................................................................................13

*In re Robert James Goodall*,
No. 10-14887-FJO-13 (Bankr. S.D. Ind.) ..........................................................24

*Savanna Grp., Inc. v. Trynex, Inc.*,
No. 10-CV-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013)..................................33

*Scott v. Bank of America*,
580 Fed.Appx. 56 (3d Cir. 2014) ....................................................................3, 20

*Sephery-Ford v. Department Stores National Bank, et al.*,
2013 WL 6574774 (N.D. Cal. 2013) ....................................................................4

*Shade v. Bank of America*,
2009 WL 5198176 (E.D. Cal. 2009)......................................................................4

*Spano v. The Boeing Co.*,
633 F.3d 574 (7th Cir. 2011) .............................................................................14

*Susman v. Lincoln Am. Corp.*,
561 F.2d 86 (7th Cir. 1977) ...............................................................................13

*Szabo v. Bridgeport Machines, Inc.*,
249 F.3d 672 (7th Cir. 2001) ........................................................................13, 17

*Thorogood v. Sears, Roebuck and Co.*,
547 F.3d 742 (7th Cir. 2008) .............................................................................25

*Tostado v. Citibank (South Dakota), N.A.*,
2010 WL 55976 (W.D. Tex. 2010)........................................................................4

*UFCW Local 1776. 11 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010)........................................................25, 26

*United States v. Whiting Pools, Inc.*
462 U.S. 198 (1983)........................................................23

*Vaughn v. General Foods Corp.*,
797 F.2d 1403 (7th Cir. 1986), *cert. denied*, 479 U.S. 1087 (1987)........................................................25

*Vigus v. So. Ill. Riverboat/Casino Cruises, Inc.*,
274 F.R.D. 229 (S.D. Ill. 2011) ........................................................18

*Wahl v. Midland Credit Mgmt., Inc.*,
243 F.R.D. 291 (N.D. Ill. 2007)........................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)........................................................12, 27

*Williams v. Ford Motor Co.*,
192 F.R.D. 580 (N.D. Ill. 2000)........................................................31

**Statutes**

11 U.S.C. § 323(a) ........................................................24

15 U.S.C. § 1692........................................................9, 16, 23, 30

18 U.S.C. § 1962........................................................10, 25

18 U.S.C. § 1964(c) ........................................................25

**Rules**

Fed. R. Civ. P. 23 ........................................................ *passim*

Fed. R. Civ. P. 1006........................................................11, 21

**Regulations**

17 C.F.R. § 240.15Ga-1(a)........................................................22

**Other Authorities**

Levittin, *Skin-in-the-Game: Risk Retention Lessons from Credit Card Securitization* (2013)........................................................19

Nagaredz, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev.
97, 132 (2009)........................................................27

## I.    INTRODUCTION

Plaintiffs ask this Court to certify a sprawling class that they claim consists of over 1 million Indiana residents. Plaintiffs' motion fails every requirement of class certification under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs have proposed three subclasses that do not meet the well-established rules governing class definition, most particularly because the membership of the subclasses could not be determined until it was first determined whether an individual had a valid claim against Defendants on the merits. Moreover, because the key facts surrounding the claims of the individual potential class members vary widely, Plaintiffs cannot prove their basic liability theory with evidence common to the proposed class but instead necessarily will need to rely on extensive evidence that will vary from class member to class member. For these reasons – and for all the reasons explained below – the Court should deny Plaintiffs' motion for class certification.

## II.    BACKGROUND

Plaintiffs are four Indiana residents who claim that Defendants wrongfully sought to collect from them debts that Plaintiffs had incurred on credit cards. Am. Compl., Dkt. No. 303 at ¶ 1. Defendants include LVNV Funding LLC ("LVNV"), an entity that claims ownership of Plaintiffs' debts, and a number of its alleged affiliates. Plaintiffs' Amended Complaint purports to allege claims for violations of the Fair Debt Collection Practices Act ("FDCPA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), along with claims for common law fraud, constructive fraud, restitution and unjust enrichment.

All of Plaintiffs' claims are based on the core allegation that Defendant LVNV did not own Plaintiffs' credit card debt when LVNV or its affiliates sought to collect that debt. *Id.* at ¶¶ 1-6. Plaintiffs' liability theory is based on the process of "securitization" of credit card debt,

pursuant to which the originating bank's credit card receivables are allegedly pooled into financial instruments that are sold to outside investors. *Id*. at ¶ 58. [1] Plaintiffs claim that, as a result of the securitization, "the originating bank is paid in full… the outside investors own the receivables as a result of a true sale and… the originating bank cannot get the receivables back…." *Id*. at ¶ 60. Accordingly, Plaintiffs claim, LVNV (or its affiliate) does not acquire the credit card debt from the originating bank but instead merely acquires "information" about the debt. *Id*. at ¶ 2.

One court in this District has already rejected Plaintiffs' "securitization theory." In *Cox v. CA Holding, Inc., et al*., No. 13-CV-1754, 2015 WL 631393 (S.D. Ind. Feb. 13, 2015), Plaintiffs' counsel (and one of the named plaintiffs in this case) brought claims similar to those alleged here. The Court addressed the securitization theory in the context of a motion to enforce an arbitration clause in a credit card agreement. Plaintiffs argued that the defendant, who claimed to have purchased plaintiffs' credit card debt, could not enforce the arbitration clause because the originating lender had securitized the debt and hence had no right to assign the plaintiffs' credit card agreement to defendant. 2015 WL 631393 at *14. Judge Magnus-Stinson concluded that the "securitization theory is based on sheer speculation." *Id*. The Court stated that Plaintiff had not even come forth with direct evidence that the account at issue had been securitized. *Id*. Moreover, the Court noted that "several other courts have rejected the notion that securitization changes the creditor's ability to enforce its interest in accounts, even where the interest in the receivables is sold." *Id*. "Both the speculative nature of Plaintiffs' securitization

---

[1] Although credit card securitizations can differ in structure, a basic structure is as follows. The securitization is created when a financial institution or other lender has accumulated a significant volume of credit card receivables and transfers the receivables to a separate entity, which then transfers the receivables to a securitization trust. The trust then packages the receivables and issues investor certificates (sold to investors) and trust certificates (retained by transferor or affiliate). Proceeds from the sale of the investor certificates go to the trust. The trust in turn pays the financial institution (seller) for the purchase of the underlying receivables. The cash flow generated from the receivables in the trust is used to fund payments owed to the investors. *See generally* FDIC Credit Card Securitization Manual, § Chapter II (2007).

argument," the Court wrote, "and the lack of citation to case law supporting that argument lead the Court to reject the securitization theory." *Id*. at *15.

As indicated by Judge Magnus-Stinson in *CA Holding*, other courts have addressed the effect of securitization on attempts to collect credit card debt. For example, in *Scott v. Bank of America*, 580 Fed. Appx. 56 (3d Cir. 2014), the Court of Appeals for the Third Circuit in a non-precedential opinion affirmed the dismissal of claims similar to those being asserted here. *Scott* involved credit card debt of plaintiff Selena Scott that Defendant Calvary SPV 1 ("Calvary") had claimed to have purchased from Bank of America ("BOA"). Plaintiff claimed that BOA had securitized plaintiffs' credit card debt and thus "had nothing to transfer to Calvary." *Id*. at 57. The Third Circuit rejected plaintiffs' argument, stating that "even after securitization the card issuer retains an ownership interest in the account." *Id*. Furthermore, the Court of Appeals explained that, under the documents governing the BOA securitization, "once Scott's account fell into default . . . ownership of [the account] automatically reverts to [BOA]," thereby placing "ownership of the receivables squarely back in [BOA's] hands." *Id*.

Similarly, in *Citibank (South Dakota), N.A. v. Carroll*, 148 Idaho 254, 220 P.3d 1073 (2009), the Idaho Supreme Court rejected a theory of liability similar to the "securitization theory" Plaintiffs assert here. *Carroll* was an action by Citibank to collect on a defaulted credit card account. The borrower claimed that Citibank lacked standing to collect the debt because the debt had been securitized. The Idaho Supreme Court affirmed summary judgment in favor of Citibank. The Court noted that under the applicable securitization documents, the plaintiffs' receivable was considered a "defaulted receivable," which was automatically transferred from the securitization trust back to Citibank prior to commencement of the collection action. 220

P.3d at 1077-78. Consequently, Citibank had standing to maintain the collection action. 220 P.3d at 1078.[2]

## III.    FACTS

### A.    Claims of the Proposed Class Representatives

#### 1.    Andrew Cox

Plaintiff Andrew Cox alleges claims arising out of a credit card account he had with Chase Bank, U.S.A. (the "Cox 1 Account"). Dkt. No. 303 at ¶¶ 77-81. Plaintiff Andrew Cox alleges that he was unable to maintain payments on the Cox 1 Account, and that after 180 days of default Chase charged-off the debt. *Id*. ¶ 64. Plaintiff Andrew Cox further alleges that, on or about April 7, 2011, the Cox 1 Account was "purportedly" sold by Chase to Sherman Originator III LLC,[3] which assigned it to Defendant Sherman Originator LLC, which assigned it to LVNV. *Id*. ¶ 77. On April 11, 2011, LVNV's agent, Defendant Resurgent Capital Services LP ("Resurgent"), allegedly furnished a report to consumer credit reporting agencies that "falsely" stated that Andrew Cox owed a debt and that the debt was owed to LVNV. *Id*. ¶ 78. Plaintiffs allege further that Defendants, through Resurgent, hired Bourdreau and Associates LLC ("Boudreau"), who wrote to Plaintiff Andrew Cox "falsely stating that LVNV was the current creditor and that [Plaintiff Andrew Cox] owed a debt." *Id*. ¶ 81.

In discovery Defendants have produced evidence associated with LVNV's purchase and ownership of the Cox 1 Account. This evidence shows that Chase sold the Cox 1 Account to Sherman Originator III, which sold the Cox 1 Account to Sherman Originator, which sold the

---

[2] Other cases holding that securitization of credit card receivables did not divest the originating lenders of its ownership interest in the credit card accounts include: *Tostado v. Citibank (South Dakota), N.A.*, No. 09-CV-549, 2010 WL 55976, *2-*3 (W.D. Tex. Jan. 4, 2010); *Shade v. Bank of America, N.A.*, No. 08-CV-1069, 2009 WL 5198176, *4 (E.D. Cal. Dec. 23, 2009); *Sephery-Fard v. Department Stores National Bank, et al.*, No. 13-CV-3131, 2013 WL 6574774 (N.D. Cal. Dec. 13, 2013).
[3] Sherman Originator III LLC is owned by Defendant Sherman Financial Group LLC. Dkt. No. 12

Cox 1 Account to LVNV. *See* Ex. A at p. 9. In the purchase agreement between Chase and Sherman Originator III, Chase represented that at time of sale:

(i)     Chase "had good and marketable title" to the Cox 1 Account, and would transfer the Cox 1 Account "free and clear of any lien or encumbrance;" and

(ii)    the account level data Chase provided with regard to the Cox 1 Account was "materially true and accurate to the best of [Chase's] books and records."

*Id*.

## 2.     Andrew Cox and Lucinda Cox

In addition to the Cox 1 Account, Plaintiff Andrew Cox and his wife Plaintiff Lucinda Cox allege claims arising out another credit card account with Chase ("Cox 2 Account"). Plaintiffs allege that Andrew and Lucinda Cox failed to maintain payments on the Cox 2 Account, and that Chase charged-off the credit card debt after 180 days of default. Dkt. No. 303 at ¶ 64. Plaintiffs further allege that, on December 10, 2010, Chase and Sherman Capital Markets LLC "purportedly" entered into a Purchase Agreement, and, on April 8, 2010, Chase sold the Cox 2 Account to Sherman Originator III LLC, which assigned it to Sherman Originator LLC, which assigned it to LVNV. *Id.* ¶ 66. On April 11, 2011, LVNV's agent, Resurgent, allegedly furnished a report to consumer credit reporting agencies that "falsely" stated that Andrew and Lucinda Cox owed a debt and that the debt was owed to LVNV. *Id.* ¶ 67. Plaintiffs allege further that Defendants, through Resurgent, hired collection agents who stated "falsely" to Plaintiffs that "the current creditor was LVNV and that a balance was due." *Id.* ¶¶ 69-73.

In discovery Defendants have produced evidence establishing LVNV's purchase and ownership of the Cox 2 Account. This evidence shows that Chase sold the Cox 2 Account to Sherman Originator III, which sold the Cox 2 Account to Sherman Originator, which sold the

Cox 2 Account to LVNV. *See* Ex A at p. 10. In the purchase agreement between Chase and Sherman Originator III, Chase represented that at the time of sale:

(i) Chase "had good and marketable title" to the Cox 2 Account, and would transfer the Cox 2 Account "free and clear of any lien or encumbrance;" and

(ii) the account level data Chase provided with regard to the Cox 2 Account was "materially true and accurate to the best of [Chase's] books and records."

*Id.* at 10-11.

### 3. **Stephanie Snyder**

Plaintiff Stephanie Snyder alleges claims arising out of her Sears credit card account (the "Snyder Account"). Plaintiffs allege that Plaintiff Snyder could not maintain payments on the Snyder Account, and that Sears charged-off Plaintiff Snyder's credit card debt after 180 days of default. Am. Compl. ¶ 82. Plaintiffs further allege that, on or about April 4, 2007, Citibank (South Dakota) USA ("Citibank") "purportedly" sold the Snyder Account to Sherman Originator LLC, which assigned it LVNV. *Id.* ¶ 83. On April 4, 2007, LVNV's agent, Resurgent, allegedly furnished a report to consumer credit reporting agencies that "falsely" stated that Plaintiff Snyder owed a debt and that the debt was owed to LVNV. *Id.* ¶ 84. Plaintiffs allege further that Defendants, through Resurgent, hired collection agents who "falsely stated 'Current Creditor: LVNV Funding LLC' and falsely stated that there was a "Current Balance Due". *Id.* ¶¶ 88-96.

In discovery Defendants have produced evidence establishing LVNV's purchase and ownership of the Snyder Account. This evidence shows that Citibank sold the Snyder Account to Sherman Originator LLC, which sold the Snyder Account to LVNV. *See* Ex A at p. 6. In the purchase agreement between Citibank and Sherman Originator, Citibank represented that at the time of sale:

(i)     Citibank "had good and marketable title" to the Snyder Account, and was the "sole owner thereof and [had] full right to transfer and sell" the Snyder Account "free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys previously retained by [Citibank] or Sears;"

(ii)    the information concerning the Snyder Account that Citibank provided to Sherman Originator LLC on tape was "materially true and correct;" and

(iii)   the Snyder Account was not securitized, and that to the extent it had previously been included in the Standard Credit Card Master Trust, all conditions precedent for removal of the Snyder Account from that trust had been satisfied.

*Id.* at 7.

### 4.    <u>Robert Goodall</u>

Plaintiff Robert Goodall alleges claims arising out of two different credit card accounts. The first is a Chase credit card account (the "Goodall 1 Account"). Plaintiffs allege that Goodall could not keep up with payments on the Goodall 1 Account, and that Chase charged-off the credit card debt after 180 days of default. Am. Compl. ¶ 102. Plaintiffs allege that, on September 9, 2010, Citibank "purportedly" sold the Goodall 1 Account to Sherman Originator III LLC, which transferred it to Sherman Originator LLC, which transferred it to LVNV. *Id.* ¶ 104. On September 30, 2010, Robert Goodall filed for bankruptcy. *Id.* ¶ 103. On February 10, 2011, LVNV's agent, Resurgent, allegedly filed a proof of claim with the U.S. District Bankruptcy Court in Indianapolis stating that LVNV was a creditor. *Id.* ¶ 105. According to Plaintiffs, LVNV "falsely" stated to the bankruptcy trustee that it was a creditor, and based on this assertion, the trustee remitted $7,904.41 to LVNV. *Id.* ¶ 106.

Defendants have produced evidence establishing LVNV's purchase and ownership of the Goodall 1 Account. This evidence shows that Chase sold the Goodall 1 Account to Sherman Originator III, which sold the Goodall 1 Account to Sherman Originator, which sold the Goodall 1 Account to LVNV. *See* Declaration of Meghan Emmerich, ¶ 3 (Ex. B) ("Emmerich Dec."). In

the purchase agreement between Chase and Sherman Originator III, Chase represented that at the time of sale:

(i) Chase "had good and marketable title" to the Goodall 1 Account, and would transfer the Goodall 1 Account "free and clear of any lien or encumbrance;" and

(ii) the account level data Chase provided with regard to the Goodall 1 Account was "materially true and accurate to the best of [Chase's] books and records."

*Id.* (Ex. A to the Emmerich Dec., Sec. 3(f), (k)).

The second account cited by Plaintiff Goodall is a credit card account with Loews ("Goodall 2 Account"). Goodall Dep. Tr. At 33-38 (Ex.C). The evidence shows that General Electric Capital Corporation, GE Money Bank, and Retailer Credit Services Inc. (collectively "GECC") sold the Goodall 2 Account to Sherman Originator III, which sold the Goodall 2 Account to Sherman Originator, which sold the Goodall 2 Account to LVNV. *Id.* at ¶ 4. In the purchase agreement between GECC and Sherman Originator III, GECC represented that at the time of sale:

(i) [GECC] "holds title in and to the Receivables, free and clear of all liens, claims and encumbrances, and is the lawful owner of, and has the right to sell, the Receivables and, upon the purchase by Buyer of the Receivables hereunder from [GECC] Buyer shall acquire unencumbered title in and to the Receivables, of the Transfer Date, except for such encumbrances, liens and claims caused or created by the Buyer."

*Id.* at ¶ 4 (Ex. E to the Emmerich Dec., Sec. 4.1(d)).

### 5. <u>Plaintiffs' Purported Causes of Action</u>

Plaintiffs purport to state seven causes of action in their Amended Complaint. Dkt. No. 303 at ¶¶ 146-219. All these purported causes of action are based on their core allegation that LVNV attempted to collect and/or collected debt that it did not own. While each of the Plaintiffs acknowledges that he or she incurred debts on their credit card accounts that they failed to repay,

they all further allege that LVNV never received ownership of those accounts or the right to collect the debts Plaintiffs incurred. *Id.* ¶¶ 67, 70, 78, 84, 90, 92, 101, 106. In particular, Plaintiffs allege that, because their originating creditors had previously surrendered all control over, and ownership of, their accounts to trusts in securitization transactions, Plaintiffs' debt obligations ended when the originating creditors (presumably acting as servicers for the trusts) charged-off their accounts 180 days after default. *Id.* ¶¶ 58-62.[4] As a result, in the purchase and transfer transactions noted above, LVNV purportedly did not obtain ownership of Plaintiffs' debts, but instead, received "leftover data" related to their now extinguished accounts. *Id.* ¶ 62. Consequently, each time Resurgent, or the debt collectors and law firms it engaged on LVNV's behalf, represented that LVNV owned the Plaintiffs' credit card accounts, or identified LVNV as a creditor of the Coxes, Snyder or Goodall, Plaintiffs claim LVNV and Resurgent falsely asserted ownership of a debt owed by him or her. *Id.* ¶¶ 67, 70, 81, 84, 89-93, 95-96, 101, 106, 121.

In Count I (*id.* at ¶¶ 146-161) Plaintiffs purport to state a claim under the FDCPA. Based on their core allegation that "LVNV does not legally own a debt, but solely possesses information and data about consumer transactions," *id.* at ¶ 155, Plaintiffs allege violations of: 15 U.S.C. §§ 1692e(5) (threatening to take any action that cannot be legally taken); 1692e(2)(A) (falsely representing the character, amount or legal status of a debt); 1692e(10) (using false representations or deceptive means to collect or attempt to collect a debt); 1692f(1) (collecting any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law).

---

[4] The "securitization theory" is the only liability theory described in Plaintiffs' Motion for Class Certification, Dkt. No. 396 at p. 7. In their Amended Complaint, Plaintiffs also allege that Defendants securitized the "data about Indiana charged-off consumer credit accounts" purchased from the banks that originated Plaintiffs' credit card debt. Dkt. No. 303 at ¶ 4. Plaintiffs have come forth with no evidence that Defendants engage in such "securitizations." In any event LVNV has stated affirmatively that it has not securitized debt that it purchased. Emmerich Dec. at ¶ 6.

Counts II and III of the Amended Complaint purport to state claims under RICO, 18 U.S.C. §§ 1962(c) (operation of an enterprise through a pattern of racketeering activity) and 1962(d) (conspiracy to violate Section 1962(c)). Plaintiffs' RICO claims are based on alleged predicate acts of racketeering activity involving: mail and wire fraud (Am. Compl., ¶¶ 107-24); interstate transportation of stolen property (*id.* at ¶¶ 125-27); and extortion (*id*. at ¶¶ 128-32). All these alleged acts of racketeering activity are rooted in Plaintiffs' allegation that Defendants attempted to collect and/or collected debt from Indiana residents "under the false pretense of a valid debt and that the debt was owed to LVNV." *Id.* at ¶¶ 107, 121, 125, 129, 130.

The Amended Complaint also purports to state Indiana common law claims, all of which are based on the core allegation that LVNV did not own debt when it attempted to collect that debt from Indian residents. Count IV purports to state a claim for common law fraud based on the allegation that Defendants "made the material misrepresentation that a valid debt existed and that the debt was ultimately owned by, and owed to, LVNV." *Id*. at ¶ 186. In Count V plaintiffs purport to state a claim for constructive fraud, based in part on the allegation that Defendants "failed to accurately report credit information by alleging that a debt was owed to LVNV when it was not." *Id.* ¶ 199. Counts VI and VII purport to state claims for restitution and unjust enrichment based on the allegation that Indiana residents made payments to Defendants based on "the false pretense that LVNV was owed a debt …." *Id*. ¶ 209.

B. **Plaintiffs' Discovery Responses Regarding Alleged Securitization of Their Credit Card Accounts**

Although all of Plaintiffs' claims in this case rest on the theory that their credit card debts were "securitized," Plaintiffs in discovery have produced no direct evidence that their credit card lenders actually included Plaintiffs' own credit card debt in any securitization. Plaintiff Andrew Cox's most recent discovery responses on this issue are as follows:

**INTERROGATORY NO. 19**:  Identify all facts, Documents or other evidence that shows or indicates Your Chase credit card accounts (as identified in Paragraphs 64, 66 and 77 of the Amended Complaint), or either of them, were included in, part of, sold to or pooled with a securitization as the term is used in Paragraph 58 of the Amended Complaint.

**ANSWER**:  Plaintiff objects that this interrogatory is premature as the deadline to disclose expert opinions has not passed, and therefore this answer is subject to and will be supplemented.  Without waiving this objection Plaintiff states that Chase's Annual Statements indicate that a vast majority of its credit card accounts are securitized, or that it has assigned all of its right, title and interest in and to those receivables.  It is therefore more likely than not that Chase securitized these accounts.  Discovery in this matter is continuing and plaintiff will supplement this answer.

Ex. D at pp. 5-6.

Plaintiff Stephanie Snyder's most recent discovery responses on this issue are identical to Mr. Cox's.  Ex. E at pp. 5-6.  Similarly, Plaintiff Robert Goodall's most recent discovery responses on this issue refer only to "Chase Annual statements [indicating] that it securitizes a majority of its receivables."  Ex. F at p. 5.

### C.   Information Produced by Defendants Regarding Indiana Accounts

In response to Plaintiffs' discovery requests Defendants produced extensive information regarding certain credit card accounts of Indiana residents that were subject to collection activity between November 2006 and January 2014.  *See* Declaration of Michael J. Mihalich (Ex. G).[5] The information provided for each account included the name and address of the person who owed the debt, the entity that sold the account to a Sherman Financial affiliate, the type of account and the purchase date.  *Id*. at ¶ 9.  The information was produced for more than 600,000 accounts of Indiana residents.  *Id*. at ¶ 7.

A review of this information reveals a number of crucial factual differences among the accounts.

---

[5] The Mihalich Declaration is submitted as a summary of voluminous evidence under Rule 1006 of the Federal Rules of Evidence.

First, the accounts are not limited to bank credit card accounts. Some of the accounts involve other types of loans, such as auto loans, student loans, installment loans and home equity lines of credit. *Id*. at ¶ 10 and Ex. A. Other accounts involve medical debt, retail debt and debts owed for telephone or other telecommunication services. *Id*.

Second, the accounts were purchased from a large number of different sellers in numerous purchase transactions over many years. *Id*. at ¶ 10 and Ex. B. Nearly one hundred different sellers are listed, ranging from large national financial institutions (such as Citibank, Chase and GECC) to less well known financial institutions to telecommunications providers (such as MCI Communications). *Id*. One thousand four hundred sixty different purchase transactions are listed, spanning a time period of over fifteen years. *Id*. at ¶ 11.

## IV.    RULE 23 REQUIREMENTS FOR CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citation omitted). In order for a court to certify a class, Federal Rule of Civil Procedure 23(a) requires that plaintiffs demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The plaintiffs must satisfy the district court, "after a rigorous analysis," that the prerequisites of Rule 23(a) have been satisfied. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551; *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619, 2015 WL 329013, at *2 (S.D. Ind. Jan. 22, 2015) (Pratt, J.).

If the requirements of Rule 23(a) are met, the plaintiffs must also satisfy at least one subsection of Rule 23(b). Plaintiffs here seek certification only under Rule 23(b)(3), which

applies if the court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The parties seeking class certification bear the burden of proof in establishing each of the requirements under Rule 23. *Panwar*, 2015 WL 329013, at *2 (citing *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977)). The failure to satisfy any one of the Rule 23 elements precludes certification. *Panwar*, 2015 WL 329013, at *2 (citing *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596 (7th Cir. 1993)). In deciding whether to certify a class, the court is not required to accept the allegations in the complaint as true. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Rule 23 does not set forth a mere pleading standard—instead, as recognized by the Supreme Court, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "[S]imilarities of claims and situations must be demonstrated rather than assumed." *Panwar*, 2015 WL 329013, at *2 (citing *Szabo*, 249 F.3d at 677).

"In evaluating class certification, the court must take into consideration the substantive elements of the plaintiff's cause of action, inquire into the proof necessary for the various elements, and envision the form the trial on the issues would take." *Panwar*, 2015 WL 329013, at *2. Before deciding whether to allow a case to proceed as a class action, "a judge should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo*, 249 F.3d at 676.

## V. ARGUMENT

### A. <u>Plaintiffs' Proposed Class Definitions Are Flawed.</u>

Before addressing the four Rule 23(a) prerequisites, courts must determine whether the putative class meets an implied prerequisite "that the class definition be sufficiently precise to

enable a court to ascertain the identity of class members by reference to objective criteria." *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 325 (S.D. Ill. 2009); *see also Oshana v. Coca Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). This requirement—*i.e.*, the "ascertainability" or "sufficiently precise" requirement—is essential for purposes of class certification under Rule 23. One reason why the class definition must be ascertainable and sufficiently precise is that the class definition marks the boundaries of *res judicata*. *Spano v. The Boeing Co.*, 633 F.3d 574, 584 (7th Cir. 2011) ("Both the scope of the litigation and the ultimate *res judicata* effect of the final judgment depend on the class definition.").

Because the class definition marks the boundaries of *res judicata*, it is improper to certify a "fail-safe" class—*i.e.*, "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* (citing *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)); *see also Panwar*, 2015 WL 329013, at *3 n.3; 1 McLaughlin on Class Actions § 4:2 (11th ed.). "Rule 23 was never meant to be an exception to the rules of *res judicata* or to provide a risk-free method of litigation," and, accordingly, "[t]he class definition must be such that all (except those who opt out) are as much bound by an adverse judgment as by a favorable one." *Dafforn v. Rousseau Assocs., Inc.*, No. F 75-74, 1976 WL 1358, at *1 (N.D. Ind. July 27, 1976).

An improper fail-safe class exists where the class definition refers to "illegal" or "impermissible" conduct on the part of the defendant, *see Dafforn*, 1976 WL 1358, at *1; *Panwar*, 2015 WL 329013, at *3 n.3, or "entitle[ment] to relief" on the part of the plaintiffs, *Randleman*, 646 F.3d at 352. An improper fail-safe class also exists where the class definition

"is in essence framed as a legal conclusion," *see Indiana State Emp. Ass'n, Inc. v. Indiana State Highway Comm'n*, 78 F.R.D. 724, 725 (S.D. Ind. 1978), where the class definition "incorporate[s] elements of the merits of the[] claims," *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 992 n.1 (S.D. Ind. 2007), or where the class definition "beg[s] the question of liability," *Lucas v. Vee Pak, Inc.*, --- F. Supp. 3d ---, 2014 WL 4637193, at *5 (N.D. Ill. Sept. 17, 2014).

Here, Plaintiffs fail to satisfy this Rule 23 implied prerequisite because all three of their proposed subclasses constitute impermissible "fail-safe" classes. Plaintiffs' subclasses are defined as follows:

> FDCPA Subclass: All Indiana citizens who were the subject of collection activity or activities ***which violate the FDCPA*** by the Defendant or Defendants' agents in an attempt to collect a debt ***incurred for personal, family or household purposes*** which were served with process or contacted in any matter by Defendants or Defendants' agents during the period beginning November 9, 2011 (one year prior to the filing of the original complaint in this action) through trial of this case.

> RICO Subclass: All Indiana citizens who paid money to Defendants ***pursuant to Defendants' scheme to defraud using the mail or wires; interstate transportation of stolen property; or extortion or any combination of these*** during the period beginning November 9, 2008 (four years prior to the filing of the original complaint in this action) through trial of this case.

> Restitution Subclass: All Indiana citizens who paid money to Defendants in payment of ***an alleged debt*** owed to Defendants for the period beginning November 9, 2006 (six years prior to the filing of the original complaint in this action) through the trial of this case.

Plfs. Mem. in Support of Mt. for Class Cert., Dkt. No. 396 at p. 8 (emphasis added).

These definitions all improperly tie class membership to a valid claim. The FDCPA Subclass is an archetypal fail-safe class, expressly limited to collection activities "which violate the FDCPA." *Id.* In addition, the FDCPA Subclass implicitly ties class membership to a valid claim by limiting itself to debt "incurred for personal, family or household purposes," the legal

- 15 -

definition of debt to which the FDCPA applies.  *See* 15 U.S.C. § 1692a(5).  Similarly, the RICO

Subclass is an improper fail-safe class that includes only those individuals who could establish

that they paid money to Defendants as a result of the predicate acts of racketeering activity

alleged in the Amended Complaint.  Because this subclass incorporates elements of the merits of

Plaintiff's RICO claims and is in essence framed as a legal conclusion, those who lose on the

merits would be defined out of the class and not bound by *res judicata*.  Likewise, the Restitution

Subclass is defined as a fail-safe class, limited to persons who made a payment on an "alleged

debt", presumably to limit the subclass to persons who made payments to Defendants even

though Defendants did not own the persons' debt and hence were not entitled to those payments.

All three of these class definitions are "improper because a class member either wins or, by

virtue of losing, is defined out of the class and is therefore not bound by the judgment."

*Messner*, 669 F.3d at 825.[6]

Although courts have discretion to redefine a class to avoid the fail-safe problem, a court

is not always able to redefine a class in a way that satisfies the requirements of Rule 23,

especially when the plaintiffs fail to come forth with potential viable solutions.  *See, e.g.*, *Hurt v.*

*Shelby Cnty. Bd. of Educ.*, No. 2:13-CV-230-VEH, 2014 WL 4269113, at *9 (N.D. Ala. Aug. 21,

2014) (concluding that the court need not re-define an improper fail-safe class because "[i]t does

not believe the plaintiffs—even if afforded the opportunity—could revise their class definition

adequately to sustain certification"); *Eager v. Credit Bureau Collection Servs., Inc.*, Nos. 1:13-

CV-30, 1:13-CV84, 1:13-CV-173, 1:13-CV-261, 2014 WL 3534949, *5 (W.D. Mich. July 16,

---

[6] In support of their proposed subclass definitions, Plaintiffs state  that "[t]he Seventh Circuit has recognized that classes 'defined by the activities of the defendants' are generally sufficiently definite to warrant class certification," citing a 1977 decision, *Alliance to End Repression v. Rochford*, 565 F.2d 975 (7th Cir. 1977).  In subsequent decisions, the Seventh Circuit has repudiated *Rochford* and indicated that that decision no longer states governing Seventh Circuit law.  *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 496 (7th Cir. 2012)("*Rochford's* tolerance of a wildly indefinite class definition under Rule 23 is no longer the norm."); *Rahman v. Chertoff*,  530 F.3d 622, 626 (7th Cir. 2008)("[*Rochford*] is a relic of a time when the federal judiciary thought that structural injunctions taking control of executive functions were sensible.  That time is past.").

2014) ("[T]he Court sees no way in which the proposed Assignment Class can be modified to avoid the fail safe problem, nor do Plaintiffs offer a viable solution."). Plaintiffs here cannot redefine their fail-safe subclasses in a way that satisfies Rule 23's prerequisite "that the class definition be sufficiently precise to enable a court to ascertain the identity of class members by reference to objective criteria." *Cunningham*, 258 F.R.D. at 325. Any potential redefinition of the subclasses would lack either ascertainability or sufficient precision.

If Plaintiffs were to redefine their improper fail-safe FDCPA, RICO and Restitution subclasses by removing the language that ties class membership to a valid claim and, instead, restricting the class to borrowers whose debts have been securitized, Plaintiffs' subclasses would not be ascertainable. For a class to be ascertainable, the class definition must be such that "it is administratively feasible for the Court to determine whether a particular individual is a member of a proposed class . . . by reference to objective criteria." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999). In determining whether the class is ascertainable by reference to objective criteria, courts need not accept plaintiffs' allegations as true. *See Szabo*, 249 F.3d at 676-77. Rather, the courts should look to whether plaintiffs have put forth evidence that it will be administratively feasible for the court to determine whether a particular individual is a member of a proposed class by reference to objective criteria. *See id.*; *Clay*, 188 F.R.D. at 490.

Here, Defendants do not possess records indicating which debts were securitized by the originating creditors and which were not. Emmerich Dec. at ¶ 5. Plaintiffs, for their part, have not come forth with any evidence that would allow the court to determine, in an administratively feasible manner, whether a particular individual's debt was securitized. Indeed, the available evidence indicates that identification of persons whose debts had been securitized would be a laborious process, requiring examination of extensive individualized evidence. *See* Section

IV.B., *infra*. Thus, even if Plaintiffs restricted the proposed FDCPA, RICO and Restitution subclasses to borrowers whose debts had been securitized, Plaintiffs' proposed class definition would still be unacceptable under Rule 23.

Additionally, if Plaintiffs were to redefine their improper fail-safe FDCPA and RICO subclasses by expanding them to include all accounts subject to collection activities in Indiana – or to expand the fail-safe Restitution subclass to include all Indiana residents who had made any payments to Defendants - the subclasses would be overbroad and not sufficiently precise. These revised subclass definitions would on their face include persons whose debts had <u>not</u> been securitized and hence who could not possibly prevail on the liability theory being asserted by Plaintiffs in this case. "A proper class definition cannot be so untethered from the elements of the underlying cause of action that it wildly overstates the number of parties that could possibly demonstrate injury." *Panwar*, 2015 WL 329013, at *3 (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009)). "Where a class is overbroad and could include a substantial number of people who have no claim under the theory advanced by the named plaintiff, the class is not sufficiently definite." *Vigus v. So. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 235 (S.D. Ill. 2011) (citing *Oshana*, 472 F.3d at 514).

**B.** **Because Resolution of Plaintiffs' Claims Will Require Individualized Proof on a Number of Issues, Many of the Rule 23 Requirements Cannot Be Satisfied.**

**1.** **Plaintiffs' Securitization Theory Will Require Individualized Proof.**

As discussed above, all of Plaintiffs' claims in this case rest on the allegation that LVNV did not own the Plaintiffs' (or the absent class members') credit card debts because the originating creditor had "securitized" those debts. Proof of each of Plaintiffs' claims will therefore require a showing that:

1. The plaintiffs' (and absent class members') credit card debt was "securitized"; and

2. As a result of the securitization the originating creditor did not have the authority to sell the debt at the time it purported to sell the debt to LVNV or its affiliate.

Proof that the class members' debt was securitized cannot be done on a common basis and instead will require individualized proof. As discussed above, the sellers of the class members' debts include nearly 100 different entities, some of which are not even credit card banks. Plaintiffs will therefore need to present evidence that each of these sellers securitized the receivables arising from the over 600,000 Indiana accounts at issue in this case, prior to the purchase of the receivables by LVNV. Plaintiffs have come forth with no basis to support a conclusion that any of these receivables were in fact securitized. According to one authority, most credit card issuers do *not* securitize their card receivables. Levittin, *Skin-in-the-Game: Risk Retention Lessons from Credit Card Securitization*, 81 GEO WASH. L. REV. 813, 826 (2013). Indeed, a recent study showed that even the largest credit card banks in the U.S. securitize only a portion of their credit card receivables. *Id*. at 827. The same study showed that securitization of credit card receivables declined dramatically following the credit crisis in 2008-09. *Id*. at 823-24.

Plaintiffs have not come forth with any direct evidence that their own credit card debts were securitized, so it is difficult to discern how they intend to prove the securitization of their own credit card debt, much less the securitization of the debts of hundreds of thousands of other people. Their discovery responses, however, suggest that they intend to rely on the same method they attempted in the *CA Holding* case. In that case, Plaintiffs relied on an affidavit from an accountant who had analyzed certain public financial documents about the originating creditors. *See*, Affidavit of Eugene Zoellner (Ex. H) ("Zoellner Aff."). Based on this evidence Plaintiffs represented to the Court that "three quarters" of one creditor's receivables "were sold and

transferred through the securitization process and hence it is highly likely that [the named Plaintiffs'] receivables would have been transferred as well." *CA Holdings*, Dkt No. 80 at p. 6.

Judge Magnus-Stinson properly found that this evidence amounted to "sheer speculation" and was not sufficient to show that an individual plaintiff's credit card debt had been securitized. In addition to the speculative nature of the methodology, a similar method of proof here would raise a raft of individualized issues. If applied to this case the accountant's methodology would require the analysis of public financial records of each of the nearly 100 debt sellers involved here over a period of more than 15 years (even assuming that such public records are available for all the sellers at issue in this case).

Moreover, even if Plaintiffs could somehow show that an individual borrower's debt was at some time securitized, Plaintiffs would also need to show that the seller had not acquired the receivable from the securitization trust prior to the purchase of the receivable by a Sherman Financial affiliate. As discussed above, courts have recognized that some credit card securitization documents provide that securitized receivables are automatically transferred out of the securitization trusts at the time the receivables are declared to be in default and/or charged-off. *Scott*, 580 Fed. Appx. at 57 (discussing Bank of America credit card securitization documents); *Carroll*, 220 P.3d at 1077-78 (discussing Citibank credit card securitization documents). These provisions are not unusual. Other major securitizers of credit card debt include similar provisions in their securitization documents. *See* Ex. I at p. 45 (Prospectus for investor notes issued pursuant to Capital One securitization stating that "on the date when any receivable in an account is charged off as uncollectible by the bank, the master trust trustee automatically transfers those receivables to [an affiliate of Capital One Bank]."); Ex. J at p. 89 (prospectus for notes issued pursuant to GECC securitization stating that "[o]n the last day of the

Monthly Period in which a receivable is charged-off, the receivable will be sold to [a GECC affiliate] and will no longer be shown as an amount payable on the trust's records.")[7] Indeed, securitization trust prospectuses from Citibank and Chase produced recently by Plaintiffs in this case include provisions recognizing explicitly that credit card receivables included within securitization trusts are removed from the trusts upon charge-off and/or may be sold to debt buyers. *See* Declaration of Patrick Yingling, Ex. K.[8]

These provisions from various securitization documents illustrate that, even if potential class members' credit card receivables were securitized at some point, the receivables may well have been transferred out of the securitization trusts prior to the sale to LVNV or its affiliates. Accordingly, to determine whether a securitized credit card receivable was transferred to the seller following securitization, the parties and the Court would need to examine the applicable securitization documents and other records pertinent to each securitized receivable.

Plaintiffs have not indicated how they would show that credit card receivables, even if securitized, had not been re-assigned to the originating creditor prior to sale. In the *CA Holding* case, however, Plaintiffs appear to have attempted to make such a showing through their accountant, Mr. Zoellner. Mr. Zoellner reviewed certain SEC forms (SEC Forms ABS – 156) filed by the alleged securitizers in that case. Zoellner Aff. at ¶¶ 9-11. Mr. Zoellner described those forms as providing "disclosure regarding repurchase and replacement related to asset-backed securities," and he noted that such forms filed by the alleged securitizers showed "no activity" for certain time periods. *Id.* Based on this evidence, Plaintiffs' counsel argued that

---

[7] Exs. I and J are available in full at
http://www.sec.gov/Archives/edgar/data/922869/000119312506209214/d424b5.htm, and
http://www.sec.gov/Archives/edgar/data/1226006/000104746909004885/a2192767z424b5.htm, respectively.
[8] Ex. K includes a chart quoting the referenced provisions from 15 different prospectuses produced by Plaintiffs on April 24, 2015. The prospectuses collectively are several thousand pages long and for that reason Defendants have prepared this chart as a summary of voluminous documents under Rule 1006 of the Federal Rules of Evidence.

the receivables had not been re-transferred to the alleged securitizer prior to the purported sale of the receivable. *CA Holdings*, Dkt. No. 87, at p. 6.

This methodology not only raises individual issues but is deeply flawed. The applicable SEC regulation requires disclosure of repurchases or replacements only concerning assets that were the subject of a request to repurchase or replace for breach of a representation or warranty concerning the securitization assets. 17 CFR § 240.15Ga-1(a). Accordingly, this disclosure would not even apply to receivables that were automatically transferred out of the securitization trust because of a charge-off.

## 2. Other Issues Requiring Individualized Proof.

### a. Defendants' Defense Based on Defendants' Good Faith Belief that the Sellers Had Authority to Sell the Accounts of Plaintiffs and the Absent Class Members.

Even if Plaintiffs could establish that class members' debts had been securitized and that the securitization prevented the originating creditor from selling the accounts/receivables, Defendants would nonetheless contest liability based on Defendants' good faith belief that the originating creditor had authority to sell the accounts/receivables. Defendants in their Answers have raised this as a defense. *See*, *e.g.*, Dkt. No. 333, Sixth and Twelfth Defenses. The principal basis of this good faith belief would arise from representations and warranties made by the sellers to the effect that the sellers had "full right to transfer and sell" the accounts. *See*, *e.g.*, Ex. A at pp. 6-7, 9-10.[9]

---

[9] Defendants' good faith belief is relevant to a number of Plaintiff's claims. Under the FDCPA, a debt collector may not be held liable "if the debt collector shows … that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonable adapted to avoid any such error." 15 U.S.C. § 1692k(c). In addition, Defendants' good faith belief that the sellers had authority to sell the class members' debts would negate the fraudulent intent that is necessary to establish Plaintiff's fraud-based claims under RICO and the Indiana common law.

To establish this defense as to all the putative class members, Defendants would be required to produce each Purchase Agreement governing the purchase of each of the over 600,000 accounts potentially in the class. As noted above, these accounts were purchased on approximately 1500 different dates over a 15 year period. Litigation of this defense in this case would involve a staggering amount of proof that is not common to all class members.

### b. Claims of Named Plaintiffs and Absent Class Members Who Have Filed for Bankruptcy.

Given the nature of the claims in this case, it can be expected that a substantial number of putative class members have filed for personal bankruptcy. Indeed, two of the four proposed class representatives have filed bankruptcy petitions. *See* Am. Comp., ¶¶ 101, 103, 105 (describing bankruptcy filings by Plaintiffs Stephanie Snyder and Robert Goodall). Moreover, in its motion to amend filed in May, 2014, Plaintiffs proposed two additional named plaintiffs who had filed for bankruptcy. *See* Def. Opp. Plfs. Mt. for Leave to Am. Compl., Dkt. No. 285 at 15.

The claims of class members who have filed for bankruptcy give rise to possible defenses requiring individualized proof. First, as illustrated previously in this case, class members who have filed for personal bankruptcy may face standing challenges if they did not list their claims against Defendants in their bankruptcy schedules. In that event the claims would remain property of their bankruptcy estates, and such class members would not have standing to pursue claims in this case.[10] This was the reason this Court refused to allow two proposed class

---

[10] All legal and equitable interests, including causes of action, are property of a debtor's bankruptcy estate. *See Lambert v. Fuller Co., Inc.*, 122 B.R. 243, 245 (E.D. Pa. 1990) ("The debtor's causes of action may be considered property under section 541 of the Bankruptcy Code, and if so become the property of the bankruptcy estate."); *see also United States v. Whiting Pools, Inc.* 462 U.S. 198, 205 n.9 (1983) (section 541 defines property of the estate broadly to include causes of action); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987) ("causes of action belonging to the *debtor* at the commencement of the case are included within the definition of property of the estate") (emphasis in original). Because the trustee is the sole representative of a chapter 7 bankruptcy estate, a debtor cannot assert a cause of action after the bankruptcy case if the debtor did not schedule the action. See 11

representatives to join this case as named plaintiffs. Order on Pltfs. Mt. to Am. Compl., Dkt. No. 297 at pp. 7-8.

In addition, under some circumstances a confirmation of a bankruptcy plan may constitute a final judgment on the merits on a debtor's claims against a creditor, thereby barring a debtor's attempt to assert the claims in subsequent litigation under the doctrine of res judicata. This principle is illustrated by the recent decision of the Court of Appeals for the Fourth Circuit in *Covert v. LVNV Funding, et al.*, No. 14-1016 (4th Cir. March 3, 2015). *Covert* was a putative class action alleging that Defendants had violated the FDCPA and various Maryland state laws by filing proofs of claim in bankruptcy without a Maryland debt collection license. Each of the named plaintiffs had filed Chapter 13 petitions; Defendants had filed proofs of claim in each proceeding; and in each the Chapter 13 plan was approved, the Defendants' claims were allowed, and each plaintiff made payments. The Fourth Circuit held that the claims asserted by the plaintiffs in the putative class action were barred in their entirety under *res judicata*.

One of the proposed class representatives in this case – Robert Goodall – is subject to the same defense that doomed the claims of the named plaintiffs in *Covert*. Mr. Goodall filed a Chapter 13 petition on September 30, 2010. *In re Robert James Goodall*, No. 10-14887-FJO-13 (Bankr. S.D. Ind.). LVNV filed an unsecured proof of claim on February 10, 2011, and Goodall filed an objection to LVNV's claim on December 4, 2013. Dkt. No. 38. The Bankruptcy Court held a hearing on the objections and allowed the LVNV claim. Dkt. No. 51. The Chapter 13 plan was approved, and Goodall paid LVNV's claim in full. Under the principles set forth in *Covert*, Goodall's purported claims in this case are barred by *res judicata*.

---

U.S.C. § 323(a); *see also Anderson v. Acme Mkts., Inc.*, 287 B.R. 624, 628-32 (E.D. Pa. 2002) (plaintiff did not have standing to assert unscheduled cause of action).

In sum, for any class member who has filed for bankruptcy, a variety of individualized issues will need to be addressed before the class member's claims can be resolved.

c.    **Reliance Or Directness Of Injury For the Fraud and RICO Claims.**

Plaintiffs' RICO and fraud claims are also rife with individualized issues related to the connection between any conduct by the Defendants and any purported injury to any purported class member. To prove a fraud claim under Indiana law, a plaintiff must show, *inter alia*, detrimental reliance on a misrepresentation by the defendant. *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1410 (7th Cir. 1986), *cert. denied*, 479 U.S. 1087 (1987). In similar fashion, a RICO plaintiff must prove an injury to "business or property" *by reason of* a violation of 18 U.S.C. § 1962. 18 U.S.C. § 1964(c); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006). Specifically, a RICO plaintiff must plead facts showing both proximate causation and "but-for" causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-66, 268 (1992). To establish proximate cause, a RICO claimant must demonstrate "some **direct** relation between the injury asserted and the injurious conduct alleged." 503 U.S. at 268 (emphasis added).

In general, class certification is not appropriate when issues regarding reliance or proximate cause will predominate over common issues. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."); *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 747-48 (7th Cir. 2008) (common issues did not predominate in deceptive advertising claim because the district court would need to hold individual hearings to determine if each class member was deceived by the advertising); *UFCW Local 1776. 11 v. Eli Lilly & Co.*, 620 F.3d 121, 133-36 (2d Cir. 2010) (reversing class certification of RICO claims

because proof of proximate cause would require individualized inquiries into connection between purported misrepresentations by defendant and putative class members' injuries).

In this case, resolution of the fraud and RICO claims will require individualized inquiries regarding the connection between conduct by any Defendants and the purported harm to each class member. Plaintiffs do not allege and have never identified any uniform communications between Defendants and the class members. More significantly, Plaintiffs fail to show how they could present aggregate proof for their fraud claim that the class members *relied* on communications by Defendants when they made payments on their accounts. Similarly, Plaintiffs fail to show a method for aggregate proof of the *direct* connection between communications by Defendants and payments by class members as required for certification of Plaintiffs' RICO claims. Class members could have made payments on their accounts for any number of reasons, including a sense of obligation to repay their debts irrespective of any communication from any Defendant. Moreover, some of the class members may have made payments on their accounts to their original creditors *after* their accounts were sold by the original creditors to LVNV. These payments by class members to the original creditors would not constitute *direct* harm to the class members *by reason of* any conduct by Defendants. Similarly, class members could not prove in the aggregate that such payments to the original creditors were in reliance on some purported miscommunication by Defendants. The Court would have to conduct mini-trials as to each class member to determine if any of the class member's payments were made to the original creditor as opposed to directly to LVNV.

In sum, Plaintiffs' fraud and RICO claims cannot proceed on a classwide basis because individualized issues of reliance or directness of harm predominate.

### 3. Plaintiffs Have Not Satisfied The Rule 23 (a)(2) Commonality Requirement.

In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the U.S. Supreme Court explained the commonality requirement in FRCP 23(a)(2) as follows:

> [The putative class members'] claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> . . . 'What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.' (quoting Nagaredz, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)) (emphasis in the original).

*Id.* at 2551.

The Supreme Court's test for commonality is plainly not met here. As discussed above, Plaintiffs cannot establish their underlying liability theory – that LVNV did not own the debt that it sought to collect – without offering proof that will vary from class member to class member, depending among other things upon the class member's originating creditor, whether the originating creditor securitized the debt and whether, if securitized, the class member's defaulted receivable was transferred back to the originating creditor prior to sale of the receivable. For this reason a classwide proceeding in this case would not be able to generate "common answers" with respect to Plaintiffs' basic liability theory. To the contrary, given the size of the class and differences among the class members, resolution of that theory would require detailed examination of evidence that is not common to all class members.

In their Motion for Class Certification, Dkt No. 395 at pp. 3-4, Plaintiffs list the following purportedly "common" questions presented by this case:

1.      Whether Defendants and their agents properly engaged in collection activities against Indiana consumers;

2.      Whether Defendants and their agents acquired legal ownership of class members' debt obligations;

3.      Whether Defendants and their agents impermissibly pulled credit reports, performed outbound dialer calling activity, sent dunning letters, and filed lawsuits against Indiana consumers;

4.      Whether Defendants and their agents committed a scheme to defraud using the mail or wires; interstate transportation of stolen property; or extortion; and

5.      Whether Defendants and their agents engaged in collection activity without legal standing.

None of these questions, however, meet the test for "common" questions established by the Supreme Court in *Walmart v. Dukes*. Resolution of each of these questions in this case would require a determination of Plaintiffs' underlying theory that LVNV did not own the debts at issue because the originating creditors had securitized the debt. As illustrated above, however, that theory raises a raft of individualized issues of proof. Accordingly, a classwide proceeding is not capable of generating "common answers" to any of the purportedly common questions that Plaintiffs posit in their class certification motion.

**4.      Plaintiffs Have Not Satisfied The Rule 23(a)(3) Typicality Requirement or the Rule 23 (a)(4) Requirement of Adequacy of Representation.**

FRCP 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." In *Oshana v. Coca-Cola Company*, 472 F.3d 506 (7th Cir. 2006), the Court of Appeals for the Seventh Circuit explained the typicality requirement as follows:

A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory. Even though some factual variations may not deflect typicality, the requirement is meant to ensure that the named representative's

claims have the same essential characteristics of the class at large. [citations and quotations omitted].

472 F.3d at 514.

In this case, the claims of the four named plaintiffs are not typical of the claims of the absent class members; indeed, they are not even typical of each other's claims. The four named plaintiffs incurred their credit card debt on six different accounts from three different creditors (Chase, Citibank and GECC). See pp. 4-11, *supra*. LVNV has produced documentation showing that the named Plaintiffs' debts were sold by three different sellers in four different transactions on dates ranging from April 2007 to January 2010, to September 2010 to April 2011. *Id*. Although some proposed absent class members obtained loans from those same creditors, other absent class members were customers of nearly 100 other creditors. See p. 15, supra. Debts of proposed absent class members were purchased by LVNV on over 1400 different dates over a period of fifteen years. *Id*. As a result – and as more fully discussed above – the claims of the named plaintiffs do not have the same "essential characteristics" as the claims of the absent class members.

Perhaps more importantly, the claims of the named plaintiffs cannot be considered "typical" of the claim of any absent class member who could assert a claim under Plaintiffs' "securitization theory." That theory requires as a threshold element that the person's debt was in fact securitized. The named Plaintiffs, however, have been unable to produce any direct evidence that their credit card debts were securitized. Accordingly, the named Plaintiffs' claims are not "typical" of claims asserted by absent class members whose debts were securitized.

Certain other aspects of each named Plaintiff's factual circumstances further render their claims atypical. Plaintiffs Andrew and Lucinda Cox made no actual payments to LVNV, Cox Dep. Tr. at 213-14 (Ex. L), and thus their claims differ significantly from the claims of absent

class members who did make payments to LVNV. In addition, one of the Cox credit card accounts (Cox Account 1) was a business account, Cox Depo. Tr. At 114-118 (Ex. L), and for that reason is not subject to the FDCPA. See 15 U.S.C. § 1692a(5). As explained above, Plaintiff Robert Goodall is subject to a *res judicata* defense based on the outcome of his Chapter 13 bankruptcy proceedings; absent class members who never filed for bankruptcy would not be subject to this defense.

As is often the case, the atypicality of the named plaintiffs' claims illustrates that the named plaintiffs cannot satisfy the Rule 23(a)(4) requirement of adequacy of representation. See, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997) (Noting that "the adequacy of representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether … maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."). Here the named plaintiffs do not "possess the same interest" and have not "suffer[ed] the same injury" as the absent class members. The named plaintiffs cannot even establish the linchpin of the plaintiffs' liability theory – *i.e.*, that their debt was securitized – and hence they cannot possibly be adequate representatives of persons whose debt was securitized. Similarly, the Coxes – who made no payments to LVNV on their credit card debt – cannot adequately represent persons who did make payments on their debt to LVNV. And Mr. Goodall – who faces a significant defense arising from his Chapter 13 bankruptcy – cannot adequately represent persons who have not filed for bankruptcy.

**5.**      **Plaintiffs Have Not Satisfied The Requirements of Rule 23 (b)(3).**

To certify a class under Rule 23(b)(3), a plaintiff must prove: (1) that questions of fact and law common to the class members predominate over questions affecting only individual

class members; and (2) that the class action is superior to other methods for resolving the case. To satisfy the predominance requirement, plaintiff must show that the substantive elements of the purported class claims are susceptible to class wide proof. *Blair v. Supportkids, Inc*., No. 02-CV-0632, 2003 WL 1908031 at *4 (N.D. Ill. 2003). Notably, "the predominance inquiry is far more demanding than Rule 23(a)'s commonality requirement." *Wahl v. Midland Credit Mgmt*., *Inc*., 243 F.R.D. 291, 299 (N.D. Ill 2007) (citing *Amchem Prods*., 521 U.S. at 623-24); *Foreman v. PRA III, LLC*, No. 05-CV-3372, 2007 WL 704478, *11 (N.D. Ill. March 5, 2007) (predominance standard is "a far more demanding analysis"). The predominance requirement is not met unless "there exists generalized evidence that proves or disproves' the class's claims on a class-wide basis. *Golon v. Ohio Sav. Bank*, No. 98-CV-7430, 1999 WL 965593 at *4 (N.D. Ill. 1999). If liability questions are not subject to class wide proof but, rather, require both individual and fact intensive determinations, common issues do not predominate. *Blair*, 2003 WL 1908031 at *4; *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 584 (N.D. Ill. 2000).

"Superiority" demands more than a suggestion that a class action is one available means for resolving the claims before the court; rather, it must be "the best available method for the fair and efficient adjudication of the controversy." *Johnston v. HBO Film Mgmt. Inc*., 265 F.3d 178, 194 (3d Cir. 2001). As part of this analysis, the Court should evaluate "the difficulties likely to be encountered in the management of a class action," including "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 164 (1974).

As shown above, resolution of Plaintiffs' claims will require consideration of a number of significant issues that will require individualized proof. Moreover, the purported "common" issues alleged by Plaintiffs are not common issues at all, because none of them can be

established by common proof.  Accordingly, in this case individual issues not only predominate, but indeed overwhelm, any common issues that are present.

Because of the need for individualized proof on so many of the key issues here, the superiority requirement is not close to being met.  Indeed, it is hard to conceive how this case could possibly be tried.  Plaintiffs would need to establish that the debts in over 600,000 accounts had been securitized.  Plaintiffs presumably intend to prove that by offering expert testimony on the securitization practices of almost 100 originating creditors.  Even if the Court deemed that expert testimony to be admissible, the securitization documents governing any such securitizations would then need to be examined to determine whether any securitized receivables had been re-assigned to the originating creditor.  Assuming Plaintiff could establish these and the other elements of their case, the Defendants would then have an opportunity to offer evidence of their own good faith belief that the originating creditors had the authority to sell the class members' debts, a showing that would require examination of all the purchase agreements applicable to the purchase of over 600,000 accounts.  Further detailed inquiry would be required with respect to any class members who had filed for bankruptcy.  Such a trial would be incredibly complex, long and completely unmanageable.

### C.       Plaintiffs' Counsel Have Not Shown Their Adequacy Under FRCP 23(g)

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and, "[i]n appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  As with all Rule 23 elements, the plaintiffs

bear the burden of proving the adequacy of class counsel under Rule 23(g). *Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181, at *14 (N.D. Ill. Jan. 4, 2013).

Plaintiffs' counsel do not specifically address the Rule 23(g) factors in their Motion, although they do include a footnote describing the experience of proposed class counsel in handling "class litigation, complex litigation and consumer and FDCPA cases." Dkt. No. 396 at n. 3. Plaintiffs' counsel, however, have failed to submit any evidence with respect to "the resources that counsel will commit to representing the class." Courts have found this to be an important factor in determining the adequacy of class counsel. *See, e.g., In re Dairy Farmers of Am., Inc.*, MDL No. 2031, No. 09-CV-3690, 2013 WL 6050431, *3 (N.D. Ill. Nov. 15, 2013) (finding counsel failed to demonstrate adequacy to represent class in putative antitrust class action where no concrete evidence of resources presented); *Fisher v. United States*, 69 Fed. Cl. 193, 201 (Fed. Cl. 2006) (denying certification and reasoning that "[i]t is unclear based upon the evidence presented whether plaintiff's counsel has the resources necessary to litigate on behalf of a class that plaintiff believes could potentially encompass 250,000 members").

The consideration of sufficient resources to represent the putative class is particularly important here given the huge size of the potential class (claimed by plaintiffs to exceed one million members). Payment of notice costs alone would require a significant cash outlay by class counsel. *Eisen*, 417 U.S. at 178 ("The usual rule is that a plaintiff must initially bear the cost of notice to the class."). Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." First class mail is appropriate in most circumstances to provide the best notice

that is practicable under the circumstances. *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (citing *Eisen*, 417 U.S. at 173–75 (1974)).

The cost of notice via first class mail to all members of the putative class in this matter is likely to be substantial. Plaintiffs assert that during the period of November 2008 through November 15, 2013, Defendants collected on at least 1,174,222 consumer accounts in Indiana. Dkt. No. 395 at 1. Thus, if Plaintiffs' subclasses were certified, Plaintiffs' counsel likely would be responsible for paying hundreds of thousands of dollars to provide notice to class members. Without any evidence that counsel has the resources to take on this responsibility, appointment of plaintiff's counsel as class counsel is inappropriate.

Plaintiffs' Counsel also fail to meet their adequacy burden because they have not investigated vigorously the claims of Plaintiffs and the putative class members. To meet their adequacy burden, "counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 317 (N.D. Ill. 1995). Counsel's failure to conduct discovery diligently and vigorously supports a finding of inadequacy. *See Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 227 (S.D. Ind. 2006) (rejecting class counsel and noting his "dilatoriness and lack of careful management of the discovery process."). In assessing the adequacy of counsel, the Court "is entitled to draw on observations of counsel's performance in the very litigation at issue." *Id.* at 231.

Plaintiffs' Counsel have failed to conduct even basic third-party discovery to investigate Plaintiffs' claims, let alone a fulsome, vigorous investigation of the putative class members' claims.[11] As discussed above, Plaintiffs' claims are premised on the allegation that their credit

---

[11] The Court has already questioned whether Plaintiffs' Counsel could adequately represent a class in this case. (Dkt. 237 at pp. 19-20 n. 7.)

card accounts were securitized by the originating creditors. In the more than two years since the original complaint was filed in this case, Plaintiffs' Counsel have conducted no third-party discovery whatsoever with respect to the originating creditors for the Plaintiffs' accounts or the putative class members. As a result of their Counsel's failure to conduct this third-party discovery, Plaintiffs bring this *second* motion for class certification without the evidence to show Plaintiffs' adequacy to serve as representatives of classes of debtors whose accounts were securitized. The Court should not put the interests of such an enormous putative class in the hands of counsel that have failed to investigate vigorously Plaintiffs' individual claims.

Dated: May 5, 2015                                        Respectfully submitted,

                                                   _/s/ James A. Rolfes_____

| | | |
|---|---|---|
| Thomas Allen *pro hac vice* | James A. Rolfes  *pro hac vice* | James W. Riley, Jr. |
| REED SMITH LLP | jrolfes@reedsmith.com | Atty. No. 6073-49 |
| 225 Fifth Avenue | David A. Maas *pro hac vice* | RILEY BENNETT & EGLOFF |
| Pittsburgh, PA 15222 | dmaas@reedsmith.com | LLP |
| (412) 288-3131 | REED SMITH LLP | 141 East Washington Street |
| (412) 288-3086 (Facsimile) | 10 South Wacker Drive | Fourth Floor |
| tallen@reedsmith.com | Chicago, IL  60606-7507 | Indianapolis, IN  46204 |
| | (312) 207-1000 | (317) 636-8000 |
| | (312) 207-6400 (Facsimile) | (317) 636-8027 (Facsimile) |
| | | jriley@rbelaw.com |

*Attorneys for Defendants Sherman Capital, LLC, Sherman Financial Group, LLC, LVNV Funding, LLC, Resurgent Capital Services LP, and Sherman Originator, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2015 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing to all counsel of record.

/s/ _James A. Rolfes_ _____