# **EXHIBIT E**



# GE Money Bank

## BILL of SALE

### Fresh Forward Flow- December

For value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Receivables Purchase Agreement (the "Agreement"), dated as of this 14th day of October 2009 by and between General Electric Capital Corporation, a Delaware corporation, GE Money Bank, a federal savings bank, and Retailer Credit Services Inc, a Delaware corporation (collectively "Seller") and Sherman Originator III LLC ("Buyer"), Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, to the extent of its ownership, the Receivables as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer on December 29, 2009 and as further described in the Agreement.

GE Money Bank

By: _____

Title: CFO

Retailer Credit Services Inc

By: _____

Title: President

General Electric Capital Corporation

By: _____

Title: Vice President

Non-Judgment AR Bulk January 2010

BILL of SALE

For value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Receivables Purchase Agreement (the "Agreement"), dated as of this 11th day of December, 2009 by and between General Electric Capital Corporation, a Delaware corporation, GE Money Bank, a federal savings bank, and Retailer Credit Services Inc, a Delaware corporation (collectively "Seller") and Sherman Originator III LLC ("Buyer"), Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, to the extent of its ownership, the Receivables as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer on the Transfer Date, and as further described in the Agreement.

GE Money Bank

By: _____

Title: CFO

Retailer Credit Services Inc

By: _____

Title: President

General Electric Capital Corporation

By: _____

Title: _____Vice President_____

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first shown above.

GE Money Bank

By: _____

Title: CFO


Retailer Credit Services Inc

By: _____

Title: President


General Electric Capital Corporation

By: _____

Title: Vice President


Sherman Originator III LLC

By: _____

Title: _____


Sherman Capital Markets, LLC as agent for
Sherman Financial Group LLC, as Guaranty

By: _____

Title: _____


25

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first shown above.

GE Money Bank

By: _____

Title: _____


Retailer Credit Services Inc

By: _____

Title: _____


General Electric Capital Corporation

By: _____

Title: ___Vice President_____


Sherman Originator III LLC

By: _____

Title: ___Director_____


Sherman Capital Markets, LLC as agent for
Sherman Financial Group LLC, as Guaranty

By: _____

Title: ___PRESIDENT_____

25

Non-Judgment AR Bulk December 2009

BILL of SALE

For value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Receivables Purchase Agreement (the "Agreement"), dated as of this 30th day of November, 2009 by and between General Electric Capital Corporation, a Delaware corporation, GE Money Bank, a federal savings bank, and Retailer Credit Services Inc, a Delaware corporation (collectively "Seller") and  Sherman Originator III LLC ("Buyer"), Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, to the extent of its ownership, the Receivables as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer on the Transfer Date, and as further described in the Agreement.

GE Money Bank

By: _____

Title: _____

Retailer Credit Services Inc

By: _____

Title: _____

General Electric Capital Corporation

By: _____

Title: _____ Vice President _____

## NON-JUDGMENT BULK RECEIVABLES PURCHASE AGREEMENT
### between

### GE Money Bank,

### Retailer Credit Services Inc

### and

### General Electric Capital Corporation

### ("SELLER")

### and

### Sherman Originator III LLC

### ("BUYER")

### 11/30/2009

## RECEIVABLES PURCHASE AGREEMENT
## NON JUDGMENT ATTORNEY REPRESENTATION ("AR") BULK SALE

This RECEIVABLES PURCHASE AGREEMENT, is made this 30th day of November, 2009, by and between General Electric Capital Corporation, a Delaware corporation, GE Money Bank, a federal savings bank, and Retailer Credit Services Inc, a Delaware corporation (collectively "Seller") and  Sherman Originator III LLC ("Buyer") with reference to the following facts and circumstances:

### RECITALS

A.	Seller desires to sell to Buyer approximately ███████ outstanding face value of delinquent non judgment, attorney represented credit card receivables, on the terms and conditions herein set forth, as such receivables exist as of the Cut-Off Date; and

B.	Buyer wishes to purchase the aforementioned receivables on the terms and conditions herein set forth, as such receivables exist as of the Cut-Off Date.

NOW, THEREFORE, in consideration of the premises and the covenants hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### COVENANTS, TERMS & CONDITIONS

### ARTICLE I
### DEFINITIONS

1.1 <u>Definitions</u>.  As used in this Agreement, the following terms shall have the following meanings unless otherwise defined herein and, wherever from the context it appears appropriate, all terms expressed herein in the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender.

"<u>Account</u>" means any retail credit card account owned by Seller with respect to which there is a Receivable

"<u>Account Debtor</u>" means the applicant or, if applicable, the co-applicant on an Account, but does not include guarantors,  sureties or authorized users who are not the applicant or co-applicant with respect to such Account. Account Debtors shall be persons, not corporate entities.

"<u>Account Document</u>" means any application, agreement, billing statement, remittance check or other correspondence relating to an Account and relevant to the collection of the related Receivable, to the extent such item is in Seller's possession and reasonably available to Seller, in the form, if any, it exists in Seller's possession.

"<u>Affiliate</u>" means, with respect to any Person, a Person that controls, is controlled by, or is under common control with that Person.

1

"Agreement" means this Receivables Purchase Agreement, including any exhibits or schedules hereto, as the same may be amended or supplemented from time to time.

"Bankruptcy Case" means a case under Chapter 7, 11, 12 or 13 of Title 11 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bid File" means the Computer File provided to Buyer to evaluate data information and received by Buyer on or about November 18, 2009.

"Bill of Sale" means a document, substantially in the form of Exhibit A hereto, to be delivered by Seller to Buyer in accordance with Section 2.2 herein.

"Business Day" means a day other than a Saturday, Sunday or day on which banks are required or permitted to be closed in New York.

"Buyer" shall have the meaning assigned to such term in the introductory paragraph hereto.

"Computer File" means a computer file, tape, cartridge or disk or other electronic medium.

"Cut-Off Date" means November 30, 2009

"Cut-Off Date Claim Amount" means the outstanding amount on the Account as of 11:59 p.m. on the Cut-Off Date.

"Event of Default" means the occurrence of any of the following events: (i) failure of Buyer or Seller to perform or observe any other term, covenant or agreement to be performed or observed by it pursuant to this Agreement; (ii) any representation or warranty made by Buyer or Seller in connection with this Agreement proves to have been false in any material respect when made; (iii) any order, judgment or decree is entered decreeing the dissolution of Buyer or Seller; (iv) a material change in the management or control of Buyer or the determination that a Material Adverse Effect, in the opinion of Seller, has occurred in the financial condition of Buyer, or a material change in the management or control of Seller or the determination that a Material Adverse Effect, in the opinion of Buyer, has occurred in the financial condition of Seller; (v) a court having jurisdiction enters a decree or order for relief in respect of Buyer, Seller or any of their subsidiaries in an involuntary case under title 11 of the United States Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed; (vi) a voluntary case is commenced by Buyer, Seller or any of their subsidiaries under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; (vii) a decree or order of a court having jurisdiction for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Buyer, Seller or any of their subsidiaries or over all or a substantial part of their property is entered; and, in the case of any event described in clauses (vi), (vii) or (viii), such event continues for 60 days unless dismissed, bonded or discharged; (viii) Buyer, Seller or any of their subsidiaries is unable or fails, or admits in writing its inability, to pay its debts as

such debts become due; or (ix) the Board of Directors of Buyer, Seller or any of their subsidiaries (or any committee thereof) adopts any resolution or otherwise authorize action to approve any of the foregoing.

"Financing Statement" means a UCC-1 financing statement.

"Funding Date" means, with respect to a Receivable, December 9, 2009 or, if such date is not a Business Day, the next Business Day.

"Funding Instructions" means a document, substantially in the form of Exhibit A1 hereto, to be delivered by Seller to Buyer prior to Funding Date.

"Material Adverse Effect" means a material adverse effect upon the business, operations, properties, assets, condition (financial or otherwise) or prospects of Buyer which materially impair the ability of Buyer to perform its obligations under the Agreement or the ability of Seller to enforce such obligations.

"Non-Conforming Receivables" shall have the meaning assigned to such term in Section 7.1 hereof.

"Notification Date" means December 4, 2009.

"Notification File" means a Computer File identifying the Receivables to be purchased by Buyer on the Funding Date, which listing shall contain the following information with respect to each receivable to the extent maintained by Seller as of the Cut-Off Date: account number, date of last payment, charge-off date, name, address, telephone number and social security number of the Account Debtors, and the Cut-Off Date Claim Amount.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Purchase Price" means with respect to the Receivables being sold on the Funding Date, an amount equal to the product of (a) price factor in following table, ▮▮▮▮▮▮▮▮ ) the Cut-Off Date Claim Amount of the Receivables being sold, as indicated on the Notification File.



"Receivable" means any retail credit card receivable relating to an unsecured credit card account owned by Seller that is being sold to Buyer pursuant to the terms of this Agreement, as such receivable exists as of the Cut-Off Date, to the extent such receivable is set forth on the Notification File and had been assigned to a law firm for collections by the Seller.

"Securities Laws" means the securities laws of any jurisdiction.

"Seller" shall have the meaning assigned to such term in the introductory paragraph hereto.

"Sherman" means Sherman Financial Group LLC, which is the 100% owner of Buyer.

"Transfer Date" means a Business Day selected by Seller on which Seller sends a Notification File to Buyer, which must be one business day prior to the Funding Date.

"Trustee" means a trustee appointed in a Bankruptcy Case.

## ARTICLE II
### PURCHASE AND SALE OF RECEIVABLES

2.1 Purchase and Sale. On the Transfer Date, Seller shall sell and Buyer shall buy all right, title and interest in and to the Receivables with respect to which Buyer has received a Notification File. Seller agrees to sell the Receivables to Buyer and Buyer agrees to purchase the Receivables, without recourse and without warranty of any kind (including, without limitation, warranties pertaining to title, validity, collectability, accuracy or sufficiency of information) except as specifically set forth herein, on the terms and subject to the conditions set forth below.

2.2 Bill of Sale; Financing Statement. Within five Business Days after Funding Date, Seller shall deliver to Buyer: (a) an executed Bill of Sale and (b) an appropriate Financing Statement or statements (if prepared by Buyer) for filing by Buyer, at Buyer's expense, in the state and county (if applicable) where Seller's chief executive office is located and/or Seller is incorporated. The foregoing notwithstanding, Buyer acknowledges and agrees that the failure of Seller to execute and deliver a Bill of Sale and/or a Financing Statement shall not constitute a default or breach by Seller of its obligations hereunder unless Seller fails to deliver such items within three (3) days after a written request by Buyer therefore, or provided that if Buyer provides Financing Statements to Seller within one week of the Funding Date, Seller shall execute and return them to Buyer.

2.3 Notification Date. On the Notification Date, Seller shall forward to Buyer the Notification File.

2.4 Payment. On the Funding Date, Buyer shall remit to Seller an amount equal to the Purchase Price by wire transfer to the bank designated by Seller in accordance with the Funding Instructions forwarded to Buyer on the Notification Date. All collections received by Seller on or after the Cut-Off Date with respect to any Receivable included herein shall be paid to Buyer according to the procedures set forth in Section 5.7 herein.

2.5 Schedule. Each of Seller and Buyer shall maintain a Computer File of all Receivables sold or reassigned under this Agreement and the date and amount of each payment received by the transferring party on those Receivables after the date of such transfer, and the

date such payment was remitted by the transferring party in accordance with the terms of this Agreement, and shall revise such schedule whenever ownership of a Receivable is transferred to or from Buyer in accordance with the terms of this Agreement and whenever a payment is received or remitted by the transferring party after the date of such transfer. No more frequently than once every three months, Buyer or Seller may request, and the other party shall provide within thirty (30) days of the request, each Computer File.

2.6 <u>Reporting Requirements</u>. Buyer shall be solely responsible for any reporting requirements and/or filings required by any federal, state or local law, rule or regulation relating to the Receivables.

2.7 <u>Intentionally Left Blank</u>

2.8 <u>Taxes</u>. Neither of the parties is aware of any state or federal sales, transfer of similar taxes that would be applicable to this Agreement.

2.9 <u>Buyer's Intention</u>. Buyer is purchasing the Receivables for its own account, for investment purposes and not with a view to the distribution thereof. Buyer shall not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of any of the Receivables (or solicit any offers to buy, purchase, or otherwise acquire any of the Receivables) or any direct or indirect interests therein, except in compliance with all applicable federal and/or state securities and Blue Sky laws, rules, regulations and requirements (collectively, the "Securities Laws") and this Agreement.

2.10   <u>Receivables Not Securities</u>. Buyer acknowledges and agrees that (a) the purchase of the Receivables pursuant to this Agreement does not involve, nor is it intended in any way to constitute, the purchase of a "security" within the meaning of the Securities Laws and (b) it is not contemplated that any filing will be made with the Securities and Exchange Commission or pursuant to the Securities Laws of any jurisdiction.

2.11   <u>Sophisticated Investor</u>. Buyer has such knowledge, sophistication and experience in business and financial matters as to be capable of evaluating both the information made available with respect to the Receivables and the merits and risks of the prospective purchase, is able to bear the economic risk of such purchase, is able to bear the risk that Buyer may be required to hold the Receivables for an indefinite period of time and is able to afford a complete loss of the Purchase Price for the Receivables.

2.12   <u>Opportunity to Ask Questions</u>. Buyer has been afforded the opportunity: (a) to ask such questions as it has deemed necessary of, and to receive answers from, representatives of Seller concerning the terms and conditions of the offering of the Receivables and the merits and risks of buying the Receivables; and (b) to obtain such additional information that Seller possesses or can acquire.

2.13   <u>Prior Agreements</u>. The Parties mutually agree that this Agreement is not related, dependant, or otherwise connected with any prior agreements between the parties. Each party reserves its rights under any prior agreement. Nothing in this Agreement shall be construed to waive any rights each party may have under any prior agreement, including breach of any such prior agreement.

## ARTICLE III
CONDITIONS PRECEDENT

3.1 <u>Conditions to Buyer's Obligations</u>.  The Buyer may terminate its obligation to purchase the Receivables on any Transfer Date and/or any or all subsequent Transfer Dates if any of the following occurs:

    (a)    <u>Representations and Warranties</u>.  As of such Transfer Date, the representations and warranties of Seller set forth in this Agreement, including, but not limited to Section 4.1, are not true and correct in all material respects.

    (b)    <u>Compliance with Covenants and Agreements</u>.  On or prior to such Transfer Date, Seller has not complied in all material respects with each of its material covenants and agreements set forth in this Agreement.

    (c)    <u>No Violation of Law</u>.  The consummation of such purchase and sale will violate an order of any court or governmental body having jurisdiction or a law, rule or regulation that applies to Buyer or Seller.

    (d)    <u>Approvals, Consents and Notices</u>.  As of such Transfer Date, any approvals, consents or other actions by, and any notices to or filings with, any governmental authority, or any other Person required for the consummation of such purchase and sale have not been obtained or made.

3.2 <u>Conditions to Seller's Obligations</u>.  The Seller may terminate its obligation to sell the Receivables on any Transfer Date and/or all subsequent Transfer Dates if any of the following occurs:

    (a)    <u>Representations and Warranties</u>.  As of such Transfer Date, the representations and warranties of Buyer set forth in this Agreement, including, but not limited to Section 4.2, are not true and correct in all material respects.

    (b)    <u>Compliance with Covenants and Agreements</u>.  On or prior to such Transfer Date, Buyer has not complied in all material respects with each of its material covenants and agreements set forth in this Agreement.

    (c)    <u>No Violation of Law</u>.  The consummation of such purchase and sale will violate an order of any court or governmental body having jurisdiction or a law, rule or regulation that applies to Buyer or Seller.

    (d)    <u>Approvals, Consents and Notices</u>.  As of such Transfer Date, any approvals, consents or other actions by, and any notices to or filings with, any governmental authority, or any other Person required for the consummation of such purchase and sale have not been obtained or made.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

4.1 <u>Representations and Warranties of Seller</u>.  Seller hereby makes the following representations and warranties solely to Buyer and not to any other Person as of the Transfer Date:

    (a)    <u>Due Organization; Authorization, Etc</u>.  As of the Transfer Date, each Seller is duly organized, validly existing and in good standing under the laws of the state of its formation, and, at all relevant times, had all necessary power and authority to originate and/or acquire and transfer the Receivables.  The execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby are within its powers and have been duly authorized by all necessary action.  This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

    (b)    <u>No Conflict</u>.  The execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the certificate of incorporation or bylaws of Seller, any federal, state or local law, rule or regulation applicable to Seller or any agreement or other document to which Seller is a party or by which it or any of its property is bound.

    (c)    <u>Consents</u>.  No authorization, approval, consent or other action by, and no notice to or filing with, any governmental authority or regulatory body or other Person is or will be required to be obtained or made by Seller for the due execution, delivery and performance of this Agreement and the transactions contemplated hereby that has not been obtained or made by Seller.

    (d)    <u>Title to the Receivables</u>.  As of the Transfer Date, Seller holds title in and to the Receivables, free and clear of all liens, claims and encumbrances, and is the lawful owner of, or has the right to sell, the Receivables and, upon the purchase by Buyer of the Receivables hereunder from Seller, Buyer shall acquire unencumbered title in and to the Receivables, of the Transfer Date, except for such encumbrances, liens and claims caused or created by Buyer.

    (e)    <u>No Brokers or Finders</u>.  Seller has not employed any investment banker, broker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transaction contemplated in this Agreement.

(f)    <u>No Proceeding</u>.  There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or, to the knowledge of Seller, threatened against Seller which would have a material adverse effect on the transactions contemplated by, or Seller's ability to perform its obligations under, this Agreement.

(g)    <u>Origination</u>.  The Receivables sold to Buyer pursuant hereto have been originated and/or acquired and serviced in material compliance with applicable state and federal consumer credit laws by Seller, its agents and affiliates.

(h)    Seller hereby acknowledges and represents that the sale of the Receivables to Buyer hereunder: (i) is not made in contemplation of the insolvency of Seller, (ii) is not made with the intent to hinder, delay or defraud the creditors of Seller, (iii) has been approved by an officer of Seller with the authority to approve the sale of the Receivables, (iv) will be recorded in the records of Seller, and (v) represents a bona fide and arm's length transaction undertaken for adequate consideration in the ordinary course of business.  Further, Seller hereby acknowledges and represents that Buyer is neither an insider nor an affiliate of Seller.

(i)    As of the Transfer Date, each of the Accounts has been maintained and serviced by Seller in compliance with all applicable state and federal consumer credit laws, including, without limitation, the Truth-in-Lending Act, the Equal Credit Opportunity Act, and the Fair Credit Billing Act.

(j)    As of the Transfer Date, none of the Receivables is subject to pending collection litigation.

(k)    The Receivables are binding, valid and enforceable as of the Cut-Off Date. For purposes of this Agreement, the violation of this warranty shall not be deemed a Material Breach unless more than five percent (5%) of the Receivables sold in any monthly sales file are not binding, valid and enforceable.  Instead, non-binding, non-valid and non-enforceable Receivables shall be considered Non-Conforming Receivables. Furthermore, as discussed in Articles Seven below, Buyer's remedies for purchasing and attempting to collect on a non-binding, non-valid and non-enforceable Receivable shall be limited to requiring Seller to repurchase the Receivable. For each Receivable, Seller will provide a breakdown of each component of the Cut-Off Date Claim Amount (principal, interest, fees, etc.).

(l)    The information in the Notification File is true, correct and complete.

(m)    To the best of Seller's knowledge, as of the Transfer Date, there are no restrictions on the ability of Buyer to collect on Receivables by filing a

lawsuit for each individual Receivable in the appropriate court, if such lawsuit is permitted pursuant to Law.

(n)     Selection.    Seller has not selected the Accounts in a manner that would be reasonably expected to have an adverse impact on the value of the Accounts or on the Buyer's ability to collect the Accounts.

(m)     Settlement Policies.  Seller has not materially changed its settlement policies for such Accounts within the 60-days prior to the sale, unless the Seller has given the Buyer written notice of such change.

4.2 Representations and Warranties of Buyer.  Buyer hereby makes the following representations and warranties to Seller as of the Transfer Date:

(a)     Due Organization; Authorization, Etc.  As of the Transfer Date, each Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby are within its powers and have been duly authorized by all necessary action.  This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(b)     No Conflict.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not and will not violate, conflict with or result in a breach or default under its, respectively, limited liability agreement and/or trust, any federal, state or local law, rule or regulation applicable to Buyer, or any agreement or other document to which Buyer is a party or by which it or any of its members or property is bound.

(c)     Consents.  No authorization, approval, consent or other action by, and no notice to or filing with, any governmental authority or regulatory body or other Person is or will be required to be obtained or made by Buyer of the due execution, delivery and performance of this Agreement and the transactions contemplated hereby.

(d)     Investigation of Receivables.  Buyer has made an independent investigation as Buyer has deemed necessary as to the nature, validity, collectability and value of the Receivables being purchased on the Funding Date, and as to all other facts that Buyer deems material to such purchase.  Buyer is making such purchase solely on the basis of such investigation and its own judgment and the representations, warranties and other information expressly set forth herein.  Buyer is not acting in

9

reliance on any representation, warranty or information except to the extent expressly set forth herein.

(e)   <u>No Broker or Finders</u>.  Buyer has not employed any investment banker, broker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transaction contemplated in this Agreement.

(f)   <u>No Proceeding</u>.  There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or, to the knowledge of Buyer, threatened against Buyer which would have a material adverse effect on the transactions contemplated by, or Buyer's ability to perform its obligations under, this Agreement.

## ARTICLE V
## CONDUCT OF BUSINESS AFTER THE PURCHASE

5.1 <u>Interim Servicing</u>.  Until the Transfer Date, Seller may continue to service the Receivables to be transferred and, in connection therewith, shall have the right to handle the Receivables and any matter relating to the Receivables in any manner that Seller deems appropriate, provided, however, that from the Cut-Off Date until the Transfer Date, Seller shall not initiate any outbound collection efforts on the applicable Receivables, but Seller shall be permitted to accept payments in accordance with its ordinary credit policy.  Buyer shall be bound by the actions taken by the Seller in compliance with applicable law with respect to any Receivable prior to the Transfer Date.  Buyer shall take no action to communicate with Account Debtors (or their agents or representatives) or enforce, service or otherwise manage any Receivable until after the purchase of the Receivables, and only in accordance with any and all applicable federal and state laws, rules, regulations and court orders.  In no event shall Seller be deemed a fiduciary for the benefit of Buyer with respect to the Receivables or any Receivable.

5.2 <u>Compliance With Law</u>.  All actions or omissions by Buyer with respect to the Receivables, including (but not limited to) all servicing, billing, processing, collections, and recovery operations and any communications or notices to Account Debtors, shall conform in all respects to the terms and conditions of the Account and to any and all applicable Laws.

(a)   Without limiting the foregoing, Buyer further represents and warrants that it shall not -

(i)   assert or suggest the existence of a security interest with respect to a Receivable;

(ii)   enter into a reaffirmation agreement or assert any obligation to enter into a reaffirmation agreement with respect to a Receivable;

(iii)   market to Account Debtors, except for purposes of collecting a Receivable, or market the names and/or addresses of Account Debtors;

    (iv)    seek to recover any portion of any Receivable that is not properly and legally recoverable under applicable Laws, including, without limitation, in the context of a Bankruptcy Case or under the Bankruptcy Code; or

    (v)    increase the amount of the Receivables above the face amount purchased from Seller or add additional or other charges or fees (including finance charges or interest) to the amount of the Receivables except as permitted by law (it being understood that no increase shall be imposed if such imposition could impose on the Seller any legal obligation with respect to Receivables).

(b)    Without limiting the foregoing, Buyer shall implement and maintain appropriate administrative, technical and physical safeguards to (a) protect the security, confidentiality and integrity of information relating to Account Debtors, in accordance with applicable law, (b) ensure against any anticipated threats or hazards to the security or integrity of information relating to Account Debtors, and (c) protect against unauthorized access to or use of information relating to Account Debtors that could result in substantial harm or inconvenience to any Account Debtor.

(c)    Buyer shall ensure that each Subsequent Purchaser and any Person acting on behalf of Buyer or a Subsequent Purchaser complies with the requirements contained in this Section 5.2.

5.3 <u>Retrieval of Account Documents; Oral Information on Accounts</u>.

(a)    <u>Account Documents</u>.

    (i)    Except as provided in this Section 5.3, Seller shall have no obligation to provide any information in respect of Receivables (other than the information contained in the Notification File).

    (ii)    Buyer may request Account Documents and, to the extent such information is in the possession of and reasonably available to Seller, Seller shall provide it in accordance with the provisions below. For the avoidance of doubt, Buyer expressly acknowledges and agrees that Seller's failure to provide Account Documents shall not render the related Receivables as Non-Conforming Receivables or otherwise subject Seller to any liability.

    (iii)    From time to time, Buyer may submit to Seller reasonable requests for Account Documents, which requests shall be substantially in the form of Exhibit B hereto. Any request by any subsequent purchaser or assignee of the Receivables or any other Person acting on behalf of Buyer or such Person, for Account Documents, to the extent there remains a right thereto, must be made through Buyer.

Seller shall provide to Buyer each requested Account Document (to the extent such document is in the possession of and reasonably available to Seller) within thirty days after Seller's receipt of Buyer's request therefor.

(iv)   During the first ████████████ after the Transfer Date, Seller shall provide to Buyer (to the extent the documents are in the possession of and reasonably available to Seller), at no additional charge to Buyer (other than specified postage charges) a number of Account Documents not to exceed the number equal to ██████████ ████████████ sold on the Transfer Date, provided that Buyer pays to Seller, within five (5) days after receipt of an invoice therefor, all postage paid by Seller in respect of provision of such Account Documents.

(v)   At all times (a) after the date ██████████ after the Transfer Date or (b) during the first ███████████ after the Transfer Date but in excess of the request amounts specified in, or otherwise not in accordance with, subsection (iv) above, Seller shall provide Buyer (to the extent the documents and/or necessary information are in the possession of and reasonably available to Seller) with requested Account Documents after Buyer pays to Seller the following: (1 ██████ per automated purchase summary, substantially in the form of the sample attached hereto as Exhibit B-1, which such automated purchase summary shall only be supplied for Receivables less than approximately thirty-six (36) months old (it being understood that Receivables greater than thirty-six (36) months old shall require an account history transcript at the price specified below); (2) ██████████████ of account agreement or billing statement; (3) ██████████████ of account history transcript; and (4) a price to be agreed upon for any other type of Account Document requested by Buyer.

(vi)   Any contrary provision contained in this Section 5.3(a) notwithstanding, the parties acknowledge and agree that: (a) if, during any thirty (30) day period, Buyer reasonably requests Account Documents totaling more than five hundred (500), Seller may provide the requested Account Documents within sixty days after Seller's receipt of each reasonable request by Buyer therefor, and (b) Seller has no obligation to provide to Buyer any document or information not in the possession of and reasonably available to Seller.

(b)   Oral Information.  Seller shall not be obligated to furnish Buyer with any oral information.

12

(c)     <u>Copies</u>.  Seller reserves the right (but shall have no obligation to) retain copies of all or any portion of documents delivered to Buyer.  Any obligation of Seller to provide Account Documents to Buyer may be satisfied by providing original documents or copies thereof, whether by electronic, photocopy, microfiche, microfilm or other reproduction process.

(d)     <u>Limitations on Seller's Obligations</u>.  Any other provisions of this Section 5.3 to the contrary notwithstanding, Seller shall have no obligation to provide Account Documents (or any other information) on or after the date two (2) years after the Funding Date.

5.4 <u>Reporting to Credit Reporting Agencies</u>.  Buyer acknowledges that Seller may in its sole discretion, at its cost, report the status of the Receivables to the appropriate credit reporting agencies and, if Seller so elects, it will report the Receivables as either transferred, transferred to another lender, charged off transferred, sold, charged off sold or another similar designation.  If Buyer elects to report Receivables to the appropriate credit reporting agencies, Buyer shall, at its cost, report Receivables to such agencies as Buyer and transferee of such Receivables.

5.5 <u>Seller as Witness</u>.  If Buyer files any legal action to collect on a Receivable and Buyer requests or subpoenas an officer or employee of Seller to appear at a trial, hearing or deposition to testify about the Account (and in the case of a request Seller agrees to provide an officer or employee to so appear), Buyer will pay Seller for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate of such officer or employee.  Buyer will also pay Seller the officer's or employee's reasonable out-of-pocket, travel-related expenses.

5.6 <u>Legal Notices Received After the Transfer Date</u>.  Buyer and Seller shall promptly notify each other of any claim, threatened claim, pending or threatened obligation or any other legal proceeding or governmental action related to Receivables and involving or implicating Buyer or Seller or actions taken in respect of Receivables.

5.7 <u>Extent of Seller's Obligations After the Transfer Date</u>.

(a)     Except as otherwise stated herein, Seller shall have no obligation to perform any servicing activities with respect to Receivables from and after the Transfer Date.

(b)     Seller shall provide to Buyer, at least monthly, a report indicating the amounts of payments received by Seller in respect of purchased Receivables and Seller shall remit to Buyer on the 20th day of each month such amounts as were received in the immediately preceding fiscal month, except that, such report and remittance shall reflect only amounts received on or after the Cut-Off Date of the Receivable.

(c)     Seller shall use good faith commercially reasonable efforts to identify and forward to Buyer, within fifteen (15) days after the end of each of Seller's fiscal months, all written correspondence received during such fiscal

month by Seller in respect of Receivables that is relevant to Buyer's recovery or ownership thereof, including bankruptcy and probate notices.

(d)    It is acknowledged and agreed that Seller shall have no obligations under subsections (b) or (c) of this Section 5.7 on or after the date three (3) years after the Transfer Date provided that Seller, in its sole discretion, shall make reasonable efforts to perform the activities specified in subsections (b) or (c) of section 5.7 after such date.

5.8   Extent of Buyer's Obligations After Repurchase.

(a)    After any repurchase of Accounts by Seller from Buyer pursuant to Section 7.2(a), Buyer shall provide to Seller, within fifteen (15) days after the end of each of Buyer's fiscal months, a report indicating the amounts of payments received by Buyer in respect of the repurchased Receivables during the immediately preceding fiscal month and shall remit to Seller such amounts within thirty (30) days after its provision of such report, except that, with respect to any payments received during the fiscal month in which the date of repurchase occurs, such report and remittance shall reflect only amounts received on or after the date of repurchase.

(b)    Buyer shall use good faith commercially reasonable efforts to identify and forward to Seller, within fifteen (15) days after the end of each of Buyer's fiscal months, all written correspondence received during such fiscal month by Buyer in respect of repurchased Receivables that is relevant to Seller's recovery or ownership thereof.

5.9   Audit Rights.   Seller shall have the right to audit Buyer with regard to compliance with the terms of this Agreement, collection and data security policies and procedures which are required by law or required pursuant to this Agreement. The audit shall be conducted by employee(s) or other representative(s) designated by Seller. Seller agrees, and its representatives will agree, to hold all information that Seller received in confidence except as is necessary for Seller to enforce its rights under this Agreement, provided, however, that Seller shall hold in confidence any information that Buyer is legally required to hold in confidence under any law or contract. Such audit shall occur at a mutually agreed upon time and place, and is to be conducted during normal business hours. Buyer shall cooperate in the conduct of the audit. The Seller shall use commercially reasonable efforts to minimize the disruption of the conduct of the business during the audit. Neither Seller nor its representatives shall be permitted to make copies (in any form) of any materials provided for review in connection with any audit, provided, however, that any report or summary regarding the audit prepared by Seller's representative (regardless of form) shall not be considered a copy of materials provided for review.

## ARTICLE VI
## USE OF NAMES

6.1 <u>Use of Names</u>.  Buyer shall use (and shall ensure that each permitted assignee, subsequent purchaser of Receivables and any other Person taking action in respect of Receivables only shall use) only Buyer's (or such other Person's) own name when taking action in respect of Receivables.  Buyer shall not state, represent or imply (and shall ensure that no permitted assignee, subsequent purchaser of Receivables or other Person taking action in respect of Receivables states, represents or implies) that Buyer (or such other Person) is connected in any manner with, or acting for or on behalf of, Seller, Seller's Affiliates or any Person with whom Seller or its Affiliates has a program or other agreement relating to Receivables.  Buyer shall not (a) use the marks and/or names of, or otherwise refer to (and shall ensure that no permitted assignee, subsequent purchaser or other Person taking action in respect of Receivables uses the marks and/or names of, or otherwise refers to) Seller, Seller's Affiliates or any Person with whom Seller or its Affiliates has a program or other agreement relating to Receivables, including the marks and/or names of the establishment(s) at which the credit card generating the Receivable was used or (b) use (and shall ensure that no permitted assignee, subsequent purchaser or other Person taking action in respect of Receivables uses) any names and/or marks similar to the names and/or marks of Seller, Seller's Affiliates or any Person with whom Seller or its Affiliates has a program or other agreement relating to Receivables, including the name of the establishment(s) at which the credit card generating the Receivable was used.  The foregoing notwithstanding, however, Buyer (and any person acting on behalf of Buyer, any permitted assignee, subsequent purchaser of Receivables and any other Person  servicing such Receivables) may use the name of Seller solely for the purpose of identifying a Receivable (a) in communications with an Account Debtor on such Receivable in order to collect amounts outstanding thereon, (b) in connection with filing suit, (c) in connection with the sale or financing of the purchase of such Receivable, (d) for internal reporting purposes, (e) in bankruptcy and probate proceedings or (f) in connection with entering into any servicing arrangement, provided, however, that neither Buyer nor any person acting on behalf of Buyer or any permitted assignee, subsequent purchaser of Receivables and any other Person servicing such Receivables) shall state or represent in any way that it is taking action for or on behalf of Seller or any of Seller's Affiliates.

## ARTICLE VII
## NON-CONFORMING RECEIVABLES

7.1 <u>Definition</u>.  For purposes of the Agreement, a Receivable shall be considered a "Non-Conforming Receivable" if any of the following conditions apply to such Receivable:

      (a)     the Receivable was, in the reasonable opinion of Seller, created as a result of fraud or forgery or Seller's mistake;

      (b)     on or prior to the Cut-Off Date, the Account Debtor was deceased;

      (c)     on or prior to the Cut-Off Date, the debt represented by such Receivable was reaffirmed or discharged in a Bankruptcy Case;

(d)     on or prior to the Cut-Off Date, the debt represented by such Receivable was compromised, settled, paid in full or satisfied;

(e)     on or prior to the Cut-Off Date, a representation or warranty of Seller made herein as to such Receivable was untrue or incorrect in any material respect;

(f)     on or prior to the Cut-Off Date, the Account Debtor on such Receivable was released from liability on the Receivable by Seller;

(g)     on or prior to the Cut-Off Date, the Account Debtor filed a Bankruptcy petition;

(h)     Buyer is required to extend credit to the Account Debtor in connection with the Account as a result of sellers actions prior to the cut-off date.

(i)     the Receivable does not comply with the definition of Receivable contained in Section 1.1 of this Agreement.

For the avoidance of doubt (and notwithstanding anything otherwise provided herein), the parties hereto acknowledge and agree that a Receivable shall not constitute a Non-Conforming Receivable, and/or that a representation or warranty of Seller shall not be untrue or breached, solely because (1) such Receivable is not enforceable in accordance with its terms, (2) any security interest relating to such Receivable is not valid, perfected or enforceable, or (3) Seller is unable to produce Account Documentation related to such Receivable.

7.2 <u>Seller's Duty/Right to Repurchase.</u>

(a)     During the first one hundred eighty (180) days after the Transfer Date, Buyer may notify Seller in writing of any good faith determination by Buyer that a Receivable is a Non-Conforming Receivable. Any such notification shall include the information and shall be in the form set forth in Exhibit C hereto. Within sixty (60) days following Seller's receipt of Buyer's determination that the Receivable is a Non-Conforming Receivable, in the format specified in the Agreement, Seller shall in good faith confirm or deny that the Receivable is a Non-Conforming Receivable. Any dispute between the parties as to whether a Receivable is a Non-Conforming Receivable shall be resolved according to the procedures set forth in Section 7.2(d). Seller shall purchase such Receivable for an amount equal to (i) the Purchase Price for such Receivable, less (ii) any recoveries on such Receivable that Buyer may have received on or after the Transfer Date, less (iii) any credit given by Seller to Buyer for payments on the Receivable received by Seller before the Transfer Date. In the event that the sum of recoveries and credit given on the Receivable as specified in clauses (ii) and (iii) in the previous sentence exceeds the Purchase Price of such Receivable, Seller shall pay Buyer nothing, and Buyer, on the date specified by Seller for repurchase, shall pay Seller in cash the difference between (x) the sum of the

recoveries received by Buyer on or after the Transfer Date and credit given by Seller to Buyer for payments on the Receivable received by Seller before the Transfer Date and (y) the Purchase Price for such Receivable.  In the event that Buyer fails to notify properly Seller of any determination by Buyer that a Receivable is a Non-Conforming Receivable within one hundred eighty (180) days after the Transfer Date (and Seller has not exercised its rights under subsection (b) below in respect thereof), said Non-Conforming Receivable shall be solely the responsibility of Buyer and Seller shall have no obligation to repurchase such Non-Conforming Receivable.

(b)   In the event that Seller at any time determines that (i) a Receivable is a Non-Conforming Receivable, (ii) there is a pending or threatened suit, action, arbitration or other legal proceeding or investigation relating to Seller or a Receivable and resolution of the matter would be facilitated if Seller owned such Receivable, or (iii) such Receivable should not be recovered or collected or should not have been sold due to a possible legal defect or infirmity, Seller may advise Buyer that it wishes to repurchase the same, in which event Seller shall purchase such Receivable for an amount equal to the Purchase Price therefor, provided, however, that Seller shall advise Buyer of any determination under clause (i) within one-hundred-eighty (180) days after the Transfer Date.  Nothing contained in clause (iii) of the immediately preceding sentence shall impose any duty on or constitute a representation of Seller with respect to the validity, enforceability or collectability of any Receivable or validity, perfection or enforceability of any security interest relating to any Receivable.  Seller's right to repurchase under this section is subject to a ███████████████ ██████████ cap of the face value of the Receivables for the Transfer Date.

(c)   Unless Buyer is sued by a third party and entitled to indemnification from Seller under Article X hereof, repurchase by Seller pursuant to this Article VII shall constitute the sole and exclusive remedy of Buyer in respect of any Non-Conforming Receivable and, except for the remedies in this Article VII, Buyer hereby waives any and all rights and remedies to sue Seller in law or equity for damages or other relief in respect of such Non-Conforming Receivable.

(d)   Any unresolved dispute between the parties in connection with Section 7.2(a) shall be settled through friendly consultations between the parties. If agreement cannot be reached through consultations between the parties, the dispute shall be submitted to binding arbitration for resolution.  The arbitration shall take place in New York, New York, and shall be conducted by the American Arbitration Association in accordance with the Commercial Arbitration Rules thereof (the "Rules") except as modified hereby. A single neutral arbitrator with no past or current business affiliations with either Buyer or Seller shall make all necessary determinations, including the arbitration decision.  Within ten (10) days

17

after delivery of a notice of arbitration, the disputing parties shall commence conferring in good faith regarding the selection of the arbitrator. The disputing parties shall select the arbitrator within twenty (20) days after delivery of the notice of arbitration. If the arbitrator shall not have been so selected by such date then the arbitrator will be selected by the American Arbitration Association in accordance with the Rules. The arbitrator's decision must be in writing and shall set forth the reasons therefor. Such decision shall be a conclusive determination of the matter and binding on the disputing parties and shall have the effect of an arbitration award, and shall not (to the extent permitted by applicable law) be contested by any of the disputing parties. The fees and expenses of the arbitrator shall initially be borne equally by the parties, and ultimately shall be allocated between or among the disputing parties by the arbitrator in accordance with the arbitrator's final decision.

## ARTICLE VIII
## BUYER'S RIGHT OF TRANSFER

8.1 Right of Transfer. Except as provided in this Article VIII, Buyer shall not assign, encumber, transfer or convey its rights under this Agreement or in respect of any Receivable without the prior written approval of Seller. Buyer may sell or transfer any of the Receivables to a third party including, without limitation, Sherman Originator LLC, an affiliate of Buyer, if Buyer ensures that every subsequent purchaser of any Receivable (including any Persons purchasing from Buyer or a subsequent purchaser) is a reputable Person, and agrees in writing to the same representations, warranties, indemnification and insurance obligation and other terms (including those in respect of Non-Conforming Receivables and further Receivables transfers) applicable to Buyer that are set forth in this Agreement. Buyer shall ensure that any such subsequent purchaser also agrees in writing that Seller shall have a direct right of action against it in the event such subsequent purchaser fails to comply fully with its obligations. Buyer shall use no lower standards in selecting subsequent purchasers of Receivables than it typically uses for its other receivable portfolios and shall ensure that every subsequent purchaser who further transfers any Receivable shall adhere to Buyer's standards. Buyer shall promptly inform Seller of the identities of any potential purchasers to whom Buyer furnishes any of the information with respect to the Receivables, and of any subsequent purchasers of the Receivables and Buyer shall only sell Receivables after making a good faith investigation of and determination that the potential purchaser's integrity and financial reliability conform to the standards set forth in Exhibit D. Sale of some or all Receivables shall not relieve Buyer of any of its liabilities or obligations hereunder and Buyer shall be liable to Seller for any failure of subsequent purchasers to comply with the terms of its Agreement. In addition, Buyer shall ensure that (a) with respect to obligations incurred and actions taken by any subsequent purchaser while it owns any Receivable, such Person shall remain liable for such obligations and actions even if it has sold the Receivables or assigned its rights and obligations in respect thereof, and (b) any subsequent purchaser remains liable for any actions of any Person to whom it sells or assigns the Receivables or any rights in respect thereof. Seller shall have the right (but not the obligation) to take action directly against subsequent purchasers who violate their obligations, and each agreement providing for the transfer of Receivables shall provide for such a direct right of action by Seller. At Seller's option, Seller may determine not to proceed against a subsequent

purchaser and instead proceed against Buyer (who shall be liable for the violations of subsequent purchaser as if such violations were violations by Buyer).

8.2 Securitization; Collateral.

Notwithstanding the terms and conditions of Section 8.1:

a) Buyer may sell or transfer the Receivables to one or more affiliates  or to one or more trusts or other securitization or funding vehicles established by such affiliate or other Person, in either case, for the sole purpose of issuing securities backed by or representing interests in the Receivables, provided that Buyer or an affiliate or subsidiary of Buyer or another Person that satisfies the requirements contained in Exhibit D shall be the servicer with respect to such securitization, and Buyer acknowledges that the sale of some or all Receivables shall not relieve Buyer of any of its liabilities or obligations hereunder and Buyer shall be liable to Seller for any failure of subsequent purchasers to comply with the terms of its Agreement.

b) Buyer or an affiliate, subsidiary or permitted transferee of Buyer may pledge, assign or create a security interest in the Receivables to or for a lender as collateral for a loan (including loans structured in the form of repurchase agreements or other sales with recourse).  Buyer acknowledges that the pledge, assignment or creation of a security interest in some or all Receivables shall not relieve Buyer of any of its liabilities or obligations hereunder and Buyer shall be liable to Seller for any failure of subsequent purchasers to comply with the terms of its Agreement and such lender shall agree to be subject to the terms and conditions of Section 8.1 (as though such lender was a subsequent buyer) in the event that it exercises its remedies as a secured party, except that if such lender sells or transfers Receivables as a secured party to a subsequent purchaser that meets the requirements of Section 8.1, such lender shall be relieved of its liabilities under Section 8.1, but Buyer shall not be so relieved.

c) No such securitization or pledge or assignment of, or creation of a security interest in, the Receivables shall (1) provide for or permit the further assignment, encumbrance, transfer or conveyance of Receivables by the trusts or lenders other than in accordance with Section 8.1 (as though such trusts or lenders were subsequent purchasers selling to other purchasers, subject to the exceptions set forth in 8.2 (a) and 8.2(b)), or (2) otherwise release Buyer from its liabilities or obligations under this Agreement.

## ARTICLE IX
## UCC FILINGS

9.1 UCC Filings Against Seller.  On or after the date hereof, Seller shall sign at Buyer's reasonable request any UCC financing statement or continuation statement required to perfect the sale of the Receivables to Buyer from Seller.  On and after the date hereof, Seller promptly shall give Buyer written notice of any changes in its name and location of its chief executive office.

9.2 <u>UCC Filings Against Buyer</u>.  On or after the date of reassignment, Buyer shall sign at Seller's reasonable request any UCC financing statement or continuation statement required to perfect the reassignment of Receivables to Seller from Buyer.  On and after such reassignment, Buyer promptly shall give Seller written notice of any changes in its name and location of its chief executive office.

## ARTICLE X
## INDEMNIFICATION

10.1   <u>By Buyer</u>.  Buyer shall indemnify and hold harmless Seller, Seller's Affiliates and any Person with whom Seller or its Affiliates has a program or other agreement relating to Receivables (including owners of the establishment(s) at which the credit card generating the Receivables were used), and any of their respective shareholders, officers, directors, agents or employees, from and against any claim, loss, cost, liability, damage or expense (including, without limitation, reasonable attorney's fees and costs of suits) that arise from or relate to (a) any breach by Buyer or any assignee or subsequent purchaser of the Receivables of the representations, warranties, covenants and other responsibilities set forth in this Agreement, (b) any other act or omission by Buyer or any assignee or subsequent purchaser of the Receivables or any of their respective officers, directors, agents, employees, representatives, assignees or subsequent purchasers with respect to the Receivables committed or occurring after the Transfer Date, or (c) the improper use by Buyer or any assignee or subsequent purchaser of the Receivables of the name, marks or other property or information of Seller, its Affiliates or any other Person with whom Seller or its Affiliates has a program or other agreement relating to Receivables.

10.2   <u>By Seller</u>.  Seller shall indemnify and hold harmless Buyer, Buyer's Affiliates and any of their respective shareholders, officers, directors, agents or employees, from and against any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorney's fees and costs of suits) that arise from or relate to (a) any breach by Seller of its representations, warranties, covenants or other responsibilities set forth in this Agreement or (b) any other act or omission by Seller or any of its respective officers, directors, agents, predecessors in interest, employees, representatives or assignees with respect to the Receivables committed or occurring prior to the Transfer Date.

10.3   <u>Limitations on Seller's Indemnification Obligations</u>.  Buyer acknowledges that it has purchased the Receivables "AS IS," without reliance on any representations or warranties of Seller except as expressly provided herein, and that the Purchase Price reflects such fact.  As a result, Buyer agrees that in no event shall Seller be liable for special, consequential or punitive damages of Buyer, Buyer's Affiliates or any purchaser or assignee of Receivables.  Buyer also agrees that no subsequent purchaser or assignee of the Receivables shall have a direct cause of action against, or right of indemnification from, Seller and that all purchase agreements with such Persons shall so provide.

10.4   <u>Indemnification Procedure</u>.  Whenever any claim of the type which would occasion indemnification under Article X hereof is asserted or threatened against any party hereto, that party shall promptly notify the other party hereto.  The notice shall include, if known, the facts constituting the basis for such claim, including, if known, the amount or an estimate of

20

the amount of the liability arising therefrom.  In the event of any claim for indemnification hereunder resulting from or in connection with the claim or legal proceedings of a claimant not a party to this Agreement, the indemnifying party shall have the right, at its option, at its expense and with its own counsel (which counsel shall be reasonably satisfactory to the party seeking indemnification) to assume the defense of any such claim or any litigation resulting from such claim or to participate with its own counsel (which counsel shall be reasonably satisfactory to the indemnified party) in the compromise or defense thereof.  If the indemnifying party undertakes to assume the defense of any such claim or litigation or participate in the compromise thereof, it shall promptly notify the indemnified party of its intention to do so, and, as a condition to the indemnifying party's indemnification obligation, the indemnified party shall cooperate reasonably with the indemnifying party and its counsel (but at the sole expense of the indemnifying party) in the defense against or compromise of any such claim or litigation. Anything in this Section 10.4 to the contrary notwithstanding, the indemnified party shall not compromise or settle any such claim or litigation without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld; provided, however, that if the indemnified party shall have any potential liability with respect to, or may be adversely affected by, such claim or litigation, the indemnifying party shall not settle or compromise such claim or litigation without the prior written consent of the indemnified party.

10.5     Insurance.  From and after the date of this Agreement and at all times that Buyer owns the Receivables, Buyer shall carry and maintain, at Buyer's sole cost and expense, standard commercial general liability insurance, including premises/operations, products, completed operations, personal and advertising liability, including libel and slander, and contractual liability coverages, to afford protection to the limits of not less than ███████████████████ in the aggregate, which requirement may be satisfied if such insurance is maintained by a servicer or by a party to whom Buyer sells or assigns all of the Receivables.  Such insurance shall be effected under a valid enforceable policy (or policies) issued by an insurer of recognized responsibility which is licensed in the States of Connecticut, Georgia, Ohio and New York. Buyer shall, contemporaneously with the execution of this Agreement, furnish to Seller an original certificate evidencing such coverage, which certificate shall state that such insurance may not be changed or canceled without thirty (30) days' prior written notice to Buyer and Seller, and thereafter a certificate of renewal shall be delivered to Seller not less than thirty (30) days prior to the expiration of the original policy or preceding renewal.

## ARTICLE XI
## CONFIDENTIALITY

11.1     General.  All oral and written information about Seller and Buyer, their respective credit card businesses and customers, including Account Holders, and this Agreement (including the Purchase Price) (collectively, the "Records"), are valuable and proprietary assets.  Seller and Buyer (and each of their respective employees and agents) shall treat the Records as strictly confidential and, except as expressly authorized hereunder, will not disclose such Records to any Person or use such Records other than in accordance therewith, provided that Buyer may disclose such Records to any subsequent purchaser or potential purchaser of the Receivables if such purchaser or potential purchaser agrees to the terms of this confidentiality provision in writing, such Records directly relate to the Receivables purchased or proposed to be purchased and such Records are reasonably required by such purchaser or subsequent purchaser to collect

21

or assess the Receivables.  Each party hereto will use its best efforts to ensure that its employees and agents maintain such confidentiality.  Each party hereto will notify the other party hereto immediately upon receiving a subpoena or other legal process about the other party's Records and will cooperate with the other party thereto to comply with or oppose the subpoena or legal process.

     11.2   <u>Limitation</u>.  This Article 11 will not apply to information, documents, and material that are in or enter the public domain other than through a wrongful act or omission of a party hereto.

## ARTICLE XII
## MISCELLANEOUS

     12.1   <u>Notices</u>.  All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, by recognized carrier of overnight mail or prepaid telegram (with messenger delivery specified), or by telecopier (receipt confirmed).  Notice given by registered or certified mail, postage prepaid, shall be deemed to be given for purposes of this Agreement three (3) Business Days after the date sent.  Notice given by recognized carrier of overnight mail shall be deemed to have been given on the second Business Day after delivery thereof to the carrier.  Notice given by personal delivery shall be deemed to be given when delivered.  Notice given by prepaid telegram or telecopier as aforesaid, shall be deemed to be given when sent, if properly addressed to the party to whom sent.  Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this Section 12.1, notices, demands, instructions and other communications shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective telecopier number) indicated below:

if to Seller:          General Electric Capital Corporation
                          4125 Windward Plaza Drive
                          Alpharetta, GA 30005
                          Attn: Manager, Recovery Support & Sales
                          Telecopier Number:  678-518-3116

                          and

                          General Electric Capital Corporation
                          777 Long Ridge Road
                          Stamford, CT  06902-1250
                          Attn:  General Counsel, GE Card Services
                          Telecopier Number:  (203) 961-5149

                          if to Buyer:

Sherman Originator III LLC
c/o Sherman Capital Markets LLC
200 Meeting Street, Suite 206
Charleston, SC  29401
Attn:  Benjamin Navarro

Sherman Financial Group LLC, as guarantor
c/o Sherman Capital Markets LLC
200 Meeting Street, Suite 206
Charleston, SC  29401
Attn:  Benjamin Navarro

Any party hereto may change the person, address or telecopier number to which notice shall be sent by giving written notice of such change to the other party in the manner provided herein.

12.2    Assignment.  Buyer may not assign the Receivables, this Agreement and/or any of its rights or obligations hereunder without Seller's prior written consent, except Buyer may transfer Receivables pursuant to Article VIII hereof.  Seller may freely assign this Agreement and/or its rights and/or obligations hereunder without Buyer's consent.

12.3    Expenses.  Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear their own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.4    Entire Agreement.  Except as set forth in the paragraph 2.13, this Agreement contains the entire agreement and understanding between the parties with regard to the subject matter hereof, and supersedes all prior agreements and understandings relating to the this Agreement.  The parties make no representations or warranties to each other, except as specifically set forth in or specified by this Agreement.  All prior representations and statements, with respect to this Agreement, made by any party or its representatives, whether verbally or in writing, are deemed to have been merged into this Agreement.

12.5    Amendment.  Neither this Agreement nor any of its provisions may be changed, waived or discharged orally.  Any change, waiver or discharge may be effected only by a writing signed by the party against which enforcement of such change, waiver or discharge is sought.

12.6    Governing Law; Severability.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE INTERNAL CONFLICT OF LAWS PROVISION OF SUCH STATE).  THE PARTIES AGREE THAT ANY LEGAL ACTIONS AMONG BUYER AND SELLER REGARDING THIS AGREEMENT OR THE RECEIVABLES SHALL BE BROUGHT IN THE STATE OR FEDERAL COURTS IN THE STATE OF NEW YORK AND EACH OF THE PARTIES THEREBY CONSENTS TO THE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION AND WAIVES ANY OBJECTION TO VENUE LAID THEREIN.  Process in any such action

may be served upon any party in the manner provided for giving of notices to it herein.  If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceable, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without this invalid, illegal or unenforceable provision.

12.7   <u>Waivers, Etc</u>.  No waiver of any single breach or default of this Agreement shall be deemed a waiver of any other breach or default of this Agreement.  All rights and remedies, either under this Agreement or by law or otherwise afforded to a party, will be cumulative and not alternative.

12.8   <u>Remedies</u>.  If either party hereto does not pay the full amount due and owing to the other party under this Agreement or if a party otherwise is in default under this Agreement, such party shall pay to the other party, notwithstanding any other rights and remedies available to Seller by law or under this Agreement, for such party's damages resulting from the other party's failure to comply with the terms of this Agreement, all of said party's reasonable expenses, including attorneys' fees to enforce this Agreement.

12.9   <u>Survival</u>.  Except as otherwise expressly provided herein, all the representations, warranties, terms and covenants of the parties hereto, including but not limited to indemnifications, shall survive the sale of the Receivables from Seller to Buyer.

12.10   <u>Headings</u>.  Paragraph headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

12.11   <u>Counterparts</u>.  This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.  A copy of an executed signature page to this Agreement delivered by either party hereto via telecopy shall be deemed effective on the date of such delivery.

12.12   <u>Offsets</u>.  Any payment required to by made by any party to the other party may be offset by any payment required to be made by the second party to the first party.

12.13   <u>Retained Claims</u>.  Buyer and Seller agree that the sale of the Receivables pursuant to this Agreement shall exclude the transfer to Buyer of any and all claims and/or causes of action Seller has or may have against: (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by Seller, underwriters or any other similar Person or Persons who have caused a loss to Seller in connection with the initiation, origination or administration of any of the Receivables, (b) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of any of the Receivables, or (c) any other party from whom Seller has contracted services in respect of the Receivables.

12.15   <u>Guaranty by Sherman.</u>  Sherman shall guaranty all of the Buyer's obligations under this Agreement, including  the indemnification obligations under Article X.  In the event Buyer fails to perform, Sherman shall be jointly and severally liable for all obligations, without any requirement for present or notice, other than as specifically required under the terms of this Agreement.  Any notice provided to Buyer shall be deemed to have been provided to Sherman and shall have the same force and effect.

24

## EXHIBIT A1

### Purchase Price Reconciliation/Funding Instructions

Date

TO:

Pursuant to the RECEIVABLES PURCHASE AGREEMENT(s), dated this _____ day of _____ by and between General Electric Capital Corporation, a New York corporation, Montgomery Ward Credit Corporation, a Delaware corporation and Monogram Credit Card Bank of Georgia, a Georgia state-chartered bank (collectively "Seller"), on the one hand, and _____ (collectively "Buyer") the following funding instructions are submitted for payment.

| Portfolio | Private Label | Oil & Gas | FD | MWC |
|---|---|---|---|---|
| GE Batch #: | | | | |
| Forwarding # | | | | |
| Total Number of Accounts | | | | |
| Outstanding Balances on Transfer Date: | | | | |
| Cut-Off Date | | | | |
| Purchase Price Factor | | | | |
| Purchase Price | | | | |
| 0%  Holdout | | | | |
| Amount of Wire transfer | | | | |
| Date of Transfer: | | | | |
| Bank: | | | | |
| ABA No. | | | | |
| Account No: | | | | |
| Account Holder: | | | | |

## EXHIBIT B

### Media Availability

| Private Label/ Core Accounts | Montgomery Wards/ Lechmere |
|---|---|
| Applications kept for 2years from date opened. | Applications possibly available from 1995 forward. |
| Sale slips kept from 6months to 2 years from purchased date. | No applications filmed/available during or between 06/95-12/95. |
| Statements available from 01/95 forward. | Sale slips kept from 6months to 2 years from purchased date. |
| | Statements available from 01/95 forward. |

**Note: No media available from closed stores.**

| Return Media to: | Last name | | First Name | |
|---|---|---|---|---|
| | Acct # | Balance | Forwarding # | Batch # |
| | Date requested: | First Request ☐ | Second Request ☐ | |

Portfolio:

Private Label ☐      Montgomery Ward ☐      Exxon ☐      Commercial ☐

☐ Application (signed)

☐ Sales Slip
    Specific Charge: _____

☐ Statement
    ☐ Date Range _____ to _____
    ☐ Last Payment
    ☐ Statement indicating balance placed

☐ Transcript

☐ Other (i.e. payment history-specific date)
_____
_____
_____
_____

28

## Exhibit C
## NON-CONFORMING RECEIVABLE BUYBACK LAYOUT

| Portf Code 2 Bytes | Trans Code 4 Bytes | Record Description | Field Layout & Byte Size Up to 200 Bytes A/N Data |
|---|---|---|---|
| | 0001 | Header Record | Sequence # (5, 0) Sale Batch # (5,0) Total Number of Records(excluding header record(6,0) Date (8,0) |
| | 0415 | Bankruptcy | Batch # (5, 0) Acct# (15) First Name (20) First Name (20) Last Name (20) Case # (15) Chap.#(2,0) Sale Balance(9,2) Buyer Pmt Rcvd (9,2) Buyer Pmt Rovd (9,2) GE Pmts Recd (9,2) |
| | 0417 | Deceased | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Date of Death(8,0) Sale Balance (9,2) Buyer pmts recd (9,2) GE pmts recd (9,2) |
| | 0424 | Payment Trans Detail | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Gross Amnt (8,0) Payment Date (8, 0) |
| | 0425 | Judgement | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Judgement (8,0) Case (12) Sale Balance (9,2) Buyer pmts Recd (9,2) GE Pmts Recd(9,2) |
| | 0426 | Fraud | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Sale Balance(9,2) Buyer pmts Recd (9,2) GE Pmts Recd(9,2) |
| | 0427 | Settled / Paid in Full | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Pmt Amt (9,2) Sale Balance (9,2) Buyer pmts Recd (9,2) GE pmts recd (9,2) |
| | 0428 | Other | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (12) Sale Balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0429 | GE Requested Buyback | Batch # (5, 0), Acct# (15), First Name (20), First Name (12), Current Balance (9, 2), Date Reqd (8, 0) Reason code (4) Sale Balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0431 | Chap. 13 conv to Chap 7 | Batch # (5, 0), Acct# (15), Last Name (20), First Name (12), Current Balance (9, 2) Date Converted (8, 0) Case# (15) Chap.# (2,0) Sale balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0432 | Chap13 to no record found | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (9, 2) Date Reviewed (8, 0) Case# (15) Chap.# (2,0) Sale Balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0433 | Chap.13 dismissed | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (9, 2) Date Dismissed (8, 0) Case# (15) Chap#(2,0) Sale Balance (9,2) Buyer pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0434 | Chap13 discharged | Batch # (5, 0), Acct# (15), Last Name (20), First Name (12), Current Balance (9, 2), Date Discharged (8, 0), Case#(15) Chap# (2,0) Sale Balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0435 | Chap. 7 conv to Chap. 13 | Batch # (5, 0) Acct# (15) Last Name (20), First Name (12), Current Balance (9, 2) Date Converted (8, 0) Case#(15) Chap.# ( 2,0) Sale Balance (9,2) Buyer Pmts Recd ( 2,0) GE Pmts Recd (9,2) |
| | 0436 | Chap. 7 no record found | Batch # (5, 0) Acct# (15) Last Name (20), First Name (12), Current Balance (9, 2), Date Reviewed (8, 0) Case# (15) Chap.# (2,0) Sale Balance (9,2) Buyer Pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0437 | Chap. 7 dismissed | Batch # (5, 0), Acct# (15), Last Name (20), First Name (12), Current Balance (9, 2), Date dismissed ( 8,0) Case# (15) Chap# (2,0) Sale Balance (9,2) Buyer pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0438 | Chap. 7 discharged | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (9, 2) Date Discharged(8,0) Case#(15) Chap# (2,0) Sale Balance (9,2) Buyer pmts Recd (9,2) GE Pmts Recd (9,2) |
| | 0439 | Bar Date -- Returned | Batch # (5, 0) Acct# (15) Last Name (20) First Name (12) Current Balance (9, 2) Bar date (8, 0) Case# (15) Chap.# (2,0) Sale Balance (9,2) Buyer Pmts Recd ( 9,2) GE Pmts Recd (9,2) |

29

## Exhibit C (cont)

| Legend | Field Definitions | | Request Reason Codes(0429) | | | |
|---|---|---|---|---|---|---|
| Portfolio Codes | Buyback | Masterfile | 0415 | Bankruptcy | 0433 | Chap 13 dismissed |
| CM = Commercial Line discharged | Acct# | AACCT# | 0417 | Deceased | 0434 | Bankruptcy |
| EX = Oil and Gas Chap. 13 | Last Name | ALNAM | 0425 | Judgement | 0435 | Chap. 7 converted to |
| XC = External (none of the above) found | First Name | AFMNAM | 0426 | Fraud | 0436 | Chap. 7 no record |
| MB = Monogram Bank | | | 0427 | Settled/Paid | 0437 | Chap. 7 dismissed |
| MW = Montgomery Ward to Chap. 11 | | | 0428 | Other | 0438 | Chap. 13 converted |
| PL = Private Label (RFSNA) | | | 0431 | Chap.13 converted to Chap. 7 | 0439 | Late Referral |
| (See following page for notes) | | | 0432 | Chap. 13 no record found | | |

**Notes:**
**1. File Transfer Format: Fixed Format Text File; 31/2 "Diskette, CD ROM, or Electronic**
2. Each sales batch should be retained and included with each buyback request
3. All numeric fields should be 0 filled, right justified with no editing (i.e. no commas, decimal points, or currency symbols)
4. Current Balance is balance at time of sale less any payments received by buyer
5. Value within ( ) = total bytes
6. Trans code 0424 – Only direct payments to buyer (not direct payments to GE Capital)
7. All 8 byte fields use Century Year Month Day with no editing (i.e. 4/16/98 should be 19980416)
8. Trans code 0425 -- Case # and/or Judgment Date acceptable
9. Trans Code 0427 – Pmt/Settled and/or Pmt amount acceptable
10. Buyer is responsible for all damages caused by transfer if computer virus
11. Hardcopy (paper) format is NOT acceptable
12. Each buyback file should include a 0001 header record
13. A unique sequence number should be sent with each buyback
**14. If buyer has received any direct payments on accounts being returned, a 0424 a payment transaction detail record for each payment should be**
   **included immediately following the applicable returned account record.**

## EXHIBIT D

1.      Buyer and all subsequent buyers shall run a Dun & Bradstreet check on all prospective purchasers ("Prospective Purchasers") from Buyer or subsequent buyers of all or part of the Receivables to ensure that no material negative information is reported with respect to such Prospective Purchasers.

2.      Buyer and all subsequent buyers shall ensure that Prospective Purchasers that are not attorneys are members in good standing in the American Collectors Association.

3.      Buyer and all subsequent buyers shall ensure that Prospective Purchasers that are attorneys are members in good standing in their respective state bar associations.

4.      Buyer and all subsequent buyers shall check all references with respect to integrity, reliability and lawfulness of business practices of Prospective Purchasers with whom they have not already developed a trusting relationship in the sale of receivables to ensure that no negative information is given with respect to such Prospective Purchasers.

5.      Buyer and all subsequent buyers shall check with the Better Business Bureau to ensure that there is no substantial number of complaints or any material complaints regarding the Prospective Purchaser.

6.      Buyer and all subsequent buyers shall check with the Prospective Purchaser's complaint and litigation logs to ensure that there is no substantial number of complaints / actions or any material litigation regarding the Prospective Purchaser indicating material failures to comply with any applicable Law.

Last run                          11/19/2009 13:25
Run by                            Admin
Subtitle                          13898: GE Capital / GE - Cease & Desist Bid (SFG) (Balance = "Current Balance")
Criteria                          (PortfolioID = 13898)
Data as-of                        11/19/2009
13898: GE Capital / GE - Cease & Desist Bid (SFG) (Balance = "Current Balance")
**Summary Sheet**                                                          11/19/2009 1:25 PM

## GE CAPITAL SELLER SURVEY
### (Cease & Desist Attorney Non Judgment Accounts – November 2009)

## Account History

1. What types of accounts are these (credit card, consumer loans, auto deficiencies, etc.)?

   **Cease & Desist Credit Card Accounts placed with Attorneys with No Judgment filed.**

2. Are credit scores at time of origination available?

   **N/A**

3. Regarding the subject file, please complete all applicable agency status categories:

   **Current Balance**

   | | | |
   |---|---|---|
   | [  ] | Internal collection effort only | _____ |
   | [  ] | Primary recalls | _____ |
   | [  ] | Secondary recalls | _____ |
   | [  ] | Tertiary or beyond | _____ |
   | [  ] | Complete life cycle | _____ |

   **The receivables that we are selling are all Attorney Placement Recalls**

4. Was your institution the original issuer for the accounts?  **Yes**

5. How were the accounts originally solicited (telemarketing, mailers, etc.)?

   **Various methods, primarily walk-in or promotion driven**

6. What credit ranking did these accounts receive at origination (A, B, C, D with D being Subprime)?

   **N/A**

7.  What guidelines had to be met for credit approval?

    **Internal risk approved guidelines**

8.  **Prior to charge-off w**hat collection efforts were made on the accounts:
    Mass settlement letters:        **No**
    Used third party collection agencies:    **Yes**
    Billing & collecting by mail:    **Yes**

    Please describe in detail and include a description of internal collection practices.

9.  What was the approximate weighted average interest charged (%) on the accounts prior to charge-off?

    **18%-22%**

10. What was the charge-off policy governing these accounts?

    **180 Days**

11. **After charge-off**, what internal collection efforts were made prior to collection agency placement?  Please describe in detail.

    **None**

## Agency Information

12. How many collection agencies have these accounts been placed with and how long at each agency?

    **The attorney firm only.**

13. Do the data fields include the name of collection agency(s) previously assigned to the files? If no, please list the agency(s) that have worked the files prior to sale.

    **N/A**

14. What was the approximate ratio of collectors to accounts at each agency?

    **N/A**

15. Were agencies given settlement guidelines?  If so please describe.

    **N/A**

16. Did the agencies send out any settlement letters?  If Yes, please describe.

    **On a one-off basis**

17. Were the accounts assigned for legal action during either internal collection efforts or at any agency level?

    **Yes, but no judgment was filed.**

18. Have all accounts that were with agencies/attorneys been recalled?

    **Inventory recalled and sitting idle for approximately 12-14 months with no activity.**

19. What was the recall date of the accounts?

    **Accounts recalled approximately 7 days ago.**

20. Are any accounts subject to contingency/other fees from prior agencies or attorneys?

    **No**

## Post-agency Information

21. What internal collection efforts were made after each recall?  Please describe in detail.

    **N/A**

## General Information

22. In identifying the accounts for sale, what criteria was assigned to generate the pool (ie. credit score, liquidation rate, no-pays, etc.)?

    **Attorney No Judgment Receivables with No Payment within the last 12 Months.**

23. Is there any type of re-aging policy that applies to these accounts?  If yes, please describe.

    **Reaging Policy is consistent with the law.**

24. Are you willing to repurchase or replace accounts sold that, prior to closing date, were documented bankrupt, fraud, deceased or otherwise legally uncollectible?  Do you have the capability of identifying these accounts prior to the sale date?

**Will repurchase based on terms of Receivable Purchase Agreement**

25. Are you willing to repurchase or replace accounts which are aged beyond the statute of limitations?

   **Out of Statute accounts are excluded from this sale.**

26. Regarding the Balance being sold:
   What is the name of the field being used for the Sales balance:
   **ACBal +(ABL1 through ABL5)**

   Does this field include post charge-off interest and late fees?          **No**

27. Can you supply any cash flow history post charge-off?

   **Yes**

28. Have these accounts been scored since charge-off?

   **N /A**

29. How are these accounts currently reported to the credit bureaus?

   **R9**

30. Which credit bureaus are these accounts reported to?

   **All major Credit bureaus**

31. Once sold, how will you be reporting these accounts to the credit bureaus?

   **We will report them as sold and change the balance to zero.**

32. Are co-makers reported to the credit bureaus?

   **N/A**

33. Our bidding pool expects supporting documentation to be accessible as governed by the Purchase and Sale Contract.  What percentages of each of the following are available in the file.  Estimate the time frame(s) needed to retrieve and the desired duration of servicing such documentation:

   _____  Written applications                    _____  Charge slips

   _____  Other applications                       _____  Correspondence

   _____  Statement of account                   _____  Loan agreement

_____ Payment histories                    _____ Other (please explain)

What is your charge for documentation?

**See contract**


34. Are you agreeable to marketing the portfolio in geographic regions and/or individual states?

   **Yes**

35. Is resale permitted?

   **Yes**

36. Does the cardholder agreement applicable to this portfolio have a mandatory arbitration clause?

   **It may**

   - Can you supply a sample of loan agreements and/or credit applications used in this portfolio?  If so, please overnight hard copies of the agreements; they will be included in the Bid Information Package.

   **N/A**